UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT SMYTH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 24-cv-10497-ADB |
| | * | |
| LELAND DUDEK, | * | |
| | * | |
| Acting Commissioner of the Social Security Administration, | * | |
| | * | |
| Defendant. | | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

   Plaintiff Robert Smyth ("Plaintiff") brings this action pursuant to § 405(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of the

Social Security Administration (the "Commissioner") denying Plaintiff's August 9, 2010 claims

for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income

("SSI").[1]  Currently pending are Plaintiff's motion to reverse the administrative law judge's

("ALJ") December 27, 2023 decision, [ECF No. 12], and the Commissioner's cross-motion to

---

[1] Leland Dudek is substituted as defendant in this case in his official capacity as Acting
Commissioner of the Social Security Administration.  *See* Fed. R. Civ. P. 25(d).

affirm the ALJ's decision denying SSI benefits, [ECF No. 18].[2]  For the reasons set forth below,

Plaintiff's motion is **<u>GRANTED</u>**, and the Commissioner's motion to affirm is **<u>DENIED</u>**.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework:  Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering

both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent[,] aged and disabled."  *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

The Social Security Act (or the "Act") provides that an individual shall be considered to

be "disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can
> be expected to result in death or which has lasted or can be expected
> to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); *see also id.* § 423(d)(1)(A).  The disability must be severe, such that

the claimant is unable to do his or her previous work or any other substantial gainful activity that

exists in the national economy.  *See* 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination
> may be concluded at any step along the process.  The steps are: 1) if
> the applicant is engaged in substantial gainful work activity, the
> application is denied; 2) if the applicant does not have, or has not

---

[2] Plaintiff filed a reply, but the Commissioner did not file a sur-reply responding to the
arguments contained in Plaintiff's reply.  *See* [ECF Nos. 4, 22].

had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" [RFC] is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

Plaintiff has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *See Flaherty v. Astrue*, No. 11-cv-11156, 2013 WL 4784419, at *8–9 (D. Mass. Sept. 5, 2013). At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that Plaintiff can perform notwithstanding his or her restrictions and limitations. *See Goodermote v. Sec'y of Health & Hum. Servs.*, 690 F.2d 5, 7 (1st Cir. 1982).

## B.    Preliminary Issues

Prior to its discussion of the relevant factual and procedural background, the Court notes the existence of two repeating issues, namely the relevant periods associated with Plaintiff's SSI and DIB claims, and the impact of Plaintiff's incarceration on his benefit eligibility. Although both of these issues are addressed in more detail in the discussion section below, for clarity, the Court now notes the following:

First, the relevant periods differ for SSI and DIB claims. For DIB claims, the relevant period typically runs from a claimant's alleged onset date through the claimant's date last insured ("DLI"), which constitutes the outer limits on the DIB relevant period. *See* 20 C.F.R. §§ 404.101(a), 404.131(a); *Monette v. Astrue*, 269 F. App'x 109, 111 (2d Cir. 2008) (noting that claimant was "eligible to receive disability insurance benefits . . . only if, he [could] demonstrate

disability, i.e., the inability to perform gainful employment, before [his DLI]").  By contrast, the relevant period for SSI benefits typically runs from the date of filing of the application through the ALJ's decision date.  *See* 20 C.F.R. § 416.335 (SSI benefits are not retroactive to the date of disability onset but are payable one month following the month in which the application was filed, which, in this case, would have been September 2020).

Here, the currently relevant DIB and SSI periods on Plaintiff's 2010 claims are quite limited and distinct.  The relevant period for Plaintiff's DIB claim appears to have been from April 2, 2009, through Plaintiff's March 31, 2010 DLI.  That is because the earliest allowable onset date for Plaintiff's 2010 DIB claim in this case was not, in fact, Plaintiff's alleged onset date.  Rather, it was April 2, 2009 — the day after the SSA denied Plaintiff's prior 2009 SSI and DIB claims at the administrative level — given that the ALJ declined to reopen the 2009 claims. *See* Tr. 13, 1815–17 (April 1, 2009 notice of disapproved claim); *id.* at 1739, 1833.[3]  Plaintiff's March 31, 2010 DLI provided the outer limit on the DIB relevant period.  *See id.* at 1836.

By contrast, the relevant period for Plaintiff's SSI claim appears to have been from Plaintiff's August 9, 2010 filing date through February 5, 2012.  The outer limit on Plaintiff's 2010 SSI claim was not the date of the ALJ decision, but instead the date was established by the DDS award of benefits on Plaintiff's successive 2012 SSI claim (discussed in more detail with the procedural history below) effective February 6, 2012.

Accordingly, based on the above, there would have been a gap between the relevant DIB and SSI periods from March through August 2010.

_____

[3] References to the Administrative Record, which was filed electronically at ECF No. 9, are cited as "Tr.___."

Second, Plaintiff appears to have been incarcerated during at least one of the relevant periods in this case. A claimant is, however, ineligible to receive benefits for any month during which he was in prison for conviction of a felony. *See* 20 C.F.R. § 404.468(a) ("No monthly benefits will be paid to any individual for any month any part of which the individual is confined in a jail, prison, or other penal institution or correctional facility for conviction of a felony."); *id.* §§ 416.211, 416.1332, 416.1335 (same); *see also* No Social Security Benefits for Prisoners Act of 2009, Pub. L. No. 111-115, 123 Stat. 3029 (2009); *accord Muldoon v. Astrue*, 590 F. Supp. 2d 188, 191 (D. Mass. 2008).

The Court has addressed these two issues in more detail below in the discussion section of this Order.

### C.    Factual Background

Plaintiff, who is currently fifty-eight years old, was forty-two years old at the time of his April 2, 2009 onset date. Tr. 473. Plaintiff attended and graduated from a vocational high school for automobile mechanics. *Id.* at 191, 473. He subsequently worked for multiple employers as an auto mechanic until he last worked in 2005, with his longest period of continuous employment being approximately five years. *Id.* at 43, 1621, 1626, 191.

Plaintiff reported to an examining psychologist that, through 2005, he had "been fired from or quit [approximately twelve] jobs due to issues with depression, anxiety, mood swings, and anger." Tr. 1621. Plaintiff repeatedly testified throughout the multiple hearings in this case that he "loved" his work but that he was unable to work beginning in February 2005 due to his recurring panic attacks, anxiety, and depression. *Id.* at 44, 1894–96, 44–46, 56–57, 61–63, 197– 203, 228–235, 677, 681–82, 685–92, 1006–08, 1017–19, 1905–09. Plaintiff testified, among other things, that his mental impairments led to rage and angry outbursts at his workplace(s),

5

resulting in multiple altercations with coworkers, including at least one serious assault on a coworker. *Id.* at 698–700, 1905–09.

Plaintiff has suffered from mental health and substance abuse issues dating back to high school. Tr. 1621, 1157. He reported first using marijuana at age eighteen, after which he progressed to cocaine for ten years, crystal methamphetamine for ten years, and then to oxycontin. *Id.* at 407. Plaintiff was also homeless off and on beginning in 2005. *Id.* at 1008–09.

In 2008, prior to the commencement of the April 2009 relevant period, Plaintiff began substance abuse rehabilitation at the South Bay Mental Health Center. Tr. 406-07, 1621. Plaintiff admitted that, while in the early stages of recovery, he "started breaking into houses to get money for drug use." *Id.* at 1621–22. Plaintiff reported that he stopped using drugs in 2008. *Id.* at 406, 1621.

From 2008 through 2017 — a time period that encompasses the entire relevant period in this case — when he was not homeless, Plaintiff resided in jail, a correctional facility, a halfway house, and a supportive group home. Tr. 13, 46, 643 n.1, 1910, 1308, 371, 1837, 405, 427, 481, 406–07, 1010–14, 1006, 1021.

Throughout this case, there has been confusion regarding the precise dates of Plaintiff's incarceration. Initially, in the first January 2012 decision, the ALJ found that Plaintiff was incarcerated from 2008–2010. Tr. 13, 643 n.1. Plaintiff's counsel, however, clarified at the most recent July 2023 hearing that Plaintiff was initially incarcerated following a conviction on felony larceny charges in 2008, but he was released in December 2008. *Id.* at 1910. Counsel noted that following his December 2008 release, Plaintiff was subsequently reincarcerated in March 2009 after he reoffended, and he remained incarcerated until "somewhere around June . . . 2010." *Id.*;

*see also id.* at 168, 371, 1308 (ALJ Klibaner's October 2020 decision, citing in part to "Parole Board Cert. of Discharge in the D section of the e-file").[4]

During his incarceration from March 18, 2009, through July 2010, Plaintiff resided at the Plymouth County Correctional Facility ("Plymouth").  Tr. 371, 406–07, 1300, 1308, 1842. While at Plymouth, Plaintiff received mental health treatment.  *Id.* at 1622, 326–97.

Upon his July 2010 release, Plaintiff was discharged to the North Cottage Rehabilitation Center halfway house, where he resided until approximately April 2011.  *See* Tr. 1837, 407, 643 n.1, 405-07, 427, 481, 520.  Plaintiff testified at his 2017 hearing that he stayed at the halfway house "well past the time he had to be there" because it was "the first time in a . . . long time" that he "had actual[] professional[s] help[ing and] trying to get [him] squared away."  *Id.* at 1009–10.

At the 2017 hearing, Plaintiff testified that his time at the halfway house in 2010 was "amazing" because of its "good structure" and the "people that pointed [him] in the right direction," including the halfway house's "team of physicians, psychiatrists, [and] therapists."[5] Tr. 1013.  He also testified that his time at the halfway house "probably saved [his] life" and that he was still in touch with people he met there.  *Id.* at 1013–14.  Plaintiff explained that he nevertheless continued to have some "bad days" while living at the halfway house.  *Id.* at 1011. He reluctantly moved out of the halfway house in or around April 2011.  *Id.* at 520, 1013-14.

---

[4] The Court does not appear to have a copy of the Parole Board document relied on by ALJ Klibaner in its administrative record.

[5] As more fully discussed herein but listed here for clarity, there have been six ALJ hearings to date, including the 2017 hearing.  *See* Tr. 36-72 (December 1, 2011 hearing), 665-710 (December 18, 2014 hearing), 997-1037 (July 7, 2017 hearing), 1164-94 (September 17, 2020 hearing), 1735-57 (January 5, 2022 hearing), 1883-1936 (July 31, 2023 hearing).

After leaving the halfway house, Plaintiff again experienced intermittent homelessness during portions of the relevant period in 2011 and 2012. *See, e.g.*, Tr. 764, 1006. Plaintiff also repeatedly reported that, during this time, he "lost" his mental health provider, and he was unable to continue with mental health treatment due to a lack of transportation and his inability to afford care. *Id.* at 626, 945–46, 773, 762, 950, 953, 1021.

Sometime around 2012, Plaintiff moved into a supportive group home, where he resided for at least five years, through the time of the July 2017 hearing.[6] *See* Tr. 1006 (Plaintiff's testimony). Plaintiff stated that the group home "play[ed] a pretty big role" in his functioning and that he attended several meetings each week with others who had "been through the same kind of stuff that [he] ha[d] been through." *Id.* at 1022. He noted that other people at the home helped him out with routine activities like grocery shopping and that they "kind of guide[d] [him] in the right direction." *Id.* at 1023. Plaintiff testified at his 2017 hearing that he did not know "what would [have] happen[ed]" had he been on his own and not in the group home. *Id.*

### D. Procedural History

The lengthy procedural history of this case spans almost fifteen years. It involves both prior and successive SSI and DIB applications, six hearings and six decisions before four different ALJs, five prior judicial appeals before five different judges, and multiple Appeals Council remand orders.[7] In nearly all of the prior ALJ proceedings, the respective ALJ repeated

---

[6] Plaintiff testified that, by that point, he was receiving SSI benefits on his 2012 claim. Tr. 1021. As a result of the 2012 SSI benefits, Plaintiff noted that he also had health insurance. *Id.* He testified, though, that "all [his] money pretty much [went] to . . . rent." *Id.*

[7] In all but one of the five appeals before the Court, the Commissioner moved for remand, Plaintiff stipulated to remand, and the Court remanded for rehearing and additional proceedings before an ALJ. In the first appeal before Judge Judith Dien, however, 13-10317 JGD, Plaintiff

many of the same errors as their predecessor ALJs, some of which are currently at issue in the

instant appeal of ALJ Ross' 2023 decision.[8]

---

contested the Commissioner's motion to remand. *See* No. 13-cv-10317-JGD, [ECF No. 30]. Plaintiff contended that any remand should be limited solely to his 2010 claims, and that there should be no reopening of the DDS October 2012 determination that he was disabled on his successive 2012 application. *Id.* It is not entirely clear from the record in that case, but the Commissioner appears to have opposed limiting proceedings on remand to the 2010 claims. *Id.* [ECF No. 33].

Judge Dien held a hearing on the Commissioner's motion to remand, after which she ordered that remand be limited to the 2010 claims, as requested by Plaintiff. No. 13-cv-10317-JGD, [ECF No. 37]; *see also* Tr. 716–17. There are no hearing transcripts from Judge Dien's hearing. *See* 13-cv-10317-JGD, [ECF No. 39]. In subsequent appeals before the Court, the parties appear to have stipulated that the remand proceedings would continue to be limited to Plaintiff's 2010 applications. *See* Tr. 1281, 1729–30.

[8] As documented by the Appeals Council's remand orders, during the six rounds of ALJ proceedings, the respective ALJs repeated several of the same errors in multiple decisions, including: (1) the ALJs' failure to adequately evaluate Plaintiff's diagnosed antisocial personality disorder, Tr. 716, 751, 1232, 1286; (2) the ALJs' failure to adequately evaluate Dr. Keuthen's and Dr. Fierman's 2010 opinions, including evaluation of the "vocational relevance" of the functional limitations opined to by Dr. Keuthen, and the ALJ's corresponding assessment of Plaintiff's RFC and the VE testimony regarding Dr. Keuthen's opined limitations, *id.* at 716, 752, 1228, 1231–32, 1285, 1942–43; (3) the ALJs' failure to properly consider and/or determine the relevant DIB and SSI periods at issue with Plaintiff's 2010 claims, *id.* at 1281–82, 1286, 1943–43; and (4) the ALJs' failure to adequately consider whether Plaintiff's prior 2009 SSI and DIB applications should be reopened, *id.* at 1286, 1760–61. The first three of these repeating errors are currently at issue in this appeal of ALJ Ross' decision.

In addition to the above four issues, on numerous occasions, prior ALJs also overlooked and/or failed to consider and/or specify the weight afforded to the medical opinions in assessing Plaintiff's RFC at step four. *See, e.g.*, Tr. 655–56 (ALJ Fulton's failure to state the weight he afforded Dr. Powers' 2012 opinion in his March 2015 decision). Notably, during rounds four and five of the proceedings, ALJ Klibaner failed to mention, let alone evaluate, Drs. Horton's and Shestopal's 2012 opinions or ME, Dr. Griffin's 2020 opinion in either of his 2020 or 2022 decisions. *See id.* at 1307–08, 1714–15, 1700–26.

While ALJ Ross, in the 2023 decision at issue, evaluated the above three opinions mistakenly ignored by ALJ Klibaner in the preceding two rounds, as discussed below, ALJ Ross' findings regarding Dr. Shestopal's opinion nevertheless ignored the Appeals Council's instructions in its immediately prior February 2023 remand order. *See* Tr. 1859–60 , 1863-64 (ALJ Ross' finding

The Commissioner refers to the lengthy procedural history as a "smokescreen," characterizing it as *Plaintiff's* "numerous bites at the apple."  [ECF No. 19 at 1].  He further suggests that the multiple proceedings were the result of the SSA's attempt to "ensure that Plaintiff's claim was fairly decided" — as opposed to multiple, repeated errors.  [*Id.*].  Finally, the Commissioner characterizes ALJ Ross' 2023 decision as a "fresh weighing of the evidence," asserting that prior proceedings "ha[ve] no bearing on the decision at hand."  [*Id.* at 25–26].  The Commissioner thus asks the Court to strictly limit its review to the sixth ALJ decision in this case from ALJ Ross, noting that ALJ Ross supplemented the record with additional evidence. *See* [*id.* at 25].

While the Court agrees that it is currently ALJ Ross' December 2023 decision at issue on appeal, it disagrees that the prior proceedings have "no bearing" on its adjudication of the issues currently on appeal.  *See* [ECF No. 19 at 25].  The Court declines to decide this case in a vacuum, and it has considered the entire record, as relevant, in adjudicating this appeal.

Notably, both the law of the case doctrine and the rule of mandate or "mandate rule," which the First Circuit has recently designated as a sub-"branch" of the doctrine, apply in social security appeals.[9]  *United States v. Cheveres-Morales*, 83 F.4th 34, 40 (1st Cir. 2023) (describing

---

that Dr. Shestopal's 2012 opinion was, in part, entitled to "no weight" because it did not adequately pertain to the "relevant period for the purposes of [ALJ Ross'] decision"); *cf. id.* at 1943 (Appeals Council's finding that "Dr. Shestopal's opinion addressed the relevant period at issue").

[9] "The law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Cheveres-Morales*, 83 F.4th at 40 (quoting *Arizona v. California,* 460 U.S. 605, 618 (1983)).  "The mandate rule . . . 'prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case.'"  *Id.* (quoting *United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004)).  "[T]he other branch of the doctrine 'contemplates that a

doctrine and sub-branches)*; Day v. Astrue*, No. 1:12-cv-141-DBH, 2012 WL 6913439, at *4–9 (D. Me. Dec. 30, 2012), *aff'd*, No. 1:12-cv-141-DBH, 2013 WL 214571 (D. Me. Jan. 18, 2013) (applying the doctrines in social security appeals, and discussing *United States v. Rivera–Martinez*, 931 F.2d 148, 151 (1st Cir. 1991) (explaining that "[i]n terms of the dynamics between trial and appellate courts, the phrase 'law of the case' signifies, in broad outline, that a decision of an appellate tribunal on a particular issue, unless vacated or set aside, governs the issue during all subsequent stages of the litigation. . . and thereafter on any further appeal")) (holding that law of the case and the rule of mandate apply in social security appeals); *Santiago v. O'Malley,* No. 2210360-DJC, 2024 WL 1258563, at *7 (D. Mass. Mar. 25, 2024) (noting that "[b]y analogy to the relationship between a district court and an appellate court, district courts have applied the mandate rule in the context of SSA appeals"); *Furey v. Saul*, 501 F. Supp. 3d 29, 50 (D. Mass. 2020) (holding that ALJ on remand violated rule of mandate where he failed to undertake analysis expressly required by remand order); *accord Colon v. Saul ("Colon I")*, 463 F. Supp. 3d 66, 72–73 (D. Mass. 2020) (similar); *see also* [ECF No. 12 at 20].  The application of the law of the case doctrine and the rule of mandate here further requires the Court to view the case and its procedural history more broadly than the Commissioner requests.

The Court, however, acknowledges that neither the law of the case doctrine nor the mandate rule applies when the evidence on remand is "substantially different."  *See Day*, 2012 WL 6913439, at *6–9 (discussing *Rivera-Martinez*, 931 F.2d at 151) (First Circuit noted that it "agree[d] with the Fifth Circuit that issues, once decided, should not be reopened unless the

---

legal decision made at one stage of a criminal or civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court.'"  *Id.*

evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice")).  Here, though, the evidence before ALJ Ross was "substantially similar" to the evidence before the prior ALJs; and, as noted, ALJ Ross even repeated several of the same errors in evaluating the same medical opinions and evidence.  *See Day*, 2012 WL 6913439, at *6-9 (rejecting Commissioner's argument that new evidence on remand foreclosed application of law of the case where the evidence on remand was "substantially similar" to the evidence previously before the ALJ).

Notably, the relevant period at issue here consisted of a closed, rather short period of time, which ended in February 2012.  Moreover, as discussed below, Plaintiff's last treatment record is from October 2011.  *See* Tr. 621–28.  Contrary to the Commissioner's suggestion otherwise, the additional 2023 *retrospective* opinion from medical expert ("ME"), Dr. Boxer, as detailed and discussed below, did not itself render the evidence before ALJ Ross "substantially different" from that of prior proceedings.[10]  *See Day*, 2012 WL 6913439, at *6–9; [ECF No. 19 at 1].  Nor did the addition of Dr. Boxer's testimony excuse ALJ Ross' compliance with the Appeals Council's prior findings and directives.

––––––––––––––––––––––––––––

[10] As noted, significantly, the relevant period ended on February 2012 — nearly *twelve* years prior to ALJ Ross' December 2023 decision.  Additionally, as explained in the Relevant Medical Evidence section below, the majority of Plaintiff's sporadic mental health treatment took place prior to March 30, 2011, with the exception of one treatment record from October 2011, which itself does not conflict with the other medical evidence from the relevant period.  *See* Tr. 621–26.  Accordingly, the medical treatment evidence underlying the subsequent 2017–2023 remote, retrospective medical opinions detailed below was, in fact, no different before ALJ Ross than it was before his predecessor ALJs.

Where the law of the case doctrine and/or the rule of mandate apply to issues currently before the Court, the Court has addressed them in the discussion section below.

Understandably, the Commissioner seeks to minimize the role of the procedural history in this case given that careful review of the record reveals a different story than the one he paints. Such review demonstrates that the lengthy procedural history was necessitated not so much by Plaintiff's "numerous bites at the apple" but instead largely by multiple ALJs' repeated failures to comply with remand orders.

No doubt, the various ALJs struggled at each iteration with tricky issues — including the precise confines of the relevant closed period at issue, and the determination as to whether Plaintiff's prior 2009 application should be reopened. Moreover, not all of the errors over the course of this case constituted repeating error.[11] To a significant degree, however, multiple ALJs failed to follow prior remand orders and repeated the same errors throughout the fifteen years pendency of this case.[12]

As detailed above, in several instances, the ALJs overlooked or ignored Appeals Council determinations in its remand orders. In other instances, the subsequent ALJ made findings that directly contradicted the determinations already made by the Appeals Council in its prior remand

---

[11] For example, some of the errors currently at issue are unique to ALJ Ross — including the alleged error regarding Dr. Boxer's testimony. As Dr. Boxer testified for first time in 2023, prior ALJs did not evaluate his testimony.

[12] Most notably, the ALJs throughout this case have been provided with six different opportunities to reevaluate the same, single 2010 medical opinion from Dr. Keuthen and to assess the RFC limitations warranted by that opinion. Review of the record shows that in four of the five preceding appeals, the Commissioner moved to remand based on the respective ALJs' errors in evaluating Dr. Keuthen's opinion, and the Appeals Council, in its remand orders, similarly determined the ALJ erred in evaluating Dr. Keuthen's opinion.

orders. The Court thus ultimately finds that this case has dragged on largely due to ALJs' repeated inattention to and failure to comply with the directives and findings in the prior remand orders.

In so finding, the Court rejects the Commissioner's characterization of ALJ Ross' 2023 decision as a "fresh weighing of the evidence" such that the procedural history, prior decisions, and prior remand orders are rendered irrelevant. [ECF No. 19 at 26; *see also Colon I*, 463 F. Supp. 3d at 72–73 (rejecting the Commissioner's similar argument in another case and concluding that the law of the case and/or rule of mandate applied where "[t]he detailed and specific instructions in the remand order suggest[ed] a limited scope of remand"). Here, following each of the court-ordered remands, the Appeals Council provided specific determinations and instructions to the subsequent ALJ on remand. As such, the Appeals Council's remand orders did not permit the respective ALJs to proceed however they wanted on remand, ignoring the dictates of the Appeals Council's orders. *See Day*, 2012 WL 6913439, at *5 (discussing scope of remand orders and the scope of subsequent proceedings on remand in social security appeals).

Accordingly, as pertinent to the Court's adjudication of the instant appeal, the Court sets forth below the relevant procedural history of this case.

*2009 Prior SSI and DIB Applications*

Plaintiff filed prior applications for SSI and DIB benefits in January 2009 ("2009 applications") that were denied at the administrative level on April 1, 2009. Tr. 1833, 1815–17.

Plaintiff did not request a hearing before an ALJ on his 2009 applications.[13]  *Id.* at 1738–39,

1833.

*2010 SSI and DIB Applications/First Round of ALJ Proceedings*

Instead, on August 9, 2010, Plaintiff filed the successive applications for SSI and DIB

benefits at issue here, originally alleging a February 1, 2005 onset date, which he subsequently

amended to July 22, 2008 ("2010 applications").  Tr. 162–73, 1740.  The Social Security

Administration ("SSA") denied Plaintiff's 2010 applications initially on October 8, 2010, and, on

reconsideration, on March 2, 2011.  *Id.* at 74–91.  Plaintiff subsequently requested a hearing,

which ALJ Stephen Fulton held on December 1, 2011.  *Id.* at 36–73.

In a January 24, 2012 decision, ALJ Fulton found Plaintiff not disabled ("first ALJ

decision") during the relevant period on his 2010 DIB application from "April 2, 2009, the

earliest allowable onset date, to the date of this decision, [January 24, 2012]."[14]  Tr. 13.  As for

---

[13] In December 2023, ALJ Ross found that good cause did not exist to reopen the 2009 applications.  Tr. 1833.  Plaintiff does not challenge on appeal ALJ Ross' reopening determination.  [ECF No. 12 at 25].

[14] In stating the relevant period for Plaintiff's DIB claim, ALJ Fulton appears to have mistakenly failed to account for Plaintiff's March 31, 2010 DLI — which, in fact, preceded both Plaintiff's July 2010 release date from incarceration and ALJ Fulton's January 2012 decision date.

Following ALJ Fulton's apparent mistake in calculating Plaintiff's DIB relevant period, every ALJ, including ALJ Ross whose opinion is currently at issue, repeated this same approach, utilizing the February 2012 end date associated with Plaintiff's 2010 SSI claims instead of the correct March 2010 DLI on Plaintiff's 2010 DIB claims.  *See, e.g.*, Tr. 1833 (ALJ Ross' utilization of a combined SSI and DIB relevant period dating from "April 2, 2009, through February 5, 2012").  As discussed in more detail below, any mistake in accounting for the correct DIB end date appears to be consequential to the calculation of Plaintiff's benefits.  That is because utilization of the correct March 2010 DIB end date/DLI would have resulted in an approximately five-month "gap" in time between the March 3, 2010 end date associated with Plaintiff's 2010 DIB claim and the subsequent August 9, 2010 commencement of the relevant period associated with Plaintiff's 2010 SSI claim.  Accordingly, the ALJs' failures to account for

Plaintiff's 2010 SSI application, ALJ Fulton found Plaintiff not disabled for the SSI relevant

period from August 9, 2010 — the date of Plaintiff's application — through the January 24, 2012

date of his decision.  *Id.* at 14.  In so finding, ALJ Fulton noted that Plaintiff was ineligible to

receive benefits during his 2008-2010 incarceration, up until July 31, 2010, "the last date of the

last month of incarceration for a conviction of a felony."[15]  *Id.* at 13–14.

      *Successive 2012 SSI Application/DDS Determination of Disability*

      Soon thereafter, on February 6, 2012, Plaintiff filed a third application for SSI benefits

("2012 application").  Tr. 761.  Weeks later, in March 2012, Plaintiff petitioned the Appeals

Council for review of the ALJ's January 2012 denial of his 2010 applications.  *Id.* at 7–9.

Accordingly, administrative proceedings were pending simultaneously on Plaintiff's 2010 claims

at issue here, and his 2012 SSI claim.

      While Plaintiff's 2010 claims were pending before the Appeals Council, on May 10,

2012, the SSA denied Plaintiff's 2012 SSI claim on initial review.  Tr. 761-70.  On

reconsideration, on October 4, 2012, the Disability Determination Service ("DDS") subsequently

found Plaintiff disabled as of February 6, 2012, based on his anxiety and affective disorders.[16]

Tr. 771–801.

----

Plaintiff's March 31, 2010 DLI necessarily meant that the ALJs also failed to address the gap
between the DIB and SSI relevant periods.

[15] ALJ Fulton's 2012 decision appears to have been the only ALJ decision to account for
Plaintiff's incarceration.  Tr. 14 (citing 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b),
416.965).  Subsequent ALJ decisions failed to adequately address the impact of Plaintiff's
incarceration on the relevant periods and his entitlement to benefits.

[16] The SSA's disability determination on Plaintiff's 2012 SSI claim is not at issue here.  Aside
from the first appeal before Judge Dein, the Commissioner has not contested in any of the past
five rounds of ALJ proceedings the DDS's 2012 determination, nor does the Commissioner

*Continuation of 2010 Applications/First Round of Proceedings*

Meanwhile, on December 28, 2012, approximately two months after DDS' decision on

Plaintiff's 2012 claim, the Appeals Council denied Plaintiff's request for review of ALJ Fulton's

first decision on his 2010 claims.  Tr. 1–6.  Plaintiff appealed to this Court on February 19, 2013,

seeking review of the Commissioner's final decision on his 2010 claims ("first appeal").  *Id.* at

712–14 (13-cv-10317-JGD).

On January 17, 2014, the Honorable Judith Dein granted the Commissioner's motion to

remand the case to the ALJ for further development of the record and for a new hearing.  Tr.

716–17.  Specifically, Judge Dein ordered the ALJ on remand to "consider the subsequent

allowance in accordance with H[allex];" to "determine whether [P]laintiff has a severe

personality disorder;" to "reevaluate" the October 26, 2010 opinion from state agency

psychologist Dr. Keuthen; to "re-determine whether there is work that [P]laintiff can perform in

the national economy within his RFC;" and "if [P]laintiff is found disabled, [to] conduct the

further proceedings required to determine whether [his] drug and alcohol addiction [("DAA")]

are contributing factors material to the determination of disability."  *Id.*

Thereafter, on June 3, 2014, the Appeals Council remanded the case to an ALJ in

accordance with Judge Dein's order.  Tr. 751–53.  The Appeals Council clarified that, on

_____

appear to have sought reopening of the 2012 claim in conjunction with the proceedings regarding
Plaintiff's 2010 claims.  Moreover, in a June 3, 2014 order, the Appeals Council noted the SSA's
favorable determination on Plaintiff's 2012 claim, stating that there was no "basis to reopen the
subsequent favorable determination," and that the October 5, 2012 "determination will remain
final and binding unless additional development provides a basis for the [ALJ] to reopen [it]
pursuant to the reopening regulations."  Tr. 751.

Accordingly, it appears that Plaintiff continues to receive SSI benefits since being found disabled
on the 2012 claim effective February 6, 2012.

remand, the ALJ was required to give further consideration "to the severity of [Plaintiff's] personality disorder and substance abuse impairments," which it found were "documented in the record," along with affording consideration to the "full restrictions" opined to by Dr. Keuthen. *Id.* at 752. It then ordered the ALJ to make multiple additional findings on remand. *Id.* at 752–53.

*2010 Applications/Second Round of ALJ Proceedings*

The same ALJ, ALJ Fulton, presided over the case on remand, held another hearing on December 18, 2014, and, in a March 2015 decision, again found Plaintiff not disabled on his 2010 applications for the respective DIB and SSI closed relevant periods. Tr. 645–46. ALJ Fulton found that the relevant period on Plaintiff's 2010 DIB application spanned from April 2, 2009 to "February 1, 2012," and the relevant period on his 2010 SSI application spanned from August 9, 2010, to the February 1, 2012.[17] *Id.* at 665–710, 640–64.

On October 30, 2015, Plaintiff subsequently filed his second appeal with this Court, which was assigned to the Honorable Nathanial Gorton. *See* 15-cv-13693-NMG. On August 9, 2016, pursuant to the Commissioner's stipulated motion to remand, Judge Gorton ordered

---

[17] In his second decision, for the same reasons set forth above, ALJ Fulton appears to have misstated the end date of Plaintiff's 2010 DIB relevant period, given that his DLI was March 31, 2010. Additionally, ALJ Fulton also misstated the end date for Plaintiff's 2010 SSI claim's relevant period — which ALJ Ross accurately recognized was the "established onset date" on Plaintiff's 2012 application. However, that date was not February 1, 2012, but rather was February 5, 2012 — the day prior to the February 6, 2012 date on which Plaintiff was found disabled at the agency level on his successive 2012 SSI claim. *See* Tr. 645 n.7, 780.

Additionally, ALJ Fulton again acknowledged Plaintiff's incarceration from 2008–2010, noting that Plaintiff was "not eligible to receive benefits" during this period. Tr. 643 n.1. ALJ Fulton did not, however, explain how, or if, the incarceration impacted his determination regarding the relevant period on Plaintiff's SSI and DIB claims. *Id.*

18

remand to a new ALJ for a new hearing, further development of the record, and for the ALJ to once again reevaluate the October 2010 medical opinion from Dr. Keuthen, along with Dr. Eugene Fierman's February 9, 2011 opinion.[18]  Tr. 1227–28.

Subsequently, on October 14, 2016, in accordance with Judge Gorton's order, the Appeals Council remanded the case to a new ALJ, noting that ALJ Fulton's second decision failed to "address the issues identified in the [prior] Appeals Council remand order date June 3, 2014." Tr. 1231.  Again, the Appeals Council provided multiple instructions to the new ALJ on remand.  *Id.* at 1231–33.

*2010 Applications/Third Round of ALJ Proceedings*

In the third round of proceedings, Plaintiff's 2010 claims were reassigned to ALJ Sujata Rodgers, who held a hearing on July 7, 2017.  Tr. 997–1037.  On August 1, 2017, ALJ Rodgers found Plaintiff was not disabled for the time period from February 1, 2005, the alleged onset date, through February 1, 2012.[19]  *Id.* at 967, 988; *see generally id.* at 963–96.

On July 24, 2018, Plaintiff appealed ALJ Rodgers' decision to the Court, and the case was assigned to the Honorable Denise Casper.  *See* 18-cv-11556-DJC.  On February 13, 2019, Judge Casper granted the Commissioner's stipulated motion to remand the case and ordered the ALJ on remand to review "the correct period at issue in this case, between April 2, 2009, and

---

[18] Previously, as noted, Judge Dein ordered remand for reconsideration of the same opinion from Dr. Keuthen.

[19] As noted by the Appeals Council, ALJ Rodgers' assessed relevant period was erroneous given that ALJ Rodgers did not concurrently find that Plaintiff's 2009 claims should be reopened.  Tr. 1286.  Additionally, ALJ Rodgers failed to address the impact of Plaintiff's incarceration on the determination regarding the relevant period or on his ability to receive benefits while incarcerated.  *See id.* at 966–67.

February 5, 2012." *See* [18-cv-11556-DJC, ECF No. 17].[20] Additionally, Judge Casper ordered

the ALJ on remand to reevaluate Plaintiff's severe mental impairments; reconsider Plaintiff's

RFC; to "further evaluate the opinion evidence from the non-examining state agency

psychological consultants;" to seek further vocational expert ("VE") evidence if warranted; and

to determine whether Plaintiff's substance abuse was a "contributing factor material to a finding

of disability." *Id.*

        On May 10, 2019, in accordance with Judge Casper's remand order, the Appeals Council

remanded Plaintiff's 2010 claims to a new ALJ for further proceedings. Tr. 1283–88. For the

second time in a row, the Appeals Council concluded that the ALJ failed to adequately evaluate

Dr. Keuthen's opinion as required by prior remand orders. *Id.* at 1285. The Appeals Council

further determined that ALJ Rodgers' decision did not comply with its prior remand orders

regarding the evaluation of Plaintiff's personality disorder. *Id.* at 1286. The Appeals Council

additionally instructed that, during the subsequent fourth round of proceedings, the ALJ was

required to consider the appropriate relevant period, which it noted spanned from April 2, 2009

through February 5, 2012 — unless the ALJ found that Plaintiff's 2009 claims should be

reopened. *Id.* Given Plaintiff's added Appointments Clause challenge, the Appeals Council

ordered reassignment to a new ALJ. *Id.* at 1287.

---

[20] The Court notes that the document included in the administrative record at Tr. 1281-82, is not, in fact, Judge Casper's order, as represented by the Court Transcript Index.

*2010 Applications/Fourth Round of ALJ Proceedings*

For the fourth round of proceedings, Plaintiff's 2010 claims were reassigned to ALJ Alex

Klibaner, who held a hearing on September 17, 2020.  Tr. 1163–95.[21]  On October 20, 2020, ALJ

Klibaner denied benefits, finding that Plaintiff had not been under a disability for the relevant

time period from April 2, 2009, through February 5, 2012.[22]  *Id.* at 1310; *see generally id.* at

1289–1320.

Subsequently, on December 23, 2020, Plaintiff filed his fourth appeal with the Court, and

the case was referred to the Honorable M. Page Kelley.  *See* 20-cv-12275-MPK.  On August 23,

2021, Judge Kelley granted the Commissioner's stipulated motion to remand the case for further

proceedings, and she specifically ordered the ALJ to address on remand whether Plaintiff's 2009

claims should be reopened in conjunction with the ALJ's review of Plaintiff's 2010 claims.  Tr.

1729–34.

Thereafter, on September 29, 2021, the Appeals Council remanded the case for rehearing

in accordance with Judge Kelley's order.  Tr. 1760–61.  The Appeals Council found that the

ALJ's October 2020 decision failed to comply with its prior May 10, 2019 remand order because

ALJ Klibaner did not consider whether Plaintiff's prior 2009 claims should be reopened.  *Id.* at

1760.  The Appeals Council ordered the ALJ to provide another opportunity for hearing, further

---

[21] The transcript of the hearing erroneously refers to an ALJ "Kibaner," which the Court understands to be ALJ Alexander Klibaner based on other evidence in the record.  Tr. 1163 (listing ALJ as "Alexander Kibaner"), 1310 (order signed by ALJ "Alexander Klibaner").

[22] Like ALJ Rodgers, ALJ Klibaner did not address the impact of Plaintiff's incarceration on the calculation of the relevant DIB and SSI periods or on his ability to receive benefits during his incarcerated period.  *See* Tr. 1292–93.  Additionally, ALJ Klibaner similarly did not account for Plaintiff's March 31, 2010 DLI in calculating the relevant periods, or for the apparent gap between Plaintiff's DIB and SSI relevant periods.  *Id.*

develop the record, and reconsider the relevant evidence pursuant to the sequential evaluation process. *Id.* at 1760–61.

*2010 Applications/Fifth Round of ALJ Proceedings*

On the subsequent fifth round of proceedings, Plaintiff's 2010 claims were again assigned to ALJ Klibaner who held a fifth hearing on January 5, 2022 and, on March 30, 2022, again denied benefits, finding that Plaintiff had not been under a disability for the relevant time period from July 22, 2008, through February 5, 2012.  Tr. 1717,  1735–57, 1697–1728.

In so finding, ALJ Klibaner noted that, at the January 2022 hearing, Plaintiff amended the onset date associated with his 2010 claims to July 22, 2008.  Tr. 1700.  The ALJ then proceeded to adjudicate on the merits whether Plaintiff was disabled from July 22, 2008, through February 5, 2012, finding that any reopening of Plaintiff's 2009 claims was "contingent on a finding that [Plaintiff] was disabled" during that period.[23]  *Id.* at 1701.  ALJ Klibaner found that Plaintiff was not disabled on the merits, and that, as a result, "there [was] no reason to reopen the prior [2009 applications]."  *Id.* at 1701–28.

On June 24, 2022, Plaintiff filed his fifth appeal with the Court, and the case was referred to the Honorable Jennifer Boal.  *See* 22-cv-10990 JCB.  On January 19, 2023, Judge Boal

---

[23] Contrary to ALJ Klibaner's 2022 decision, the relevant period for Plaintiff's DIB claim commenced on April 2, 2009 — as opposed to the July 2008 amended onset date.  As noted, the earliest possible onset date was April 2, 2009 — the day after the SSA denied Plaintiff's prior 2009 SSI and DIB claim at the administrative level — given that the ALJ declined to reopen the 2009 claims.  *See* Tr. 1815–17 (April 1, 2009 notice of disapproved claim); *id.* at 1701.

Moreover, like his fourth decision, ALJ Klibaner's fifth decision similarly failed to address the impact of Plaintiff's incarceration on his ability to receive benefits during the relevant period. *See* Tr. 1700–01.  Additionally, again, ALJ Klibaner did not account for Plaintiff's March 31, 2010 DLI in calculating the relevant periods or for the apparent gap between Plaintiff's DIB and SSI relevant periods.  *Id.*

granted the parties' stipulated motion to remand the case "for further administrative proceedings" and for the ALJ to issue a new decision. Tr. 1937–39.

On February 3, 2023, the Appeals Council ordered remand pursuant to Judge Boal's order, finding that the ALJ again failed to adequately evaluate Dr. Keuthen's opinion as directed by the Appeals Council's prior remand orders. Tr. 1942–43. Additionally, the Appeals Council found that ALJ Klibaner's March 2022 decision failed to properly evaluate state agency psychologist Dr. Shestopal's October 2012 opinion, which the Appeals Council determined pertained to the relevant period at issue in this case. *Id.* at 1943.

On remand, the Appeals Council ordered reassignment to a new ALJ. Tr. 1944. It further ordered the ALJ to obtain evidence from an ME and to properly consider the non-treating source opinions and explain the weight accorded such opinions, which the Appeals Council noted may require the ALJ to "request the nontreating sources [to] provide additional evidence and/or further clarification of the opinion[s]." *Id.* at 1943. The Appeals Council additionally ordered the ALJ to further consider Plaintiff's maximum RFC, and, in doing so, to "provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." *Id.* Finally, the Appeals Council ordered the ALJ to obtain supplemental evidence from a VE if warranted by the expanded record. *Id.*

*2010 Applications/Sixth Round of ALJ Proceedings*

For the sixth round of proceedings before an ALJ, Plaintiff's 2010 claims were reassigned to ALJ William Ross. Tr. 1870. ALJ Ross held a sixth hearing on July 31, 2023, and, on December 27, 2023, he found Plaintiff was not disabled during the relevant period from April 2, 2009, through February 5, 2012. *Id.* at 1883–1936, 1831–70. ALJ Ross found that,

Case 1:24-cv-10497-ADB    Document 23    Filed 03/24/25    Page 24 of 139


based on his review of the record, good cause did not exist to reopen Plaintiff's prior 2009

applications.  *Id.* at 1833.

    The instant appeal followed.

### E.  Relevant Medical Evidence

*Pre-April 2, 2009[24] Medical Evidence*

    Plaintiff's earliest mental health records in the administrative record before the Court date

back to July 2008, when Plaintiff was first incarcerated at Plymouth from July 2008 through

December 2008.[25]  *See* Tr. 326, 341, 372.  At that time, prison medical providers noted only that

Plaintiff suffered from mental health issues for which he had received psychiatric treatment

during the past five years.  *Id.* at 326, 341, 372.

    From approximately December 2008 through March 2009, during a brief break in

Plaintiff's 2008–2010 incarceration, South Bay Mental Health Center licensed mental health

counselor ("LMHC"), Richard Berrio, saw Plaintiff pursuant to court-ordered mental health and

substance abuse treatment.  Tr. 1630–32, 287–325.  In or around February 2009, Counselor

Berrio completed a psychiatric disorder questionnaire, in which he opined as to Plaintiff's

functional limitations based on his treatment of Plaintiff from December 18, 2008, through that

time.  *Id.* at 1630-32.  In that questionnaire, Berrio diagnosed opioid dependence in remission

and adult antisocial behaviors.  *Id.* at 1630.  He opined that Plaintiff possessed "poor social

_____

[24] This date, April 2, 2009, marks the commencement of the DIB relevant period — the first of the two (SSI and DIB) relevant periods to begin.

[25] Although the record does not contain any medical records regarding mental health treatment prior to December 2008, Plaintiff reported to at least one examining psychologist, Dr. Wojcik, that he had been previously hospitalized for mental health reasons approximately five times, first in his teens and later in his mid-20s.  Tr. 1621.

24

skills," would "not respond well to those of authority," and further noted that Plaintiff was "very irritable if he d[id] not get his own way." *Id.* at 1631.

Subsequently, in March 2009, Therapist Berrio opined that Plaintiff suffered from extreme functional impairments in his job performance and friendships, and that he experienced marked impairments in his ability to control his temper. Tr. 312. Therapist Berrio described Plaintiff's symptoms as "depressed mood, decreased energy, hopelessness, irritability, impulsiveness, disruption of thought content, paranoia, oppositionalism, difficulty w[ith] sleep, difficulty concentrat[ing], and anhedonia." *Id.* He further noted that Plaintiff was both an emotional and physical trauma victim and perpetrator, and that his substance use was in "early partial remission." *Id.*

As noted, Plaintiff reoffended and was reincarcerated from March 2009 to July 2010. During this time, all of Plaintiff's mental health treatment was provided by prison medical staff. *See* Tr. 326–97. A March 12, 2009 intake form noted that that Plaintiff had "no friends" and that he suffered from "mental health issues." *Id.* at 353 (noting that "[i]nmate lacks close friends in the community"). In a mental health status update form dated the next day, March 13, 2009, prison medical staff provisionally diagnosed Plaintiff with depression and bipolar disorder, and they noted that his mood was "angry" and "irritable" and that his behavior, while "minimally cooperative," was "agitated." *Id.* at 368–69.

Several days later, on March 18, 2009, Plaintiff was evaluated by prison licensed clinical social worker ("LCSW"), Aimee Shock, and psychiatrist, Dr. Richard Veliz. Tr. 371–72. Dr. Veliz diagnosed mood disorder and polysubstance dependence. *Id.* at 371. Both Dr. Veliz and Ms. Shock noted that Plaintiff reported he was taking psychiatric medications, and that he had been treated for mental health issues throughout the "past [five] years" but not in the three

months immediately preceding his reincarceration.  *Id.* at 371–72.  Dr. Veliz noted that while

Plaintiff presented as moderately depressed, he was "oriented . . . , talkative, [and] friendly."  *Id.*

at 371.  Dr. Veliz prescribed Remeron and Klonopin.  *Id.*

     *Medical Evidence From April 2, 2009–February 5, 2012*[26]

     Throughout his incarceration, prison medical staff treated Plaintiff's mental impairments

with various psychiatric medications.  Tr. 332, 334, 341–42.  In July 2009, Plaintiff was seen

again by Dr. Veliz, who noted that although Plaintiff presented as cooperative and with a

"normal range of affect," Plaintiff's anxiety had increased, and he was sleeping "no more than

two hours . . . nightly."  *Id.* at 332.  Dr. Veliz increased Plaintiff's Remeron dosage and

prescribed Thorazine.  *Id.*

     The record includes two additional psychiatric progress notes from October 2009 and

March 2010, when Plaintiff was seen by another prison staff psychiatrist, Dr. Monika Do Valle.

Tr. 364.  In October 2009, Dr. Valle noted that Plaintiff was oriented with a "normal range of

affect," but he was experiencing daily anxiety.  *Id.*  Dr. Valle instructed Plaintiff regarding

relaxation techniques and increased both his Remeron and Thorazine dosage.  *Id.*

     In March 2010, Dr. Valle observed that Plaintiff presented as "flush-faced" with an

"anxious affect" and that he reported increased anxiety, including "high anticipatory anxiety"

related to interacting with others, and racing thoughts.  Tr. 364.  Dr. Valle again increased

Plaintiff's Remeron dosage and added Seroquel to his medication regimen.  *Id.*  The March 2010

visit record is the final prison psychiatric record prior to Plaintiff's release.  *See id.* at 326–97.

---

[26] This constitutes the combined relevant periods for Plaintiff's 2010 SSI and DIB claims, but
does not account for the gap between those two periods from March–August 2010, as discussed
previously.

In July 2010, following his release from incarceration, Plaintiff received primary care treatment from LCSW Fragale and nurse practitioner ("NP") Kassirer at Norton Family Practice. Tr. 429–87.  In an August 2010 intake form, Fragale noted that Plaintiff had been residing at a halfway house for approximately three weeks and that he reported having been sober for approximately two years at the time.  *Id.* at 473.  Fragale observed Plaintiff to be "fairly stable despite transient panic and anxiety" and referred him to psychotherapy.  *Id.* at 474.

In August 2010, NP Kassirer completed a check-box medical report for Massachusetts Emergency Aid to the Elderly, Disabled, and Children ("EAEDC"), in which she diagnosed anxiety and depression.  Tr. 596.  NP Kassirer indicated that Plaintiff possessed an impairment that impacted his ability to work, which she opined was expected to last for three to six months. *Id.* at 598.  Other than that conclusion, NP Kassirer did not opine regarding any specific functional limitations.  *See id.* at 597–98.

Plaintiff was also treated in 2010–2011, by Norton psychopharmacologist, Dr. Nardolillo, who prescribed Buspar and Zoloft for Plaintiff's anxiety and panic attacks.  Tr. 467, 460–61. Plaintiff reported in September 2010, that the new medications were helping with his panic and anxiety.  *Id.*  Later in November 2010, Plaintiff reported to Dr. Nardolillo and NP Kassirer that the medications continued to help with his anxiety and panic — and had even enabled him to participate in group therapy at his halfway house with fewer severe panic attacks — but that his depression had increased.  *Id.* at 451, 448.  Plaintiff continued to experience hopelessness and lack of motivation, and Fragale noted that Plaintiff, while "generally stable, . . . appears to be at a clinical plateau," and in danger of regressing and relapsing.  *Id.* at 446.

Around the same time, in September 2010, Plaintiff underwent a psychological examination with Dr. Hennessey in conjunction with the completion of Dr. Hennessey's medical

opinion, which included an interview, examination and testing.  Tr. 405–10.  At the time of the

examination, Plaintiff was a resident of a halfway house and was receiving substance abuse

treatment.  *Id.* at 405.  Plaintiff was also then taking several different psychiatric medications,

including Buspar, Zoloft, Seroquel, and Remeron.  *Id.* at 406.

Dr. Hennessey noted that Plaintiff had been seen and treated for anxiety and depression

during the time he was incarcerated from 2008-2010, and that prior to that incarceration, he had

been treated in the emergency room at least twice for panic attacks.  Tr. 406, 407.  He stated that,

at the time of his 2010 opinion, Plaintiff was attending nightly AA meetings, weekly individual

counseling, and group counseling several times per week, and that Plaintiff had routine chores

and responsibilities at the halfway house.  *Id.* at 407.  Plaintiff reported to Dr. Hennessey that

"[o]n a typical day," he rated his anxiety as "10/10," and that he suffered from multiple, severe

panic attacks each day, which brought on heart palpitations that made him feel like he was

having a heart attack.  *Id.* at 408.

Dr. Hennessey diagnosed panic disorder, major depressive disorder, and substance abuse

in full remission.  Tr. 408.  Based on his testing and interview, Dr. Hennessey assessed

Plaintiff's GAF at 60.[27]  *Id.* at 409.  He opined that Plaintiff's memory was within normal limits,

---

[27] The GAF is a scale "ranging from zero to 100, used to rate social, occupational and
psychological functioning on a hypothetical continuum of mental health."  Carolyn A.
Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Court
§ 5:30 (Jan. 2025).

> A GAF score is a subjective rating of an individual's overall
> psychological functioning, which may assist an ALJ in assessing a
> claimant's mental RFC.  While a GAF score may help an ALJ assess
> mental residual functional capacity, it is not raw medical data.

*Id.* (citations omitted).

except for his short-term memory. *Id.* at 408. Dr. Hennessey further found that Plaintiff's

thought processing and content were organized and logical. *Id.* He did not opine regarding any

specific functional limitations. *Id.* at 405–10.

Less than one month later, in October 2010, non-examining state agency psychologist,

Dr. Keuthen, completed a medical opinion while Plaintiff's 2010 claims were on initial

administrative review before the SSA. Tr. 411–19. Dr. Keuthen reviewed Plaintiff's records and

found that Plaintiff suffered from major depressive disorder, panic disorder, antisocial

personality disorder, and a history of substance use disorders. *Id.* Dr. Keuthen opined that

Plaintiff suffered from moderate limitations in his understanding and memory, sustained

concentration and persistence, social interaction, and adaptation abilities. *Id.* at 425–26. In her

view, Plaintiff's RFC permitted him to "understand and recall simple work tasks and

locations/instructions;" to "work for a supportive, non-critical employer in a setting with low

interpersonal demand;" and to "negotiate predictable work routines." *Id.* at 427. Dr. Keuthen

further opined that Plaintiff's "focus and pace may be hampered by his anxiety and depression[,]

though he could focus for [two]-hour blocks during an [eight]-hour day in an unpressured

setting." *Id.*

---

A GAF score of "one" indicates that the patient has a "persistent danger of severely hurting self or others;" whereas, a score of "100," indicates "superior functioning." *Kelly v. Berryhill*, No. 18-cv-10711-ADB, 2019 WL 3464691, at *4 n.3. (D. Mass. July 31, 2019) (quoting *Lopez-Lopez v. Colvin*, 138 F. Supp. 3d 96, 98 n.4 (D. Mass. 2015) *reconsidered in part on other grounds*, 144 F. Supp. 3d 260 (D. Mass. 2015)); *see also* Am. Psychiatric Inst., Diagnostic & Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

A GAF score of 51–60 is indicative of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See* DSM-IV.

Subsequently, in December 2010, Plaintiff reported to LCSW Fragale at a follow-up appointment that despite "positive changes," he continued to suffer from anxiety and chest pains for which a cardiologist had ruled out any physical cause. Tr. 438. In January 2011, Plaintiff reported to NP Kassirer that his depression and anxiety were under control, and that he "fe[lt] like a different person." *Id.* at 533–34. He noted that he nevertheless continued to lack motivation and felt tired all the time. *Id.*

In February 2011, NP Kassirer noted that Plaintiff reported anxiety in the morning and a desire to avoid people at his halfway house. Tr. 525. Plaintiff, however, also reported that he was able to attend and speak up at group meetings at the halfway house — absent the anxiety that he had previously experienced in similar situations. *Id.* NP Kassirer increased his Zoloft dosage. *Id.* at 527.

Around this same time, in February 2011, non-examining state agency psychologist, Dr. Fierman, completed a medical opinion in conjunction with the administrative reconsideration of Plaintiff's 2010 claims and adopted in full Dr. Keuthen's opinion. Tr. 488.

One month later, in March 2011, Plaintiff reported to Dr. Nardolillo that his anxiety and depression had increased again. Tr. 520. He related that he was experiencing racing thoughts and avoiding people because he "tense[d] up." *Id.* Dr. Nardolillo noted that Plaintiff might be experiencing added stress associated with the anticipation of moving out of his halfway house in two weeks. *Id.* He also noted that Plaintiff was experiencing financial difficulties. *Id.* Dr. Nardolillo switched Plaintiff from Zoloft to Prozac. *Id.*

Plaintiff last saw NP Kassirer and Dr. Nardolillo on March 30, 2011, prior to his move from the halfway house to another town. Tr. 512. At that time, Plaintiff reported feeling better on Prozac. *Id.*

NP Kassirer subsequently completed a second EAEDC medical report on Plaintiff's behalf on March 30, 2011.  Tr. 551–60.  She noted that Plaintiff was suffering from panic attacks several times per week, during which he experienced blurred vision and a racing heart.  *Id.* at 556.  NP Kassirer again opined that Plaintiff's impairments interfered with his ability to work, and that they were expected to last for three to six months.  *Id.* at 559.  Other than this conclusion, NP Kassirer did not opine regarding any specific functional limitations.  *See id.*

After Plaintiff moved out of the halfway house, he did not receive any mental health treatment from March 30, 2011, until October 24, 2011, when he sought treatment with another provider, Northeast Health Services ("Northeast"), for his "racing thoughts, angry outbursts, poor impulse control, panic attacks, and anxiety."  Tr. 621–28.  At that time, Plaintiff reported that he was living in a rooming house and that he had "lost" his mental health treatment when his prior clinic closed.  *Id.* at 626.  The Northeast clinician noted that Plaintiff had been off his psychiatric medications for the "past four months."  *Id.*  He diagnosed bipolar disorder and assessed Plaintiff's GAF at 50.[28]  *Id.*

Plaintiff, however, failed to follow up with Northeast after the October 2011 visit, and, aside from several medical opinions, there are no additional mental health treatment records in the administrative record.[29]

---

[28] A GAF score of 41–50 is "indicative of serious symptoms like suicidal ideation, or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job."  DSM-IV at 32.

[29] Subsequent May and October 2012 records from examining psychologist, Dr. Powers, and from non-examining state agency psychologist, Dr. Shestopal, confirm that while Plaintiff sought counseling in 2011, he suspended treatment due to a lack of transportation.  Tr. 945–46, 773, 762; *see also id.* at 1851 (ALJ Ross states that "[t]he record contains no evidence of any

*Near Relevant Period: Post-February 5, 2012–October 5, 2012*[30]

As noted above, the relevant period for Plaintiff's 2010 SSI claim ended because DDS found Plaintiff disabled effective February 6, 2012, on his successive 2012 SSI claim.  Tr. 780–81.  Plaintiff, however, was not actually receiving any disability benefits as of February 2012 because DDS had not yet awarded the benefits.  *Id.*  It was not until eight months later, on October 5, 2012, that DDS, in fact, awarded benefits on Plaintiff's 2012 SSI claim (which were retroactive to February 6, 2012).  *Id.*

During this pre-DDS decision period in 2012, examining psychologists, Drs. Horton and Powers, each completed a medical opinion.  Non-examining state agency psychologists, Drs. Kiley and Shestopal, additionally completed opinions during this time period.

Dr. Powers examined Plaintiff in conjunction with his May 2012 opinion.  Tr. 945–47. He reported that Plaintiff had not been receiving mental health treatment during the winter of 2011–2012 due to "lack of transportation," but also noted that Plaintiff intended to resume counseling at the Middleboro Counseling Center during summer 2012.  *Id.* at 946.  Dr. Powers further noted that Plaintiff recognized his "need for care," but that "transportation and finances

---

continuing treatment after this initial evaluation at NorthEast on October 24, 2011, through February 5, 2012").

The Court notes that Drs. Power's and Shestopal's opinions also specify that Plaintiff sought counseling at the "Middleboro Counseling Center."  *See* Tr. 945.  There are, however, no records from Middleboro in the administrative record, and it unclear whether Middleboro Counseling Center is the same as Northeast Health Services, which was itself located in Middleboro, Massachusetts.  *Id.* at 621–28.

[30] This includes the period between the DDS's assessed February 6, 2012 disability effective date, and the October 5, 2012 date that the disability determination was, in fact, made by DDS. Tr. 780.

32

ha[d] encumbered his effort to sustain treatment." *Id.* at 947. Plaintiff told Dr. Powers that he was attending AA twice per week. *Id.* at 946.

Dr. Powers diagnosed major depressive disorder, panic disorder, alcohol and opioid dependence in remission, and multiple psychosocial stressors. Tr. 945–47. He administered an MSE and found that Plaintiff was "oriented in all spheres but memory impairment." *Id.* at 947. Dr. Powers noted that "[a] formal intellectual evaluation was not performed, but [that Plaintiff's] interpersonal interaction and reported history suggests endowment with a low average range." *Id.*

Dr. Powers additionally opined that Plaintiff suffered from a "likely learning disability," that he was "untreated for depression and a panic disorder[,]" and that he was "experienc[ing] currently acute distress for lack of treatment." Tr. 947. Like the Northeast clinician, Dr. Powers opined that Plaintiff had a GAF score of 45–50. *Id.* He concluded that "[s]ome improvement in [Plaintiff's] overall function would be expected once formal mental health treatment is resumed," but this improvement was unlikely until Plaintiff was able to receive such services. *Id.*

Very soon thereafter, on May 10, 2012, non-examining state agency psychologist, Dr. Kiley, found that, based on review of Plaintiff's records, his anxiety was severe, but his depression was not severe. Tr. 764–65. He opined that Plaintiff suffered from moderate limitations in his ability to concentrate, but that he remain[ed] able to focus on and complete simple tasks at a reasonable pace." *Id.* at 766. Dr. Kiley also found that Plaintiff was moderately limited in his ability to interact appropriately with the general public, but that he was "not significantly limited" in his ability to interact appropriately with supervisors and coworkers. *Id.* at 767. He explained that Plaintiff was "able to manage simple social demands." *Id.* Dr. Kiley

33

found, at most, mild limitations in terms of Plaintiff's activities of daily living ("ADL") and his "repeated episodes of decompensation." *Id.* at 765–67. He further opined that "with t[reatment]," Plaintiff would be able to work. *Id.* at 767.

Subsequently, in September 2012, Dr. Horton reviewed records, examined Plaintiff, and administered an MSE, Gestalt test, Trailmaking test, and the Wechsler memory test, in conjunction with his opinion. Tr. 949. He diagnosed Plaintiff with nicotine dependence, anxiety disorder, amnestic disorder, opioid and cocaine dependence in full and sustained remission, "rule-out" learning disorder, panic disorder with agoraphobia, and dysthymic disorder.[31] *Id.* at 954.

Dr. Horton noted that Plaintiff had received a ride to the appointment, and had explained that his driver's license had been revoked, such that he depended on others for transportation. Tr. 949–50. Dr. Horton added that "[p]reparatory anxiety ma[de] it difficult for [Plaintiff] to travel." *Id.* at 950. He further noted that Plaintiff was not receiving any mental health care or treatment at the time, *id.*, and that while Plaintiff had previously taken psychotropic medications as prescribed, he had "not . . . taken [them] in more than six months [since March 2012] because [he] c[ould not] afford the co-payments." *Id.* at 953.

Plaintiff reported to Dr. Horton that he had difficulty with focus and concentration. Tr. 951. Based on his own testing, Dr. Horton found that Plaintiff's cognitive ability was below average and that Plaintiff possessed "extremely low range" memory skills. *Id.* at 953. He also

---

[31] "A rule out diagnosis . . . 'means that there is evidence that [the claimant] [may] meet the criteria for that diagnosis, but [the medical source] need[s] more information to rule it out.'" *Madera v. Colvin*, No. 15-cv-30133-MGM, 2016 WL 7331555, at *2 (D. Mass. Dec. 16, 2016) (second alteration in original) (citing *Morin v. Colvin*, No. 1:13-cv-220, 2014 WL 268721, at *2 n.3 (D.N.H. Jan. 23, 2014)).

opined that Plaintiff's "[s]evere deficits in memory functioning (for both newly learned and historical information), suggest[ed] [Plaintiff] will find it difficult to learn and recall work procedures." *Id.* at 954. Dr. Horton further opined that Plaintiff's "[s]ymptom (anxiety) interference may also have a negative impact on attendance, work rate/persistence, tolerance for change/stress, and ability to sustain relationships with coworkers and supervisors." *Id.* Dr. Horton stated that Plaintiff was incapable of managing monthly benefits. *Id.*

Weeks later, on October 4, 2012, in conjunction with the reconsideration of Plaintiff's 2012 claims at the administrative level, non-examining state agency psychologist, Dr. Shestopal, found that Plaintiff's anxiety constituted a severe impairment, but that his depression and substance addiction were not severe. Tr. 776. Dr. Shestopal opined that Plaintiff suffered from marked difficulties in maintaining concentration, persistence, or pace. *Id.* at 777. In support, he cited May 2012 findings from Plaintiff's psychiatric consultative examination with Dr. Powers, along with September 2012 findings from Plaintiff's consultative examination with Dr. Horton. *Id.* at 775, 777 (citing *id.* at 945–48, 949–54). Dr. Shestopal acknowledged Dr. Powers' diagnosis of "severe cognitive impairments," which he found to be consistent with Dr. Horton's similar findings regarding Plaintiff's "severe" "memory deficits." *Id.* at 777. Dr. Shestopal ultimately opined that Plaintiff possessed a marked limitation in his cognitive function "based on psych scores." *Id.*

In assessing Plaintiff's RFC, Dr. Shestopal also opined that Plaintiff possessed marked limitations in his "ability to work in coordination with or in proximity to others without being distracted by them," his "ability to interact appropriately with the general public," his "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," his "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness

and cleanliness," his "ability to respond appropriately to changes in the work setting," and his "ability to travel in unfamiliar places or use public transportation." Tr. 779–80.

Dr. Shestopal additionally explained his assessed RFC, opining that: (a) Plaintiff was "able to recall and manage simple tasks;" (b) Plaintiff was "NOT able to maintain focus, pace and persistence for simple tasks for [two]-hour periods within a normal work schedule;" (c) Plaintiff was "NOT able to manage appropriate, superficial interactions in the workplace," and (d) Plaintiff was "NOT able to adapt to minor changes in work demands." Tr. 780 (emphasis in original). Finally, Dr. Shestopal noted "no current evidence of any substance abuse disorder. *Id.*

*Remote Post-October 2012 Medical Evidence*

Following Dr. Shestopal's October 2012 opinion, there are no further medical records in the Court's administrative record until several additional medical opinions dated 2017–2023.[32]

In April 2017, following the Court's and the Appeals Council's remand for a third round of proceedings on Plaintiff's 2010 claims before an ALJ, Plaintiff was again examined and assessed by Dr. Powers. Tr. 1156–58. Dr. Powers noted that Plaintiff remained untreated for his depression and panic disorder in 2017. *Id.* at 1158. He further opined as to limitations and delivered an assessment "largely equivalent" to his prior 2012 examination, finding Plaintiff to be "of apparently low average intellectual endowment [with a] likely learning disability [and a] history of dual diagnosis treatment for affective disorder and substance abuse." *Id.*

_____

[32] Presumably, the absence of records is explained by the expiration of the SSI relevant period in February 2012 — at which point Plaintiff was found disabled at the administrative level based on his 2012 claims. The extent of Plaintiff's mental health treatment during this remote period is unclear from the record. At least one examining psychologist's opinion, however, indicates that Plaintiff received some mental health treatment post-2012. *See* Tr. 1622 (Dr. Wojcik references records suggesting that Plaintiff was seeing a social worker as of December 15, 2014, for his social anxiety disorder.).

Nearly two years later, in March 2019, in conjunction with the fourth round of proceedings on Plaintiff's 2010 claims, Dr. Wojcik reviewed Plaintiff's medical records, examined Plaintiff and administered tests, and then opined regarding the functional limitations associated with his mental health impairments. Tr. 1620–26. He diagnosed Plaintiff with persistent depressive disorder, generalized anxiety disorder with features of a social anxiety disorder, panic disorder, opioid use disorder in sustained remission, and a "history of possible learning disorders." *Id.* at 1625. He found that Plaintiff had "experienced chronic symptoms of depression, anxiety, and a panic disorder since his high school years" and that the related "symptoms have been continuous since [Plaintiff] stopped working in . . . 2005 or 2006." *Id.* at 1626. Dr. Wojcik further opined that "[g]iven that [Plaintiff] stopped using substances by his report in about 2009, it does not appear that substance usage is a factor in his present work limitations." *Id.*

Several weeks later, on April 20, 2019, Dr. Wojcik completed a corresponding medical source statement in which he rated Plaintiff's functional limitations. Tr. 1627–29. He opined that Plaintiff had multiple moderate limitations in the four relevant functional categories, but that Plaintiff suffered from marked limitations in his abilities to handle conflicts with others, to sustain an ordinary routine and regular attendance at work, to work a full day without more than the allotted number or length of breaks, to distinguish between acceptable and unacceptable work performance, to set realistic goals, to make plans for himself independently of others, and to be aware of normal hazards and to take appropriate precautions.[33] *Id.* at 1627–28. He additionally

---

[33] The Court notes that the DSHS form utilized by Dr. Wojcik contained four functional categories identical to the four Paragraph B functional areas, along with ratings that aligned closely with, but were not identical to, the controlling regulations and the criteria typically

opined that Plaintiff was capable of "occasionally" interacting appropriately with the general public, coworkers, and supervisors; that due to his symptoms, Plaintiff would be off-task fifteen to twenty percent of every eight-hour work day; and that he would be absent approximately four days per month. *Id.* at 1628.

Thereafter, on September 17, 2020, in conjunction with the fourth round of ALJ proceedings, Dr. Glenn Griffin testified as an ME regarding Plaintiff's impairments and related limitations for the time period from April 2, 2009, through February 5, 2012.[34] Tr. 1170, 1172–79. He testified that Plaintiff's medically determinable impairments ("MDIs") included his substance abuse in remission, major depressive disorder, and panic disorder without agoraphobia. *Id.* at 1173.

Dr. Griffin, however, further opined that despite a diagnosis of antisocial behavior and/or antisocial personality disorder, Plaintiff's records did not establish either impairment, and that antisocial personality disorder was therefore not an MDI for Plaintiff. Tr. 1174; *see id.* at 287–325 (records from December 2008–March 2009). Dr. Griffin reasoned that an antisocial personality disorder diagnosis requires clinical evidence of the impairment prior to age eighteen,

---

utilized by SSA consulting psychologists in evaluating a claimant's limitations for purposes of the subsequent RFC assessment. *See* 20 C.F.R. §§ 404.1520a(b)(2), (c)(3), 416.920a(b)(2), (c)(3) (noting that the four "Paragraph B" criteria include: 1) the claimant's ability to understand, remember, or apply information; 2) the claimant's ability to interact with others; 3) the claimant's ability to concentrate, persist, or maintain pace; and 4) the claimant's ability to adapt or manage oneself); *see also id.* at §§ 404.1520a(c), 416.920a(c) (ALJ is required to rate degree of limitation in each of the four areas using a five-point scale: "None, mild, moderate, marked, and extreme"). Dr. Wojcik's form referred to what the regulations designate "moderate" impairments as "impaired." *See id.* at 1627-29.

[34] Dr. Griffin's testimony was obtained in response to the Appeals Council's May 2019 order requiring the ALJ to obtain an evaluation as to whether Plaintiff's antisocial personality disorder constituted a severe impairment at steps three and four of the sequential analysis. *See* Tr. 1286.

which he testified did not exist in Plaintiff's case.  *Id.* at 1174–75.  He additionally opined that bipolar disorder also was not an MDI for Plaintiff because he "did not find in the record any consistent evidence of mania or hypomania."  *Id.* at 1175.

In terms of Plaintiff's limitations during the time period, Dr. Griffin testified that Plaintiff had mild limitations in understanding, remembering, and applying information and in interacting with others; a moderate limitation in concentration, persistence, and pace; and a mild to moderate limitation in his ability to manage and care for himself.  Tr. 1176.  According to Dr. Griffin, Plaintiff did not meet or satisfy any listings.  *Id.* at 1175.

Dr. Griffin additionally testified that his opinion was consistent with the limitations opined to by Dr. Keuthen.  Tr. 1176.  He opined that Plaintiff could complete "simple, repetitive tasks" and should "be restricted to occasional contact with coworkers, supervisors, or the general public."  *Id.*  Dr. Griffin also opined that Plaintiff would "be able to tolerate simple changes in [his] work routine."  *Id.*  In his view, under the limitations outlined, Plaintiff should be "able to perform under the ordinary work pressures of . . . unskilled work."  *Id.* at 1177.

Nearly three years later, following the Court's July 2023 remand, and in accordance with the Appeals Council's February 3, 2023 remand order, non-examining ME, Dr. Alan Boxer, testified at the July 2023 hearing in conjunction with the sixth round of proceedings.[35]  Tr. 1912–20.

---

[35] As stated above, the Appeals Council found that ALJ Klibaner erred in evaluating the medical opinion evidence in his March 2022 decision.  Tr. 1942–43.  The Appeals Council ordered the subsequent ALJ (ALJ Ross) on remand to "[o]btain evidence from [an ME] related to the nature and severity of and functional limitations resulting from [Plaintiff's] impairments."  *Id.* at 1943. Dr. Boxer's testimony followed.

Dr. Boxer gave his opinion as to each step of the sequential analysis. Tr. 1912–20. He testified that, based on his training, experience, and review of the medical record, Plaintiff suffered from two severe impairments: panic disorder and persistent depressive disorder. *Id.* at 1913. Dr. Boxer, however, opined that the diagnosis of antisocial personality disorder was not supported by the record, thus implying that it did not constitute an MDI or severe impairment. *Id.* In support, Dr. Boxer noted that "the only thing [he saw] in the record [was] mention of . . . antisocial behaviors." *Id.* (referring to *id.* at 1630, Berrios' February 2009 records). He explained that mere "antisocial behavior is not a mental disorder . . . [or] a personality disorder." *Id.* Dr. Boxer further suggested that the record merely indicated "some criminal behavior in [Plaintiff's] younger years." *Id.*

Dr. Boxer subsequently testified that Plaintiff's panic disorder and depression did not satisfy Listings 12.04 or 12.06. Tr. 1913. In so concluding, he acknowledged that he did not "have a great deal of notes from [the relevant] period, but [that] there [was nevertheless] no doubt from the records that [Plaintiff] has a chronic anxiety disorder and is a very uncomfortable adult around large groups of people, crowds and people he is not familiar with." *Id.* at 1914. Dr. Boxer asserted that the "most detailed record" he had regarding Plaintiff's impairments was from September 2010 — a time that fell in the middle of the relevant period in this case — which reflected that Plaintiff "was having panic attacks every couple of weeks," but that they "were less severe since he had been started on medication at that time." *Id.*

In support of his opinions, Dr. Boxer referred to Plaintiff's medical records from July through December 2010, during his treatment with NP Kassirer, LCSW Fragale, and Dr. Nardolillo. Tr. 1914–15 (referencing *id.* at 429–87). He concluded that although it "seemed like [Plaintiff] was doing better" when he was on anti-anxiety medications and his panic attacks were

"down to . . . occurring approximately once every two weeks," his anxiety was still not "totally controlled." *Id.* at 1915.

In response to the ALJ's inquiry regarding the period from December 2010 through February 2012, Dr. Boxer again acknowledged that he "[did not] have a great deal" of records. Tr. 1915. He opined, though, that during 2011, Plaintiff experienced "fluctuating levels of anxiety, depression, and low motivation," but "nothing acute during 2011 while he [was] on . . . three different medications." *Id.* Dr. Boxer, however, testified that he was unable to "comment" on Plaintiff's condition during "the first part of 2012" because Plaintiff's records from that year were "towards the end of 2012." *Id.*

In Dr. Boxer's view, Plaintiff would have possessed the following functional limitations based on his mental impairments from January 2008 through February 2012: (1) "he could not [have been] around large groups of people" due to his anxiety, and he would have been "limited to work" involving only "smaller groups of people with whom he [was] familiar;" (2) he would have needed to "excuse himself" for "anywhere . . . [from] five minutes to . . . [twenty to thirty] minutes" if he did have a panic attack, the frequency of which Dr. Boxer stated was "hard to say" given the limited documentation, but that he estimated, based on the limited records, would have been once every two weeks; (3) Plaintiff would have been "significantly limited" in "remembering complex instructions" and "carrying them out" based potentially on "some learning issues" in addition to Plaintiff's anxiety; and, (4) Plaintiff would have been unable to adapt to changes related to "coworkers or . . . supervisors[] he [was] unfamiliar with, not comfortable with." Tr. 1915–17.

Additionally, Dr. Boxer elaborated that if Plaintiff's employer did not provide him with a "cool[ing] off" opportunity following a panic attack, Plaintiff would not "be able to function on a

consistent basis in that . . . workplace." Tr. 1919. Subsequently, in response to questioning by

Plaintiff's counsel, Dr. Boxer added that if Plaintiff had "panic attacks more frequently" than

reported in the records he reviewed, such a discrepancy would change his opinion. *Id.* at 1918–

19. Specifically, Dr. Boxer opined that if Plaintiff had panic attacks multiple times per week, "it

would [have been] markedly difficult for him to function in a work setting with that frequency."

*Id.* at 1919.

F.    **Vocational Expert Testimony/Meuse Declaration**

Throughout the multiple hearings in the case, Plaintiff's counsel attempted — sometimes

successfully, other times unsuccessfully — to elicit testimony from multiple VEs regarding

several opined limitations from medical opinions that were themselves ultimately rejected by the

respective ALJs, including ALJ Ross. These included, among others, Dr. Keuthen's multiple

opined limitations, Dr. Horton's opined memory limitations, Dr. Boxer's and Dr. Wojcik's

opined social and adaptation limitations, and Drs. Horton's, Wojcik's, and Boxer's opined

limitations related to Plaintiff's need for special breaks, to be off-task more than is typically

permitted, and for special attendance accommodations.

*Relevant Background*

At Plaintiff's first December 2014 hearing before ALJ Fulton, VE Scorzelli testified

regarding Dr. Keuthen's opined limitations restricting Plaintiff to work with a "supportive, non-

critical supervisor in a setting with low interpersonal demand and predictable work routines."

Tr. 707–08. Plaintiff's counsel suggested to the VE that a "supportive" supervisor would be

someone who was "not going to overreact when [or] if [Plaintiff] blows up or walks off." *Id.* at

708. In response, VE Scorzelli testified that if an employee is "blowing off on the job, in my

opinion, any kind of aggression whatsoever, would cause that person to be terminated

42

immediately." *Id.* The VE then suggested that it would take "a very special place" to accommodate the limitations opined to by Dr. Keuthen. *Id.*

Subsequently, following Judge Dein's January 2014 remand order, in June 2014, the Appeals Council specifically ordered the ALJ on remand to "[o]btain supplemental evidence from a [VE] to clarify the effect of the assessed limitations on [Plaintiff's] occupational base" in accordance with multiple social security rulings ("SSRs").[36] Tr. 752. Among other things, the Appeals Council further instructed the ALJ that, "before relying on the [VE] evidence[,] the [ALJ must] identify and resolve any conflicts between the occupational evidence provided by the [VE] and the information in the Dictionary of Occupational Titles (DOT), and its companion publication, the Selected Characteristics of Occupations ([SSR] 00-04p)[.]" *Id.* The Appeals Council also included nearly identical instructions in its second October 2016 remand order. *Id.* at 1232.

During Plaintiff's third 2017 hearing before ALJ Rodgers, Plaintiff's counsel again attempted to query VE William Stark regarding the availability of jobs that could accommodate Dr. Keuthen's opined limitations to a "supportive, non-critical [supervisor]" with "no [or low] interpersonal demands." Tr. 1030. ALJ Rodgers, however, refused Plaintiff's hypothetical, ruling that Dr. Keuthen's limitations were "not . . . vocationally relevant," and that she was not going to "accept that part of [Dr. Keuthen's] opinion." *Id.* at 1030–31. In response, Plaintiff's counsel posed a revised hypothetical to VE Stark, incorporating another one of Dr. Keuthen's limitations, asking whether it was "likely that an employer [would] go out of his or her way to be

---

[36] SSRs "are binding on all Social Security Administration personnel, including state agency adjudicators, administrative law judges, and the Appeals Council." *McDonald v. Sec'y of Health & Hum. Servs.*, 795 F.2d 1118, 1125 (1st Cir. 1986).

supportive and non-critical." *Id.* at 1032. VE Stark subsequently testified that "[i]n a normal situation, employers don't provide a lot of support in the work," and that "[g]enerally, they are not real supportive." *Id.*

Counsel thereafter attempted to inquire of VE Stark regarding Dr. Keuthen's additional limitation to "low interpersonal demands." Tr. 1033. ALJ Rodgers required counsel to rephrase "low interpersonal demands," which counsel then rephrased to "interact[ion] with co-workers less than one-third of the time." *Id.* In response, VE Stark testified that such a requirement "could end all jobs." *Id.* He elaborated that:

> [i]n a sheltered workshop, you usually get a lot of supportive supervision and you would be in the vicinity of other people performing the same sheltered work[, but t]here would be some interaction even in the sheltered workshop.[37]

*Id.* at 1033–34.

---

[37] The ability to work in a sheltered workshop is typically not the same as the performance of substantial gainful activity. *See, e.g.*, *Sessler v. Sec'y of Health & Hum. Servs.*, No. 86-cv-1105, 1990 WL 52970, at *3 (N.D.N.Y. Apr. 20, 1990) (ALJ erred in concluding work existed for Plaintiff at step five where it failed to "take into account the crucial factor of sheltered versus competitive employment"); *see also Carbee v. Comm'r of Soc. Sec.*, No. 1:17-cv-0051-GTS, 2018 WL 333516, at *7 (N.D.N.Y. Jan. 9, 2018); *Sarchese v. Barnhart*, No. 01-cv-2172-JG, 2002 WL 1732802, at *10 (E.D.N.Y. July 19, 2002).

> In a sheltered workshop, as opposed to the work force at large, the workers are provided with simple tasks, vast amounts of supervision and assistance, and massive support systems. The work that they do is in no way comparable to that performed in the national economy, and the assistance that they receive is far in excess of anything that a normal job provides. Consequently, the pay that they receive from the sheltered workshop is often greater than the value of their work.

Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure in Federal Court, § 3:13, Sheltered Workshops (Jan. 2025 update).

Following the Court's third remand order, in May 2019, the Appeals Council again issued identical instructions requiring the ALJ to obtain "supplemental evidence from a [VE]" on remand.  Tr. 1286.

Subsequently, at the next 2022 hearing, which was before ALJ Klibaner, VE Ditrinco testified that if Plaintiff failed to respond to supervisors appropriately during his initial training period, he would first be given "a warning or two."  Tr. 1752.  VE Ditrinco testified that more than two inappropriate responses to a supervisor would become "work preclusive."  *Id.*  Once again, in February 2023, the Appeals Council's remand order contained identical instructions regarding the required VE evidence on remand.  *Id.* at 1943.

*VE Vercillo's Testimony at July 2023 Hearing*

Thereafter, at Plaintiff's July 2023 hearing, Plaintiff objected to VE Vercillo's testimony.  Tr. 1922–23.  ALJ Ross overruled the objection and posed a hypothetical to VE Vercillo that mirrored the RFC that ALJ Ross ultimately assessed in his subsequent written decision.  *Id.* at 1923–25, 1841.  Both the VE hypothetical and the ALJ's assessed RFC omitted several opined limitations from the medical opinions challenged in this case.  *Id.*  In response to ALJ Ross' hypothetical, VE Vercillo testified that Plaintiff would be able to perform the jobs of janitor and/or night cleaner.  *Id.* at 1925.  VE Vercillo elaborated that a laundry laborer and folder position would also satisfy the ALJ's hypothetical because it involved limited interaction with people.  *Id.* at 1926.  VE Vercillo acknowledged that there would be "some coworkers" associated with the three named positions, but that there would not be "as large of a group as . . . in a warehouse or inspection [job]."  *Id.*

When ALJ Ross inquired regarding the amount of time Plaintiff would be permitted to be off-task at the three positions, VE Vercillo responded that such a limitation was not expressly

45

addressed by the DOT.  Tr. 1926–27.  She opined, though, that based on her experience and

other vocational materials and publications, Plaintiff would not be permitted to be more than

fifteen percent off-task or non-productive.  *Id.*  VE Vercillo further testified that Plaintiff would

not be able sustain competitive work if he was absent more than one and one-half days per

month.  *Id.* at 1927.  She additionally clarified that Plaintiff would also not be employable if his

mental impairment symptoms rendered him off-task for thirty minutes once every two weeks.

*Id.* at 1928.

Thereafter, in response to Plaintiff's counsel's questioning, VE Vercillo additionally

testified that competitive work would be unavailable for a person:  (1) who physically assaulted

another coworker — even once; or (2) who was unable to maintain focus on simple tasks for two

hour blocks; or (3) who required less than occasional interaction with coworkers and/or

supervisors; or (4) who was unable to learn the tasks required for simple work following a thirty-

day learning period absent additional special supervision and/or reminders or retraining.  Tr.

1932–33.

### Post-2023 Hearing Meuse Declaration

Following the 2023 hearing, but prior to ALJ Ross' decision, Plaintiff submitted a

declaration from David Meuse, a rehabilitation counselor and expert who had previously testified

in social security cases.  Tr. 2110–11; *see also, e.g.*, *Santiago v. Saul*, No. 1:20-cv-10266-LTS,

2021 WL 11704593, at *2 (D. Mass. Jan. 20, 2021).

Mr. Meuse's "rebuttal declaration" served three primary purposes.  First, Mr. Meuse

opined regarding the impact of Dr. Horton's opined memory limitations on Plaintiff's ability to

find competitive work.  Tr. 2110–11.  He attested that he had reviewed Dr. Horton's test results

regarding Plaintiff's difficulties with memory, and that based on those findings, "more than

[ninety-nine] percent of the entire population would be able to remember instructions, demonstrations, and directions better than [Plaintiff]." *Id.* at 2110. Mr. Meuse opined that memory difficulties such as those found by Dr. Horton would preclude Plaintiff from working at the three jobs proffered by the VE because such limitations "would require a special accommodation such as learning the job in a sheltered workshop or with the support of a job coach." *Id.* Mr. Meuse further attested that a person with Plaintiff's memory "would typically have a very difficult time remembering what steps and in what sequence to take on a job and would require frequent supervision, reminders and redirection at a level that would not be tolerated in competitive full-time employment." *Id.* at 2110–11.

Second, Mr. Meuse testified to the "real world" meaning of Dr. Keuthen's opined limitations regarding Plaintiff's "need to work in an unpressured setting with low interpersonal demand and a supportive, non-critical employer." Tr. 2111. He stated that it was "not impossible" that an employer existed with "one of the three jobs" proffered by the VE that met Dr. Keuthen's opined requirements. *Id.* According to Mr. Meuse, however, such a job "would typically require placement with vocational rehabilitation and with work supports, such as a job coach on site." *Id.*

Third, Mr. Meuse ultimately testified that *either* the memory limitations opined to by Dr. Horton *or* the varied limitations opined to by Dr. Keuthen "would preclude the performance of any of the three jobs cited [by the VE] in a full-time competitive work setting." Tr. 2111.

### G.    ALJ's Decision

On December 27, 2023, in the sixth ALJ decision on Plaintiff's 2010 applications, ALJ Ross found that that Plaintiff was not disabled under the Act for the closed period from April 2,

47

2009 through February 5, 2012.[38]  Tr. 1831–70.  Applying the five-step sequential evaluation process for determining whether an individual is disabled, at step one, ALJ Ross determined that Plaintiff had not engaged in substantial gainful activity during the relevant period from April 2, 2009 through February 5, 2012.  *Id.* at 1836.

At step two, ALJ Ross determined that Plaintiff suffered from two severe impairments: depressive disorder and anxiety/panic disorder.  Tr. 1836.  ALJ Ross also found at step two that Plaintiff's asthma, hyperlipidemia, and right bundle branch block were not severe.  *Id.* at 1837. ALJ Ross additionally found that Plaintiff's polysubstance abuse, which included "cocaine, other opioids, crystal methamphetamine, and alcohol" use, was not severe because it was "largely in remission" and did not have "any significant effect on [Plaintiff's] medically determinable mental or physical impairments" or "cause[] any significant work-related functional limitations during the relevant period."  *Id.*

ALJ Ross found that Plaintiff's "antisocial behavior," and/or "antisocial personality disorder," and bipolar disorder did not constitute MDIs because they were not diagnosed by "an acceptable medical source" during the relevant period.  Tr. 1838.

At step three, ALJ Ross determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of a listed impairment,

---

[38] Like the prior ALJs, ALJ Ross did not account for the fact that Plaintiff's March 31, 2010 DLI would appear to have constituted the outer limits on Plaintiff's 2010 DIB relevant period.  *See* Tr. 1836 (noting that Plaintiff's DLI was March 31, 2010, but failing to address that in calculating relevant periods).  Consequently, ALJ Ross also did not account for the apparent gap between Plaintiff's DIB and SSI relevant periods from the March 31, 2010 expiration of the DIB relevant period until the August 9, 2010 commencement of the SSI relevant period.  *Id.* at 1833– 34.  Finally, ALJ Ross' 2023 decision did not address the impact of Plaintiff's incarceration on the determination regarding the relevant periods or on Plaintiff's ability to receive benefits during the incarcerated period.  *See id.*

specifically considering Listings 12.04 (depressive disorder) and 12.06 (anxiety and obsessive-compulsive disorders).  Tr. 1839–40.  In so finding, the ALJ found that Plaintiff possessed moderate limitations in all four of the functional paragraph B categories.  *Id.* at 1839–41.  The ALJ thus concluded Plaintiff did not meet the paragraph B criteria because he did not have two marked limitations or one extreme limitation in any of the four paragraph B categories.  *Id.*

ALJ Ross additionally found that Plaintiff did not meet the paragraph C criteria because:[39]

> the record evidence, as reviewed [at step four] and [in] the discussion of the 'paragraph B' criteria . . . *does not support a finding* of a serious and persistent mental disorder *evidenced by* both medical treatment, mental health therapy, *psychosocial supports, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of [Plaintiff's] mental disorder*, and, marginal adjustment, that is minimal capacity to adapt to changes in one's environment or to demands that are not already part of one's daily life.[40]

---

[39] "Paragraph C of Listing 12.04 requires a showing that the mental disorder is 'serious and persistent,' meaning that a claimant has 'a medically documented history of the existence of the disorder over a period of at least [two] years, and there is evidence of both: [m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [a claimant's] mental disorder; and [m]arginal adjustment, that is, [a claimant] ha[s] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life.'" *Cruz Madera v. Saul*, No. 19-cv-01320-FDS, 2021 WL 9100419, at *10 n.24 (D.P.R. Feb. 26, 2021) (alterations in original, emphasis omitted) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1); *accord McKeage v. Kijakazi*, No. 21-cv-11683-TSH, 2023 WL 2988746, at *9 (D. Mass. Feb. 8, 2023).

[40] With this cursory finding, ALJ Ross failed to mention or discuss in his step three findings that, when Plaintiff was not homeless, he resided in prison, a halfway house, and a sober living home during the entire relevant period in this case.  *See* Tr. 1841.  As discussed below, both prison and the halfway house clearly constituted "highly structured setting[s]" for purposes of Paragraph C. Although Plaintiff did not specifically challenge the ALJ's Paragraph C findings, he did challenge the ALJ's failure to account for the impact of the highly structured settings on his functional limitations and assessed RFC at step four of the sequential analysis.  The Court has,

Tr. 1841 (emphases added).

At step four, ALJ Ross found that Plaintiff possessed an RFC for a "full range of work at all exertional levels" with additional non-exertional limitations, but he limited Plaintiff to "simple, routine, and repetitive tasks over an eight-hour workday within a normal break schedule." Tr. 1841. ALJ Ross also determined that Plaintiff was unable to "perform time-pressured tasks," and was instead limited to "goal-oriented work, not time-sensitive, strict production quotas, such as found in assembly-line work." *Id.*

ALJ Ross further found that Plaintiff possessed an RFC limiting him to "simple work-related decisions." Tr. 1841. ALJ Ross also limited Plaintiff to "occasional interact[ion] with supervisors and co-workers," and found that while "[Plaintiff] could work in the presence of co-workers and engage in appropriate occasional social interactions," he "could not work in the context of a work team where work-related interactions with co-workers and supervisors was constant and/or physically close." *Id.* ALJ Ross added that Plaintiff "was limited to working with things and objects rather than people." *Id.* Finally, ALJ Ross stated that Plaintiff "could tolerate simple routine changes in a work setting and could understand, remember, and carry out simple instructions." *Id.*

ALJ Ross subsequently found that Plaintiff was unable to perform his past work as an auto mechanic. Tr. 1866. At step five, ALJ Ross relied on the testimony of VE Vercillo in concluding that there were nevertheless sufficient jobs existing in the national economy that Plaintiff could perform, including janitor/cleaner, night cleaner/office cleaner, and laundry

---

therefore, addressed this issue below in conjunction with its analysis of the ALJ's step four findings.

laborer and folder.  *Id.* at 1867–68.  He afforded "no weight" to the Meuse declaration.  *Id.* at

1869.  ALJ Ross thus ultimately concluded that Plaintiff was not disabled at step five.  *Id.* at

1869–70.

## II.    STANDARD OF REVIEW

This Court's review of the Commissioner's decision is "limited to determining whether

the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."

*Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *accord Sacilowski v. Saul*, 959

F.3d 431, 437 (1st Cir. 2020) (citation omitted) (holding the court reviews "whether the final

decision is supported by substantial evidence and whether the correct legal standard was used").

The Court must defer to the Commissioner's factual findings, so long as such findings are

"supported by substantial evidence," but the Court's review of the Commissioner's conclusions

of law is *de novo*.  *See Sacilowski*, 959 F.3d at 437; *see also Nguyen v. Chater*, 172 F.3d 31, 35

(1st Cir. 1999).

"Under the substantial-evidence standard, a court looks to an existing administrative

record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations."  *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (quoting *Consolidated Edison*

*Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a mere scintilla,"

and "means – and means only – 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Id*.  The Court will affirm the ALJ's findings, even if the

record could support a different conclusion, when there is substantial evidence to support the

ALJ's findings.  *See Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991);

*accord Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018).

A denial of benefits, however, will not be upheld if the Commissioner "has committed a legal or factual error in evaluating a particular claim." *See Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting *Sullivan v. Hudson*, 490 U.S. 877, 885 (1989)). In particular, an ALJ's findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Sacilowski*, 959 F.3d at 437 (quoting *Nguyen v. Chater*, 172 F.3d at 35). "The ALJ cannot reject evidence for no reason, or for the wrong reason, and must explain the basis for his findings." *Crosby v. Heckler*, 638 F. Supp. 383, 385 (D. Mass. 1985). Accordingly, if an "ALJ fail[s] to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, le[aves] unresolved conflicts in the evidence, th[e] Court cannot conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998). "Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation." *Crosby*, 638 F. Supp. at 385–86.

## III.    DISCUSSION

Plaintiff argues that ALJ Ross' 2023 decision should be reversed because he erred: (1) at step two in finding that Plaintiff's antisocial personality disorder did not constitute an MDI;[41] (2) in evaluating five medical opinions at step four; (3) in assessing Plaintiff's RFC at step four; and (4) in evaluating the vocational evidence at step five. [ECF No. 12 at 1]. The Commissioner

---

[41] Plaintiff raised this step two issue as an error in conjunction with his challenge to the ALJ's evaluation of Dr. Keuthen's opinion. *See* [ECF No. 12 at 1, 18]. In the future, Plaintiff is reminded to set forth clearly and distinctly all alleged errors at the outset.

argues the ALJ's decision is free of harmful legal error, supported by substantial evidence, and should be affirmed.  *See* [ECF No. 19].  The Court addresses each issue in turn below.

### A.    Relevant Periods on 2010 SSI and DIB Claims and Impact of Plaintiff's Incarceration

As referenced previously, the Court is required to first address two preliminary issues that were not addressed by the parties but that are necessary to the Court's adjudication of this appeal:  (1) the relevant periods associated with Plaintiff's 2010 DIB and SSI claims; and (2) the impact of Plaintiff's incarceration on his 2010 DIB and SSI claims.

As noted above, there has been confusion throughout the past fifteen years regarding the precise confines of the relevant periods associated with Plaintiff's 2010 DIB and SSI claims and the impact, if any, of Plaintiff's incarceration on the relevant period(s) and his claims.  Neither the most recent 2023 ALJ decision, nor the parties in their current briefs on appeal, adequately addressed either of these issues.  *See* Tr. 1831–33, 1837 (ALJ Ross mentions incarceration, but only for the purpose of showing that Plaintiff was not abusing substances while incarcerated); *see also* [ECF No. 12 at 7 n.4 (noting Plaintiff's incarceration between March 2009 and June 2010, but failing to address impact of incarceration on eligibility for benefits)]; [ECF No. 19 at 6 (Commissioner mistakenly acknowledges the dates of Plaintiff's incarceration as April 2009–April 2010, but otherwise fails to address consequences of incarceration)].

As noted, in his 2023 decision, ALJ Ross, like other preceding ALJs, simply compressed the two relevant DIB and SSI periods into a single relevant period, spanning from "April 2, 2009, through February 5, 2012."  Tr. 1833 (citing *id.* at 1286, 1761) (Appeals Council's remand orders).  He did not address the role of Plaintiff's March 2010 DLI in calculating the relevant period for Plaintiff's 2010 DIB claim, or the resulting March -August 2010 gap between the

relevant DIB and SSI periods.  It is unclear to the Court whether there is any support for this

"combined" approach given the lack of explanation on the issue.[42]

Adding to the confusion, Plaintiff's incarceration appears to have encompassed the *entire*

relevant DIB period from April 2, 2009, through March 3, 2010.  As described above, Plaintiff

was incarcerated from March 2009, until July 2010, on a felony larceny conviction.[43]  *See* Tr.

1837 (ALJ Ross' finding that Plaintiff "was incarcerated from March 2009 through late-July

2010") (citing *id.* at 326–97, 490–93); *see also id.* at 1308, 371, 406–07, 1910.  Accordingly,

Plaintiff was not eligible to receive payment of any SSI *or* DIB benefits until August 1, 2010,

after his July 2010 release from prison.  *See* 20 C.F.R. § 404.468(a).  By the time Plaintiff was

eligible for payment of benefits on August 1, 2010, however, the outer limits on the relevant

---

[42] Nevertheless, the Court notes that, as a practical matter, the utilization of a single DIB and SSI combined relevant period like that used by ALJ Ross, makes no real difference to the analysis of the issues.  That is because Plaintiff's mental impairments, for the reasons discussed below, were chronic in nature, albeit waxing and waning over the years, including throughout the relevant period(s) in this case.  There is no evidence that Plaintiff's chronic mental impairments materially differed during the March–August 2010 gap from what they were before and after that gap.  Additionally, as explained below, Plaintiff would have been ineligible to receive *any* benefits — either DIB or SSI — until August 1, 2010, after his July 2010 release from prison, regardless of whether the ALJ employed a single or multiple relevant periods.  *See* 20 C.F.R. § 404.468(a).

[43] As noted, throughout this case, there has also been a lack of clarity regarding Plaintiff's precise dates of incarceration.  The record before this Court is no exception and appears to be missing a Parole Board Certificate of Discharge, previously relied on by ALJ Klibaner.  *See* Tr. 1308 (In his October 2020 decision, ALJ Klibaner, references a "Parole Board Cert[ification] of Discharge" in support of a finding that Plaintiff "was incarcerated during at least part of the relevant period at issue.").  Nevertheless, the Court's review of the existing administrative record confirms that Plaintiff was, in fact, initially incarcerated prior to the commencement of the DIB relevant period from sometime in 2008, until December 2008.  *Id.* at 1910.  Plaintiff subsequently reoffended and was reincarcerated from March 18, 2009, until sometime in July 2010.  *Id.*; *see also id.* at 168, 371, 1308, 1837, 407, 643 n.1, 405, 427, 481.

period associated with Plaintiff's DIB claim — his March 2010 DLI — had passed.[44]  The same, however, was not the case, with Plaintiff's SSI benefits.  As noted, the August 9, 2010, through February 5, 2012 SSI relevant period did not overlap with Plaintiff's incarceration given that he was released in July 2010, prior to the August 2010 commencement of the SSI relevant period.

For consistency, the Court has generally referred to the same combined SSI and DIB relevant period — April 2, 2009, through February 5, 2012 — as that employed by ALJ Ross in addressing Plaintiff's claims.  Because the Court, however, ultimately determines that an award of benefits is warranted, when calculating those benefits on remand, the SSA will be required to ascertain with more precision the DIB and SSI relevant periods, including accounting for what appears to be a March 2010–August 2010 gap between those periods, along with the impact of Plaintiff's incarceration on his entitlement to DIB benefits.

### B.    The ALJ Did Not Err at Step Two in Evaluating Plaintiff's Antisocial Personality Disorder.

Plaintiff contends that the ALJ erred in evaluating his antisocial personality disorder at step two.  [ECF No. 12 at 18-19].  As noted above, in 2009, treating LMHC Berrio diagnosed Plaintiff with "adult antisocial behaviors."  Tr. 1630.  Subsequently, in October 2010, non-examining state agency psychologist, Dr. Keuthen, found that Plaintiff's "antisocial personality

---

[44] Plaintiff fails to adequately address the impact of his incarceration on his 2010 DIB claim in his briefing before the Court.  Plaintiff instead simply ignores the fact of his 2009–2010 incarceration when explaining why he has continued to pursue DIB benefits on his 2010 claim.  [ECF No. 12 at 4 n.1].  Plaintiff acknowledges that, based on his successful 2012 SSI claim, he continues to receive SSI benefits (effective February 2012) and then explains that he continues to pursue DIB benefits on his 2010 claim because the receipt of additional DIB benefits would increase his overall income.  [*Id.*].  Nowhere, though, does Plaintiff acknowledge that his 2009–2010 incarceration would appear to have rendered him ineligible for DIB benefits during the entire DIB relevant time period — April 2, 2009 through his March 31, 2010 DLI.

disorder," which she described as "[i]nflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress," constituted an MDI. *Id.* at 418.

In the Court's prior January 2014 remand order on Plaintiff's first appeal, Judge Dein instructed the ALJ on remand to "determine whether [P]laintiff has a severe personality disorder." Tr. 716. In its subsequent June 2014 remand order, the Appeals Council specifically noted that ALJ Fulton failed to "discuss the severity of [Plaintiff's] antisocial personality disorder," which was diagnosed by Dr. Keuthen, a "greatly weighted source," who in turn had referenced a diagnosis for anti-social behavior by [LMHC] Berrio. *Id.* at 751.

Subsequently, in his March 2015 decision, ALJ Fulton found that Plaintiff suffered from an additional severe mental impairment, "social avoidance disorder." Tr. 648. ALJ Fulton afforded Dr. Keuthen's opinion "great weight," but again did not discuss antisocial personality disorder in his second opinion. *Id.* at 655.

Thereafter, in August 2016, Judge Gorton granted the Commissioner's motion to remand the case for the third round of proceedings. Tr. 1228. The Appeals Council's related October 2016 remand order noted that, for a second time, ALJ Fulton gave Dr. Keuthen's opinion great weight, but failed to account for her diagnosed impairment of anti-social personality disorder. *Id.* at 1232.

In the third round of proceedings, ALJ Rodgers' August 2017 decision found that Plaintiff suffered from bipolar disorder in addition to anxiety and depression. Tr. 969. ALJ Rodgers gave "partial weight" to Dr. Keuthen's opinion, but the ALJ again failed to address the severity or limitations associated with Dr. Keuthen's diagnosis of antisocial personality disorder. *Id.* at 969–70, 979, 985.

In February 2019, Judge Casper granted the Commissioner's stipulated motion to remand.  In its related May 2019 remand order, the Appeals Council specifically noted that ALJ Rodger's decision did "not comply" with its prior orders requiring evaluation of Plaintiff's antisocial personality disorder.  Tr. 1286 (noting that "the decision (pages 4–5) does not contain an evaluation as to whether [Plaintiff] has a severe impairment of antisocial personality disorder").  *Id.*

Subsequently, in the fourth round of proceedings, ALJ Klibaner, like the preceding ALJs, similarly failed to consider the severity of Plaintiff's antisocial personality disorder, as diagnosed by Dr. Keuthen.  Tr. 1295–96.  He also did not discuss the diagnosis in his discussion of Dr. Keuthen's opinion, an opinion to which he gave "substantial weight."  *Id.* at 1302–03, 1306.  Judge Kelley granted the Commissioner's stipulated motion to reverse and remand, and the Appeals Council again remanded.  *Id.* at 1760–61, 1729–30.

Finally, during the fifth round of proceedings, ALJ Klibaner addressed Plaintiff's antisocial personality disorder for the first time and found that it did not constitute an MDI at step two of the requisite sequential analysis.  Tr. 1703.  In support, the ALJ reasoned that, "[w]hile there are indications that [Plaintiff] had behavioral problems prior to age [eighteen], there is no evidence that such behavior was caused by an antisocial personality disorder."  *Id.*  ALJ Klibaner did not, however, discuss either LMHC Berrio's or Dr. Keuthen's respective diagnoses in making that finding, in spite of affording those opinions "great" and "substantial" weight, respectively.  *Id.* at 1703, 1708, 1710, 1713.

Thereafter, in January 2023, Judge Boal granted the parties' stipulated motion to remand, and the Appeals Council again remanded.  Tr. 1937–39, 1942–44.

In the sixth round of proceedings, ALJ Ross acknowledged Dr. Keuthen's diagnosis of antisocial personality disorder, but found at step two that Plaintiff's antisocial personality disorder did not constitute an MDI, let alone a severe impairment.  Tr. 1837–38.

In support, ALJ Ross stated that "the sole basis for Dr. Keuthen's assessment of antisocial personality disorder [was] treatment notes from February 2009 in which 'adult antisocial behavior' is referenced."  Tr. 1837 (referring to treating LMHC Berrio's diagnosis). ALJ Ross then accurately found that, although he was a treating counselor, LMHC Berrio was not considered an "acceptable medical source" under the pre-March 2017 regulations for purposes of diagnosing an MDI.  *Id.* at 1838; *see also* 20 C.F.R. §§ 404.1502, 404.1513, 416.902, 416.913 (2006) (amended 2011); SSR 06–03p, *Considering Opinions and Other Evidence From Sources Who are Not "Acceptable Medical Sources" in Disability Claims*, 2006 WL 2263437, at *2 (Aug. 9, 2006).[45]

ALJ Ross then found that Plaintiff's antisocial personality disorder could not constitute an MDI because he had not been diagnosed by a "treating provider" or an "examining psychologist" who constituted an "acceptable medical source."  Tr. 1838.  In support, ALJ Ross cited to MEs Drs. Griffin's and Boxer's 2020 and 2023 testimony, respectively, during which

---

[45] The governing regulations in effect in 2010, limited "acceptable medical sources" to licensed physicians, psychologists, optometrists, podiatrists, and "[q]ualified speech-language pathologists."  20 C.F.R. §§ 404.1513 and 416.913(2006) (amended 2011).  Accordingly, under the regulations then in effect, evidence from other medical sources, such as licensed social workers or therapists, like Counselor Berrio, was insufficient to establish the existence or severity of a claimant's impairments.  *Id.*

For claims filed after March 27, 2017, however, the SSA no longer distinguishes between an "acceptable medical source" and an "other medical source."  *See* 20 C.F.R. §§ 404.1520c, 416.912c.

both MEs opined that antisocial personality disorder was not one of Plaintiff's MDIs.  *Id.*; *see also id.* at 1174–75, 1913.

Plaintiff is correct that ALJ Ross erred in finding that an MDI of antisocial personality disorder could not be established by a non-treating or non-examining physician, such as Dr. Keuthen.  [ECF No. 12 at 18]; *see* Tr. 1838.  MDIs are defined as, "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."[46]  20 C.F.R. §§ 416.921; *see also id.* § 404.1521 (same).  The governing regulations emphasize that:

> [A] physical or mental impairment must be established by objective medical evidence from *an acceptable medical source*. We will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).

*Id.* §§ 416.921, 404.1521 (emphasis added).

The versions of the governing regulations in effect in 2010, when Plaintiff filed his claims, provided in pertinent part that:

> 'Acceptable medical source' refers to one of the sources described in § 404.1513(a) [or, in the case of § 416.902, the sources described in § 416.913(a)] who provides evidence about your impairments.  It includes treating sources, nontreating sources, and *non[-]examining sources*.

20 C.F.R. § 404.1502 (2006) (amended 2011) (emphasis added); *id.* § 416.902 (2006) (amended 2011) (emphasis added).

_____

[46] Determining severity at step two of the sequential analysis is a two-step process.  *See* SSR 16-3p, *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304, at *3–8 (Oct. 25, 2017); *see also Forrette v. Saul*, No. 19-cv-30089-KAR, 2020 WL 5803166, at *10 (D. Mass. Sept. 29, 2020).  Prior to determining whether an impairment is "severe," an ALJ is required to first ascertain whether the impairment constitutes "an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms."  SSR 16-3p, 2017 WL 5180304, at *3; *see also* 20 C.F.R. § 416.921.

The regulations subsequently defined "[n]onexamining source" to include "a physician, psychologist, or other acceptable medical source who has not examined you but [who] provides a medical or other opinion in your case." 20 C.F.R. § 404.1502 (2006) (amended 2011); *id.* § 416.902 (2006) (amended 2011). In particular, the regulations specify that "[a]t the administrative law judge hearing and Appeals Council levels of the administrative review process, . . . it includes *state agency medical and psychological consultants*, other program physicians and psychologists, and medical experts or psychological experts we consult." *Id.* (emphasis added); *see also Leeper v. Astrue*, No. 2:10-cv-260-DBH, 2011 WL 2559599, at *3 (D. Me. June 24, 2011) (holding that a state agency psychologist was "an acceptable medical source"), *report and recommendation adopted*, 2011 WL 2791268 (D. Me. July 15, 2011).

Non-examining state agency psychologist, Dr. Keuthen, was therefore an "acceptable medical source" for purposes of diagnosing Plaintiff's antisocial personality disorder. Dr. Keuthen's reliance on LMHC Berrio's treatment notes in formulating her own opinion did not somehow transform Dr. Keuthen from an "acceptable medical source" to an "unacceptable medical source," as the ALJ and the Commissioner erroneously suggest. *See* Tr. 1838 (asserting that Dr. Keuthen simply "adopted" LMHC Berrio's opinion); [ECF No. 19 at 20]. Furthermore, the Commissioner's suggestion that LMHC Berrio's opinion was the "sole" basis for Dr. Keuthen's opinion constitutes speculation and improper *post hoc* rationalization, and it mischaracterizes the evidence that Dr. Keuthen generally relied on in completing her opinion. *See* [ECF No. 19 at 20]; Tr. 81 (noting multiple sources of evidence considered by Dr. Keuthen in conjunction with her opinion). For these reasons, the ALJ erred in finding that there were no "acceptable medical sources" who diagnosed antisocial personality disorder given Dr. Keuthen's diagnosis.

Nonetheless, in assessing Plaintiff's MDIs, ALJ Ross relied on opinions regarding Plaintiff's antisocial personality disorder from other acceptable medical sources, namely, MEs Drs. Griffin and Boxer.  *See* Tr. 1838.  As noted, both Drs. Griffin and Boxer reviewed Plaintiff's medical records and, contrary to Dr. Keuthen, opined that Plaintiff did not suffer from antisocial personality disorder during the relevant period.  [ECF No. 19 at 21].

The Commissioner suggests that the conflicting medical opinions supported the ALJ's finding that Plaintiff's antisocial personality disorder did not constitute an MDI.  [ECF No. 19 at 21].  Plaintiff counters that, in spite of the contrary opinions, the ALJ was not free to simply disregard Dr. Keuthen's medical determination that his antisocial personality disorder constituted an MDI.  [ECF No. 22 at 3].

Where, as here, there is a conflict in the medical opinion evidence regarding the existence of an MDI, the ALJ is entitled to resolve the conflict.  *See Kimball v. Astrue*, No. 07-cv-115-BW, 2008 WL 449847, at *5–6 (D. Me. Feb. 14, 2008), report and recommendation adopted, No. CIV. 07-cv-115-BW, 2008 WL 648920 (D. Me. Mar. 5, 2008) (upholding ALJ's resolution of conflicting medical opinions regarding the existence of an MDI, noting the existence of "rather reasonable disagreement among experts as to the level and type of findings necessary to diagnose [ulnar neuritis or neuropathy]").  ALJ Ross was entitled to rely on the two opinions from acceptable medical sources, Drs. Boxer and Griffin, in finding that antisocial personality disorder was not an MDI for Plaintiff at step two.  *See* Tr. 1174 (Dr. Griffin's testimony that Plaintiff's records did not establish antisocial personality disorder, and that it was not an MDI); *id.* at 1913 (Dr. Boxer's testimony that the record did not establish antisocial personality disorder).

**C.    The ALJ Erred in Evaluating Medical Opinions from Drs. Keuthen, Fierman, Horton, Wojcik, and Boxer.**

Plaintiff challenges ALJ Ross' evaluation of five medical opinions from Drs. Keuthen, Fierman, Horton, Wojcik, and Boxer.

**1.    Pre-March 2017 Legal Standards re Evaluation of Medical Opinion Evidence**

For claims filed before March 27, 2017, as is the case here, each of the three types of medical opinions — treating, examining, and non-examining — is accorded different weight pursuant to the then-controlling regulations.  *See* 20 C.F.R. §§ 404.1527, 416.927.  According to the First Circuit, under the pre-March 2017 regulations:

> [A] treating physician's opinion is controlling if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' And even if not deemed controlling, a treating physician's opinion is entitled to weight that reflects the physician's opportunity for direct and continual observation.

*Sacilowski*, 959 F.3d at 441 (alteration in original) (quoting *Purdy*, 887 F.3d at 13).

The ALJ must "give good reasons" regarding the weight afforded to a treating physician's opinion, meaning reasons which are defined as "supportable," and "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion."  *Alberts v. Astrue*, No. 11-cv-11139-DJC, 2013 WL 1331110, at *8 (D. Mass. Mar. 29, 2013) (first quoting 20 C.F.R. § 404.1527(c)(2); then quoting SSR 96-2p, *Policy Interpretation Ruling Titles II and XVI:  Giving Controlling Weight to Treating Source Medical Opinions*, 1996 WL 374188, at *5 (July 7, 1996)); *accord Soto-Cedeño v. Astrue*, 380 F. App'x 1, 4 (1st Cir. 2010); *Kenerson v. Astrue*, No. 10-cv-161–SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011); *Haggblad v. Astrue*, No. 11-cv-028-JL, 2011 WL 6056889, at *7–8 (D.N.H. Nov. 17, 2011), *report and recommendation adopted sub nom Haggblad v. Comm'r*,

2011 WL 6057750 (D.N.H. Dec. 6, 2011).  These "good reasons" must "offer a rationale that

could be accepted by a reasonable mind."  *Haggblad*, 2011 WL 6056889, at *8 (citing *Lema v.

Astrue*, No. 09-cv-11858, 2011 WL 1155195, *4 (D. Mass. Mar. 21, 2011)).

As with treating versus non-treating physicians, "[i]n general, less weight is given to the

opinion of a non-examining medical source than that of an examining source."  *Alberts*, 2013

WL 1331110, at *10 (citing 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the

medical opinion of a source who has examined you than to the medical opinion of a source who

has not examined you.")).

"[N]ontreating, non[-]examining sources may[,] [however,] override treating [and

examining] opinions, provided there is support for the result in the record."  *Alberts*, 2013 WL

1331110, at *10 (quoting *Haggblad*, 2011 WL 6056889, at *7–8); *see also Berrios Lopez v.

Sec'y of Health & Hum. Servs.*, 951 F.2d 427, 431 (1st Cir. 1991) (collecting cases in which

opinions of treating physicians have been properly discounted and holding that where reports

from non[-]examining sources "contain little more than brief conclusory statements," such

reports "are entitled to relatively little weight"); *see also Ormon v. Astrue*, 497 F. App'x 81, 84–

85 (1st Cir. 2012) (citing *Berrios Lopez,* 951 F.2d at 431) (ALJ erred in adopting nonexamining

source's opinion over examining physician's opinion where ALJ mischaracterized record

evidence and improperly rejected Plaintiff's symptom testimony).  "The opinion of a non-

examining physician[,] [however,] cannot by itself constitute substantial evidence that justifies

the rejection of the opinion of either an examining physician or a treating physician."  *Arroyo

Lorenzo v. Colvin*, No. 14-cv-1697-CVR, 2016 WL 632232, at *5 (D.P.R. Feb. 17, 2016)

(quoting *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) , *superseded on other grounds by* 20

C.F.R. parts 404 & 416) (holding that "[t]he Court, and thus the ALJ, cannot rely on agency

[non-examining] conclusions that are not supported by the majority of the evidence in the record").

If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must nevertheless determine the amount of weight to give the treating opinion — and the other medical opinions — based on the following six factors: (1) "[l]ength of treatment relationship and the frequency of examination;" (2) "[n]ature and extent of the treatment relationship;" (3) "[s]upportability" of the medical opinion; (4) consistency of the opinion "with the record as a whole;" (5) "[s]pecialization" of the treating source; and (6) "other factors . . . that tend to support or contradict the opinion." *Alberts*, 2013 WL 1331110, at *8 (quoting 20 C.F.R. § 404.1527(c)) (stating that "unless [the ALJ] give[s] a treating source's medical opinion controlling weight . . . [the ALJ] consider[s] all of the [six listed factors] in deciding the weight" to give the opinion).

While the ALJ is not required to discuss each of the six factors in weighing the medical opinions, they are nevertheless required to "explain the reasons" and "the weight given to the opinions" in sufficient detail that "allows a . . . [court] or subsequent reviewer to follower the adjudicator's reasoning." 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2); *see also Bourinot v. Colvin*, 95 F. Supp. 3d 161, 177 (D. Mass. 2015); *Pinnick v. Colvin*, 132 F. Supp. 3d 180, 188 (D. Mass. 2015) (quoting *Braley v. Barnhart*, No. 04-176-B-W, 2005 WL 1353371, at *4 (D. Me. June 7, 2005) (noting a lack of authority for the proposition that "an [ALJ] must slavishly discuss each of these factors for his consideration of a treating-source opinion to pass muster")). "The factors provide a balancing test, not a checklist." *Alberts*, 2013 WL 1331110, at * 8 (citing *Conte v. McMahon*, 472 F.Supp.2d 39, 48–49 (D. Mass. 2007) (disagreeing with claimant that a "failure to address specifically each factor constitutes legal error" because the list "presents the

quintessential balancing test" and stating that the ALJ did not "neglect[ ] to perform the balancing," but rather "chose to stress one factor [, consistency of the opinion with the record as a whole,] over the others")); *accord Newman v. Saul*, 474 F. Supp. 3d 345, 362 (D. Mass. 2020) (holding that ALJ adequately evaluated weight of treating physician's opinion where "[t]he only factors noted in the [ALJ's] decision are supportability and consistency," because consideration of those factors under the circumstances of the case constituted "sufficient balancing to determine that the doctor's opinion is entitled to less weight"); *but see Richards v. Kijakazi*, 554 F. Supp. 3d 242, 251–52 (D. Mass. 2021) (finding that although the ALJ "arguably considered the supportability and consistency of [the treating physician's] opinion," the ALJ erred in his balancing of the factors where he "failed to consider the factors centered on [the physician's actual] treatment relationship with [the claimant]," and "it [was] conceivable that given consideration under the appropriate standard, the ALJ would have given additional weight to [the treating physician's] opinion").

Where "the ALJ fails to explicitly indicate the weight given to all [of the medical opinions], the reviewing court cannot affirm the Commissioner's decision." *Nguyen*, 997 F. Supp. at 182 (citation and internal quotation marks omitted).

## 2.    Background

In his 2023 decision, ALJ Ross evaluated fifteen medical opinions regarding Plaintiff's mental impairments, spanning from March 2009 through the date of Plaintiff's 2023 hearing.[47] Two of the "opinions" were completed during the year prior to the commencement of the

---

[47] Plaintiff's physical impairments — and the medical opinions pertaining to those impairments — are not at issue in the current appeal.

relevant period, including a 2009 opinion from Dr. Harris and the December 2009 opinion from Counselor Berrio (referred to collectively as "pre-relevant period opinions").  Five of the "opinions" were completed during the April 2009–February 2012 relevant period, including the August 6, 2010 and March 30, 2011 EAEDC medical reports from NP Kassirer; a September 2010 opinion from examining psychologist, Dr. Hennessey; an October 2010 opinion from non-examining state agency psychologist, Dr. Keuthen; and a 2011 opinion from non-examining state agency psychologist, Dr. Fierman (referred to collectively as "relevant period opinions").

Additionally, four opinions were completed in 2012, including a May 2012 opinion from examining psychologist, Dr. Powers; a May 2012 opinion from non-examining state agency psychologist, Dr. Kiley; a September 2012 opinion from examining psychologist, Dr. Horton, and an October 2012 opinion from non-examining state agency psychologist Dr. Shestapol (referred to collectively as the "near relevant period" opinions).  Finally, four of the opinions were completed or testified to between five and eleven years after the end of the relevant period, including the April 2017 opinion from examining psychologist, Dr. Powers; the April 2019 opinion from examining psychologist, Dr. Wojcik; the 2020 opinion from testifying, non-examining ME, Dr. Griffin; and the 2023 opinion from testifying, non-examining ME, Dr. Boxer (referred to collectively as the "remote opinions").

ALJ Ross rejected the majority of the fifteen opinions, declining to afford any of the fifteen medical opinions significant or controlling weight.  *See* Tr. 1853–66.  Specifically, ALJ Ross afforded little or no weight to ten opinions, including those from Dr. Horton (near relevant period), Dr. Harris (pre-relevant period), Dr. Kiley (near relevant period), Dr. Shestopal (near relevant period), Therapist Berrio (pre-relevant period), Dr. Powers (near relevant period and remote), Dr. Wojcik (remote), and NP Kassirer's EAEDC opinions (relevant period).  *Id.*

ALJ Ross, by contrast, stated that he gave "some weight" to the September 2010 opinion from examining psychologist, Dr. Hennessey (relevant period), and that he afforded "partial weight" to four opinions, including the 2023 opinion from testifying ME, Dr. Boxer (remote), the 2020 opinion from testifying ME, Dr. Griffin (remote), and the 2010 and 2011 opinions from state agency psychologists, Drs. Keuthen and Fierman (relevant period).  Tr. 1853–66.

Despite ALJ Ross' statement that he gave Dr. Griffin's opinion only "partial" weight, review of ALJ Ross' assessed RFC demonstrates that the ALJ, in fact, afforded the most weight to non-examining psychologist Dr. Griffin's 2020 opinion.[48]  Tr. 1841, 1856, 1170–79.  Notably, ALJ Ross afforded full weight to and adopted several of Dr. Griffin's opined limitations that he found were "consistent with and supported by the record."  *Id.* at 1856, 1841.  Those included Dr. Griffin's opined limitations that Plaintiff "could carry out simple, routine, repetitive tasks[;] could occasionally interact with co-workers and supervisors[;][49] was able to tolerate simple changes in work routine[;] was unable to perform externally[-]set, production rate-pace[] task[s] such as assembly line work[;] [and was] able to work under . . . work pressures within these limits with *no need for special supervision*."[50]  *Id.* at 1856 (emphasis added); *cf. id.* at 1841 (ALJ Ross assesses Plaintiff's RFC to permit "simple, routine, and repetitive tasks *over an eight hour workday within a normal break schedule*," and "simple routine changes in a work setting," but to

---

[48] In the 2022 decision, the decision immediately preceding ALJ Ross' 2023 decision, ALJ Klibaner mistakenly failed to discuss or evaluate Dr. Griffin's opinion.  Tr. 1700–26.

[49] As described below, ALJ Ross asserted that he was placing greater limitations on this particular restriction as opined by Dr. Griffin.  Tr. 1856.

[50] As discussed below with Dr. Keuthen's opinion, there is a factual issue as to whether Dr. Griffin testified to the above italicized portion of the opinion.

preclude "time-sensitive, strict production quotas, such as found in assembly line work") (emphasis added).[51]

ALJ Ross, however, provided no record citations in support of his finding that Dr. Griffin's opinion was consistent with the record evidence.[52]  Tr. 1856.  Nor did he address the fact that Dr. Griffin was a non-examining source in affording greater weight to his opinion than to opinions from other examining sources.  *Id.* at 1855–56; *see also Alberts*, 2013 WL 1331110, at *10 (citing 20 C.F.R. § 404.1527(c)(1)) ("In general, less weight is given to the opinion of a non-examining medical source than that of an examining source.").

ALJ Ross explicitly rejected only one of Dr. Griffin's opined limitations:  that Plaintiff was capable of occasional work "in a team environment and perform[ing] tandem tasks."  Tr. 1177, 1841, 1856.  ALJ Ross stated that he gave the limitation "no weight," citing to "[Plaintiff's] subjectively reported and documented anxiety symptoms in relation[] to social interactions."  *Id.* at 1856.  Nevertheless, his assessed RFC allowed for occasional work with supervisors and colleagues, such that Plaintiff "could work in the presence of co-workers and engage in appropriate occasional social interactions."[53]  *Id.* at 1841.  ALJ Ross also added the

---

[51] The Court notes that, as discussed below, Dr. Griffin did not specifically testify regarding Plaintiff's need for breaks other than to opine that Plaintiff was "otherwise able to perform under the ordinary work pressures of . . . unskilled work."  Tr. 1177.

[52] The Court discusses below ALJ Ross' repeated failure to provide adequate record citations in support of his findings pertaining to the evaluation of the medical opinions.

[53] Additionally, ALJ Ross noted that Plaintiff "was limited to working with things and objects rather than people."  Tr. 1841.  This limitation does not appear to have been stated in any of the medical opinions relied on by ALJ Ross.

caveat that Plaintiff "could not work in the context of a work team where work-related

interactions with co-workers and supervisors was constant and/or physically close."  *Id.*

In addition to Dr. Griffin's opinion, ALJ Ross stated that he also afforded "partial

weight" to Drs. Boxer's and Keuthen's opinions.  Tr. 1853–55, 1856–59.  Despite stating that he

gave these opinions the same "partial weight" that he gave Dr. Griffin's opinion, ALJ Ross, in

fact, afforded those two opinions much more limited weight than the weight he afforded Dr.

Griffin's opinion.  *Id.*

As for Dr. Boxer's opinion, challenged by Plaintiff and discussed in more detail below,

ALJ Ross rejected multiple opined limitations, adopting and affording weight to only one of

many of Dr. Boxer's opined limitations — one that Dr. Boxer, in fact, shared with Dr. Griffin:

that Plaintiff was "able to understand, remember, and carry out simple, routine tasks."  *See* Tr.

1854, 1841.  As for Dr. Keuthen's opinion, also discussed in more detail below, ALJ Ross

declined to adopt several of Dr. Keuthen's opined limitations as stated, including that Plaintiff

was limited to "predictable work routines" in an "unpressured setting" with "low interpersonal

demands."  *Id.* at 1858 (finding the limitations not "vocationally relevant").  Instead, the ALJ

redefined Dr. Keuthen's limitations to align more closely with and to mirror the limitations the

ALJ adopted from Dr. Griffin's opinion.[54]  *Id.*  ALJ Ross also rejected Dr. Keuthen's opined

limitation restricting Plaintiff to work for a "supportive, non-critical supervisor."  *Id.* at 1856,

1859.  Accordingly, in sum, ALJ Ross accepted only those limitations from Drs. Boxer's and

---

[54] ALJ Ross redefined Dr. Keuthen's limitations as limitations to "simple work-related decisions" and "simple routine changes in the work setting," and further specified that Plaintiff could not "perform time pressured tasks," but was instead "limited to goal-oriented work, not time sensitive[,] strict production quotas, such as [those] found in assembly line work." Tr. 1858.

69

Keuthen's opinions that aligned with the limitations that he had already adopted in conjunction with his evaluation of Dr. Griffin's opinion.

Finally, ALJ Ross afforded "some weight" to the "observations" and GAF assessment in Dr. Hennessey's 2010 opinion, which itself did not include any opined functional limitations. Tr. 1865; *see also id.* at 409. Specifically, ALJ Ross found that Dr. Hennessey's September 2010 assessed GAF score of 60, which reflected "moderate" symptoms and impairments, was "helpful in formulating [Plaintiff's] residual functional capacity"[55] *Id.* at 1865.

_____

[55] The Court notes that ALJ Ross' treatment of Dr. Hennessey's GAF score appears to conflict with ALJ Ross' subsequent statement that he was generally affording GAF scores "little weight." Tr. 1865.

Moreover, ALJ Ross failed to adequately explain why Dr. Hennessey's singular GAF score was more persuasive than the other two 2011 and 2012 GAF scores of 50 and 45–50, which themselves indicated "serious" symptoms and impairment. *See* Tr. 1865; *see also id.* at 626, 947. Notably, Dr. Hennessey's GAF score was assessed at a time when Plaintiff's fluctuating mental health symptoms were at their best — when Plaintiff was at the halfway house receiving treatment. Plaintiff's late 2010 GAF score was, therefore, understandably higher than the other GAF scores in the record from 2011 and 2012, after Plaintiff's release from the halfway house when his fluctuating symptoms were worse. *Id.*

Other decisions from this court confirm that an ALJ should not pick and choose among GAF scores. Instead, to the extent the ALJ considers GAF scores, the ALJ should consider them as a whole in light of the entire longitudinal record. *See Lopez-Lopez*, 138 F. Supp. 3d at 111 (internal citations and quotation marks omitted) (quoting *Mendes v. Colvin*, No. 14-12237-DJC, 2015 WL 5305232, at *8 (D. Mass. Sept. 10, 2015)). In support, the court has noted that "[t]he Fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) drop[ped] the use of GAF scores 'for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.'" *Curley v. Comm'r of Soc. Sec.,* No. cv-16-11240-IT, 2017 WL 2624225, at *2 & n.5 (D. Mass. May 30, 2017), *report and recommendation adopted*, No. 16-CV-11240-IT, 2017 WL 2622745 (D. Mass. June 16, 2017) (discussing *Lopez*, and quoting DSM-V (2013), at 16). The court, however, recognized that, "[n]evertheless, the Social Security Administration . . . has indicated that it will continue to receive into evidence and consider GAF scores, [and that] courts have not disavowed the GAF scale as a measurement of one's mental capacity." *Id.* (noting "[ALJs] can continue to consider GAF scores just as [they] would other opinion evidence, [although] scores must have supporting evidence to be given significant weight"). The

###     3.    Issues/Findings Common to All Challenged Medical Opinions

ALJ Ross generally found that the "record evidence [did] not objectively support the . . .

degree of resulting functional limitation[s]" opined to in the majority of medical opinions. *See*

Tr. 1852–53.  In support of this overarching finding, ALJ Ross made several preliminary,

common consistency findings applicable to his evaluation of most, if not all, of the medical

opinions, including the five opinions challenged by Plaintiff, as follows:

> (1) For the period "from April 1, 2011, through February 5, 2012," . . . "the record contains almost no evidence of mental health treatment;"
>
> (2) Prior to April 2011, Plaintiff's treatment records show "conservative treatments of prescribed psychotropic medications[] and outpatient therapy, [and that Plaintiff's] reported anxiety and depressive symptoms improved;"
>
> (3) Prior to April 2011, Plaintiff's treatment records demonstrate that "he was clinically stable throughout the relevant period, with stable, largely intact [MSE] findings;" and
>
> (4) Plaintiff's "reported and/or documented activities during [the relevant] period" demonstrate that he was able to "independently perform[] personal care activities, manag[e] his finances, regular[ly] participat[e] in group therapy. . . , regular[ly] participat[e] in AA meetings, socializ[e] with family members, shop[ at] stores, and . . . seek care in an emergency department."

Tr. 1852-53.

ALJ Ross then repeated the above findings in his evaluation of the specific medical

opinions at issue on appeal here.  *See* Tr. 1852–1865.  Given the repeating nature of the

common/preliminary findings and their applicability to ALJ Ross' evaluation of all five

---

courts agree, though, that "ALJs cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians *or from a single GAF score in isolation*."  *Id.* (emphasis added).

challenged opinions, the Court addresses the common consistency findings below prior to its individualized analysis of ALJ Ross' evaluation of the challenged opinions.

Before doing so, however, the Court must address another issue common to ALJ Ross' evaluation of the challenged medical opinions:  the failure to provide adequate record support for his findings.

ALJ Ross failed to provide adequate record citations in support of the above preliminary findings and in support of many of the related common findings in his evaluation of the medical opinions.  In particular, ALJ Ross, provided *no* record citations in support of his first three findings above.  *See* Tr. 1852–53.  Regarding the fourth finding as to Plaintiff's activities, the ALJ cited generally to exhibits at large and to Plaintiff's testimony.  *Id.* at 1853 (citing "Ex. 3E, 8E, 5F, 8F, and Claimant Testimony").  This failure to provide adequate record citations and support for his findings continued throughout the ALJ's evaluation of nearly all of the medical opinions — including his evaluation of the medical opinions challenged on appeal.  *See, e.g.*, *id.* at 1852–53, 1855, 1856, 1863–64.

Frequently, the ALJ offered either no record support or very general record support for his findings regarding the various medical opinions.  *See* Tr. 1852–53, 1855, 1856, 1863–64.  Where ALJ Ross provided support, his citations were undifferentiated and largely to the record as a whole or to multiple exhibits in their entirety.[56]  *See, e.g.*, *id.* at 1854 (citing generally "Ex. 3E, 4F, 5F, 8F, 12F, and 19F" and "3F-5F, 8F, 12F, 19F" in support of ALJ's findings regarding

---

[56] The Court notes that the administrative record before an ALJ, like the one here, typically contains numerous exhibits.  The "exhibits" themselves, though, often contain multiple years' worth of medical records from the respective medical sources and/or entities.  Thus, the ALJ's citations to "exhibits" at large typically is not sufficient to differentiate between discreet medical records and/or the specific evidence contained therein.

Plaintiff's functional abilities and daily activities used to discount Dr. Boxer's opined

limitations); *id.* at 1858 (same with respect to Dr. Keuthen's opinion); *id.* at 1856 (citing no

record support for specific findings related to Dr. Griffin's opinions); *id.* at 1864 (citing to "Ex.

3F-5F, 8F, and 12F" and "Claimant Testimony" regarding Dr. Horton's opinion).  Given the size

of the record and length of the procedural history in this case, the ALJ's non-specific record

citations are not helpful and leave the Court guessing regarding ALJ Ross' intended support for

many of his findings.[57]  *See Crosby*, 638 F. Supp. at 385–86 (ALJ "cannot reject evidence for no

reason, or for the wrong reason, and must explain the basis for his findings" such that there is "an

adequate basis for the reviewing court to determine whether the administrative decision is based

on substantial evidence"); *see also Leggett v. Berryhill*, No. 16-cv-11027-JGD, 2018 WL

700786, at *7 (D. Mass. Feb. 2, 2018) (finding that ALJ failed to adequately explain basis for

omitting functional limitation contained in medical opinion).

     The Commissioner attempts to fill the ALJ's citation void with numerous *post hoc*

rationalizations and record citations in support of ALJ Ross' above preliminary findings and the

other common findings.  *See* [ECF No. 19 at 18 nn.9 &10 (providing multiple *post hoc* record

citations regarding the above preliminary findings in support of the ALJ's evaluation of Dr.

Horton's opinion, which were not offered by ALJ Ross)]; [*id.* at 16 (same with Dr. Wojcik's

_____

[57] The Court Transcript Index in this case is eleven pages long and includes fifteen plus years'
worth of evidence and exhibits.  Furthermore, Plaintiff testified at *six* different hearings in this
case.  Accordingly, ALJ Ross' generic, undifferentiated citations to "Claimant Testimony" are
unhelpful given the hundreds of pages of testimony included in the record before the Court.

 The Court further notes that close review of the ALJ's preceding ten-page summary of medical
evidence also does not clarify the ALJ's intended support for many of his otherwise inadequately
supported findings.  *See* Tr. 1843–53.

opinion)]; [*id.* at 14–15 nn.5–7 (same with Dr. Boxer's opinion)].  The Commissioner's *post hoc* support includes more than *sixty* citations to specific record evidence that were not provided by ALJ Ross himself.[58]  *See* [*id.*]; [ECF No. 22 at 7, 11].

Plaintiff correctly notes that the Court may not rely on the *post-hoc* rationalizations offered by the Commissioner — or the Court's own guesses as to the support ALJ Ross intended. [ECF No. 22 at 7–8]; *see Burlington Truck Lines Inc. v. United States*, 371 U.S. 156, 169 (1962) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) ("In dealing with a determination or judgment which an administrative agency alone is authorized to make, [a reviewing court] must judge the propriety of such actions solely by the grounds invoked by the agency.").  The Court is required to rely on the reasons provided by ALJ Ross.  *See Larlee v. Astrue*, 694 F. Supp. 2d 80, 84 & n.38 (D. Mass. 2010) (quoting *Burlington*, 371 U.S. at 169) ("Where the ALJ's reasons or support for his findings 'are inadequate or improper, the [C]ourt is powerless to affirm the administrative action.'"); *accord Stratton v. Astrue*, 987 F. Supp. 2d 135, 146 (D.N.H. 2012) (remanding where Commissioner offered an "impermissible *post hoc* rationale" for ALJ's determination).

The Court, therefore, declines the Commissioner's invitation to speculate regarding the ALJ's intended record support for his preliminary and related common findings.  The Court has

---

[58] *See* [ECF No. 19 at 18 nn.9–10, 16, 14–15 nn.5–7 (citing Tr. 51, 398, 403, 408, 442, 446, 451, 460–61, 467, 474, 479, 497, 512, 518, 520, 525, 527, 534, 556, 573, 610, 625–26, 694, 947, 1013, 1023 in support of Plaintiff's "largely normal MSEs" and "stable, under control symptoms;" citing *id.* at 47–48, 53–54, 56, 61–62, 197, 199, 200–01, 228, 231–32, 438, 448, 451, 510, 512, 525, 622, 951, 1889–1911, 1901–02 in support of Plaintiff's activities of daily living; citing *id.* at 45–46, 326–97, 406–07, 473, 676, 946, 1157, 1900, 197, 199, 201, 228, 232, 451, 525, 1013 in support of Plaintiff's improvement while incarcerated and at the halfway house; and, citing *id.* at 408, 460, 479, 556, 573, 946, and 951 in support of Plaintiff's "pleasant" and "cooperative" demeanor at times)].

noted in its discussion below specific instances where the ALJ's failure to provide adequate record support undermined his evaluation of the medical opinions.

The Court turns to the common consistency findings offered by ALJ Ross in support of his rejection of the five challenged medical opinions.

>    a.    *Nature of Plaintiff's Mental Impairments and Mental Health Treatment*

In rejecting multiple opined limitations, ALJ Ross cited to Plaintiff's "conservative treatment" during the relevant period from April 2009–April 2011, which the ALJ also noted correlated to an improvement in Plaintiff's symptoms. Tr. 1852–53 (finding that "prior to [April 1, 2011], [Plaintiff's] treatment records . . . show . . . conservative treatments of prescribed psychotropic medications and outpatient therapy," during which "[Plaintiff's] reported anxiety and depressive symptoms improved"). ALJ Ross additionally cited to Plaintiff's lack of "mental health treatment" from April 2011–February 2012. *Id.* at 1852 (finding that "[t]he record contains almost no evidence of mental health treatment" during that period); *see also id.* at 1855 (ALJ Ross' rejection of Dr. Boxer's opined social limitations and his opinion regarding Plaintiff's need for breaks); *id.* at 1859 (ALJ Ross' rejection of Dr. Keuthen's opined limitation regarding the need for a supportive, non-critical supervisor); *id.* at 1862–63 (ALJ's rejection of Drs. Power's and Horton's opinions regarding the nature of Plaintiff's mental impairments — and, in particular, his panic attacks — based in part on Plaintiff's absence of treatment in 2012).

Plaintiff argues that ALJ Ross erred because he failed to adequately consider the nature of Plaintiff's mental illness in assessing his RFC. *See* [ECF No. 22 at 9]; *but see* [ECF No. 19 at 9–10, 16 (arguing that the ALJ gave supported reasons in rejecting medical opinion evidence)]. The Court agrees.

"Cycles of improvement and debilitating symptoms of mental illness are a common

occurrence . . . ." *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (alteration omitted)

(quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)).  "[F]luctuations are one of the

symptoms of the disease." *Lopez v. Colvin*, No. 13-cv-597 ML, 2014 WL 5410299, at *16

(D.R.I. Oct. 22, 2014) (holding that ALJ erred in evaluating psychologist's medical opinion

where ALJ "substitut[ed] his own judgment for [the doctor's]" and failed to account for the

fluctuations associated with the claimant's mental impairments in finding that the claimant's

"improved functioning" at the time of discharge from a psychiatric hospitalization demonstrated

greater overall functioning than the limitations contained in the medical opinion evidence).

A claimant's "failure to pursue or comply with treatment" –or his pursuit of

"conservative" treatment — may support a finding that he is not disabled.  *See Cordeiro v. Saul*,

391 F. Supp. 3d 170, 178 (D. Mass. 2019); *Bird v. Kijakazi*, No. 3:21-CV-30045-KAR, 2022 WL

4468376, at *14 (D. Mass. Sept. 26, 2022); *see also* Social Security Ruling ("SSR") 16-3p, *Titles

II and XVI:  Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304, at *9-10 (Oct. 25,

2017) (noting that an ALJ "may find the alleged intensity and persistence of an individual's

symptoms inconsistent with the overall evidence of record" where "the frequency or extent of the

treatment sought by an individual is not comparable with the degree of the individual's

subjective complaints, or if the individual fails to follow prescribed treatment that might improve

symptoms").

Social Security Ruling 16-3p, however, requires an ALJ to "consider[] [the] possible

reasons [Plaintiff did] not comply with treatment or seek treatment consistent with the degree of

his . . . complaints" prior to concluding that medical opinions are "inconsistent with the

evidence" based on Plaintiff's conservative treatment, lack of treatment, or failure to comply

with treatment. 2017 WL 5180304, at *9–10. In particular, SSR 16-3p requires an ALJ to consider whether Plaintiff was "[un]able to afford treatment," whether Plaintiff lacked "access to free or low-cost medical services," and whether Plaintiff's mental impairment "affect[ed] his judgment, reality testing, or orientation" such that he did not appreciate "the appropriate treatment for or the need for consistent treatment of his . . . . impairment." *Id*. at 10; *see also Alcantara v. Astrue*, 257 F. App'x 333, 335 (1st Cir. 2007) (per curiam) (ALJ erred where he failed to consider whether Plaintiff had good reasons for failing to pursue or comply with treatment); *Cordeiro*, 391 F. Supp. 3d at 178–79 (ALJ erred when he failed to consider that Plaintiff "halted medical care" because she "lacked medical insurance during the relevant timeframe"); *accord Aziz v. Saul*, No. 19-cv-11885-WGY, 2021 WL 735810, at *13–14 (D. Mass. Feb. 25, 2021) (discussing SSR 16-3p, 2017 WL 5180304); *Perry v. Colvin*, 91 F. Supp. 3d 139, 149–51 (D. Mass. 2015) (finding that the ALJ drew an impermissible negative inference based on the claimant's inconsistent treatment history where good causes, including the inability to pay for medications, explained gaps in treatment).

Additionally, where there is evidence that the mental illness itself may be a cause of the claimant's noncompliance or lack of treatment, the ALJ should address that possibility and explain why he is relying on the claimant's noncompliance despite the fact it might be caused by Plaintiff's mental illness. *See* SSR 16-3p, 2017 WL 5180304, at *9–10; *see also Day v. Astrue*, No. 07-cv-157-RJD, 2008 WL 63285, at *5 n.7 (E.D.N.Y. Jan. 3, 2008) (quoting *Regennitter v. Commissioner of Social Sec. Admin*., 166 F.3d 1294, 1299-1300 (9th Cir. 1999), and *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)) (noting that courts have "criticiz[ed] the [ALJ's] use of a lack of treatment to reject [a claimant's] mental complaints both because mental illness is notoriously underreported and because it is a questionable practice to

chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation'").

Here, ALJ Ross failed to adequately consider the chronic waxing and waning nature of Plaintiff's mental illness — along with the role that Plaintiff's mental illness and his accompanying financial and insurance difficulties — played in the cyclical nature of his treatment, improvement, and decompensation.  During the relevant period, Plaintiff took multiple psychiatric medications for his mental impairments, including, but not limited to, Remeron, Klonopin, Buspar, Zoloft, Seroquel, Thorazine, Xanax, and Prozac.  Tr. 409, 371, 332, 364, 467, 460–61, 405,  520, 620.  Plaintiff's medication regimen was adjusted frequently in response to Plaintiff's new and/or increasing symptoms.  *Id.*; *see also id.* at 446, 525, 621–28. As noted, Plaintiff was also treated during this time period with individual psychotherapy and group therapy, and participated in AA meetings at his halfway house.  *Id.* at 474, 451, 408.

Even assuming that Plaintiff's mental health treatment, as described above, is appropriately considered "conservative," ALJ Ross nevertheless failed to explain what other treatment options Plaintiff had and/or what more he could have done during the time that he was receiving mental health treatment.[59]  *See Roeschlaub v. Comm'r of Soc. Sec.*, 27 F. Supp. 3d 211, 222 (D. Mass. 2014) (holding that ALJ erred in rejecting physician's opined limitation based on the claimant's "conservative, irregular treatment history" where the claimant took "various pain and anti-inflammatory medications, . . . under[went] steroid injections for pain, [and] . . . participated in physical therapy," because, in spite of the alleged "conservative" nature of the

---

[59] This is especially true of the April 2009–July 2010 period when Plaintiff received all of his mental health treatment while in prison.  Tr. 326–97.

treatment, "[t]here [wa]s nothing in the record to indicate that the plaintiff's course of treatment ha[d] somehow been inadequate or inappropriate").

Nor did ALJ Ross account for the additional reasons for Plaintiff's subsequent post-March 2011 non-treatment or non-compliance, as documented by the longitudinal record, and required by SSR 16-3p. *See* 2017 WL 5180304, at *9–10; *see also* Tr. 764, 1006, 626, 945–46, 773, 762, 950, 953, 1021, 520, 512. As described above, the record reflects that Plaintiff routinely dealt with chronic mental impairments, financial insecurity, and difficulties accessing mental health care. *See* Tr. 764, 1006, 626, 945–46, 773, 762, 950, 953, 1021, 520, 512. In particular, the longitudinal record indicates that Plaintiff's post-March 2011 lack of care was related to his loss of health insurance, his inability to pay for care, his move out of the halfway house to a new town, and the office closure of his prior medical provider. *See id.* at 764, 1006, 626, 945–46, 773, 762, 950, 953, 1021, 520, 512, 764, 1006, 1021. Additionally, as discussed in more detail with the finding below, the longitudinal record further suggests that the loss of Plaintiff's structured environment (the halfway house), and his mental illness itself, both played significant roles in Plaintiff's noncompliance and/or non-treatment after March 2011.[60] *See, e.g.*, *id.* at 676–77, 1009–10, 1013–14, 407–08, 436, 533–34.

For these reasons, ALJ Ross erred in discounting the challenged medical opinions.

### b.    *ALJ's Reliance on Plaintiff's Improvement While in a "Highly Structured Environment"*

ALJ Ross also rejected the challenged medical opinions based in part on Plaintiff's alleged improvement while he received psychiatric treatment during his incarceration and stay at

---

[60] As described in the Relevant Medical Evidence section above, it was after Plaintiff left the halfway house that his mental health impairments and related symptoms most significantly deteriorated, namely the period from March 2011, through February 2012.

the halfway house.  *See* Tr. 1852–53, 1854, 1856, 1859 (rejecting Dr. Keuthen's opined

limitation regarding Plaintiff's need for a supportive supervisor, and Dr. Boxer's opinion that

additional social limitations were necessary given Plaintiff's past history of anxiety and panic

around unfamiliar people).  In doing so, ALJ Ross cited generally to exhibits containing

Plaintiff's incarceration records and his treatment and therapy records from the halfway house.

*See id.* at 1854 (citing generally to "Ex. 3E, 3F, 4F, 5F, 8F, 12F, 19F") (rejecting Dr. Boxer's

opined limitations based on Plaintiff's ability to participate in treatment groups at the halfway

house, and the fact that while incarcerated, Plaintiff was able to adapt even though he "had no

control over who he was exposed to socially"); *see also id.* at 1859, 1856.  In particular, ALJ

Ross found "no evidence that [Plaintiff] was unable to adapt or manage himself appropriately"

while incarcerated and living in the halfway house.  *See id.* at 1859 (referring to "Finding 4 of

this decision"); *id.* at 1840 ("Finding 4") (citing generally to "Ex. 3E, 3F, 4F, 5F, 8F, 12F").

Plaintiff argues that the ALJ improperly relied on the improvement in his symptoms

while in the "highly structured" prison and halfway house.  *See* [ECF No. 22 at 6–7]; Tr. 1854.

Plaintiff acknowledges that he reported that "the structure of the halfway house was helpful" in

dealing with his mental impairment symptoms.  [ECF No. 22 at 6–7 (citing Tr. 676–77, 1009–10,

1013–14)].  He argues, though, that a work environment and a prison (or halfway house) setting

are not equivalent because "[t]he reality is that an inmate cannot leave a prison setting no matter

how poorly he functions."  [*Id.* at 7].  Plaintiff further asserts that controlling law did not permit

ALJ Ross to rely on his experiences while he resided in a structured and/or institutional

environment to discount the medical opinions.  [*Id.* (citing SSR 16-3p, 2017 WL 5180304, at *9;

Listing 12.00(G)(2)(b),(c); 20 C.F.R. § 404.1572)].

The Commissioner counters that the ALJ reasonably utilized Plaintiff's experiences at the halfway house and while in prison in rejecting Dr. Boxer's opined social limitations. [ECF No. 19 at 10–11 (detailing evidence from Plaintiff's incarceration and halfway house regarding his interactions)]. The Commissioner argues that Plaintiff's "main gripe" constitutes a simple "invitation [to] this Court to improperly reweigh the evidence." [*Id.* at 14].

The Court disagrees, and, for the reasons below, finds that the ALJ erred in evaluating the medical opinions when he failed to account for the role of the structured environment(s) in any improvement and/or stability in Plaintiff's mental impairment symptoms.

Social Security Ruling 16-3p required ALJ Ross to consider whether Plaintiff "may have structured his . . . activities to minimize symptoms to a tolerable level by avoiding . . . mental stressors that aggravate his . . . symptoms." 2017 WL 5180304, at *9. Moreover, Listing 12.00(F), in effect at the time Plaintiff filed the 2010 claims at issue, further required ALJ Ross to consider the impact of the structured environment on his mental impairment symptoms and functioning. 20 C.F.R. Ch. III, pt. 404, subpt. P, app. 1, § 12.00(F). That listing provides in pertinent part:

> Effects of structured settings: *Particularly in cases involving chronic mental disorders, overt symptomology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure*. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, over symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. *If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings*. For these reasons, identical paragraph C criteria are included in 12.00, 12.02, 12.03, and 12.04.

*Id.* (emphases added).

Several courts have found that prisons, while not explicitly mentioned in Listing 12.00, are like halfway houses and constitute "highly structured settings" that can minimize a claimant's psychological symptoms. *See Morris v. Astrue*, No. 11-cv-248-JL, 2012 WL 4499348, at *11 (D.N.H. Sept. 28, 2012) ("The court has no doubt that a prison environment can provide the type of highly structured setting described in the listings."); *Langwell v. Comm'r of Soc. Sec. Admin.*, No. 3:14-cv-00019-ST, 2015 WL 3936449, at *6 (D. Or. June 4, 2015) ("[P]rison provides a regimented lifestyle and rewards for good behavior that are unique to incarceration[,] [and it is precisely the type of highly controlled environment the [Social Security Administration] requires the ALJ to contemplate before a finding that a claimant's behavior is improved or [his] symptoms have diminished.").

Here, in rejecting the challenged opinions, ALJ Ross relied on Plaintiff's "improvement" while in prison and at the halfway house, which, the record shows, resulted in Plaintiff receiving more regular mental health treatment. ALJ Ross erred in failing to address or account for the role that the structured environments played in Plaintiff's improvement and stability — and, likewise, the role that the *absence* of the halfway house played in Plaintiff's corresponding period of decline. *See, e.g., May v. Comm'r of Soc. Sec.*, No. CV 18-6145-RMB, 2019 WL 2315030, at *5 (D.N.J. May 31, 2019) (discussing SSR 96-8, governing the RFC assessment, including "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis") (ALJ erred in assessing Plaintiff's RFC as step four when "all of the ALJ's observations that contributed to the RFC determination were drawn from behavior exhibited in a supported living environment or a treatment program," and he

failed to consider whether absent the highly structured living environment, Plaintiff would be able "to work on a regular and continuing basis").

Further, contrary to ALJ Ross' finding, Plaintiff's prison records do not, in fact, demonstrate the same type of "improvement" that Plaintiff subsequently experienced while at the halfway house.  *See* Tr. 368–69; 371–72, 332, 364; *cf. id.* at 460–61, 467, 451, 533–34, 525. Moreover, ALJ Ross failed to cite to any specific evidence in Plaintiff's prison medical records to support the finding that Plaintiff, in fact, adapted socially while incarcerated.  *See id.* at 1853–54, 1856, 1859.  Nor has the Court located any record support for this finding.[61]

By contrast, Plaintiff himself acknowledged that his time at the halfway house was the most highly structured and supportive period of his life.  *See* Tr. 676–77, 1009–10, 1013–14 (testifying that his time at the halfway house was "very structured," "very helpful," and "probably saved [his] life"); *cf. id.* at 407–08, 436, 533–34 (while reporting improvement, Plaintiff also continued to experience mental impairment symptoms, sometimes severe).  The record evidence further demonstrated a correlation between Plaintiff's time at the halfway house and his receipt of regular mental health treatment and some improvement on medication.  *See id.* at 407–08, 436, 533–34.  Thus, to the extent that Plaintiff's symptoms improved during his residence at the halfway home, the longitudinal record suggested that such improvement could be attributed to the consistent psychiatric treatment and other services and supports that Plaintiff received while residing in the highly structured setting.  *See id.* at 676–77, 1009–10, 1013–14 407–08, 436, 533–34.

---

[61] In fact, the limited incarceration records suggest to the contrary.  *See, e.g.*, Tr. 364 (March 2010 psychiatric note documenting "high anticipatory anxiety prior to interactions with people"); *id.* at 353 (form indicating that Plaintiff "lacks close friends in the community").

For these reasons, ALJ Ross erred in rejecting the challenged medical opinions based on Plaintiff's stability and/or improvement during the relevant period absent any consideration of the role of the highly structured environment(s).

> ### c.    *Clinical Stability and Routine MSE Findings During the Relevant Period*

ALJ Ross also preliminarily found that Plaintiff was "clinically stable throughout the relevant period, with stable, largely intact mental status examinations." Tr. 1853. ALJ Ross subsequently utilized that finding in rejecting Dr. Horton's opined memory limitations, *id.* at 1863–64 (citing to "Ex. 3F-5F, 8F, 12F" as a whole); Dr. Wojcik's multiple opined marked functional limitations, *id.* at 1864–65 (citing again to exhibits as a whole, "Ex. 3F-5F, 8F, 12F, 19F"); and Dr. Boxer's opined memory limitations (no record support cited), *id.* at 1855.

Plaintiff argues that ALJ Ross erred because the findings that Plaintiff was "stable" based on the routine MSEs failed to demonstrate that Plaintiff was, in fact, "doing well," and/or that he was not suffering from the functional limitations opined to by Drs. Horton, Wojcik, and Boxer. [ECF No. 22 at 9]. Plaintiff contends that the ALJ's reliance on certain MSE findings further ignored the waxing and waning nature of his mental impairments and their symptoms. [*Id.*].

The Commissioner counters that ALJ Ross reasonably and permissibly concluded that Drs. Horton's, Boxer's, and Wojcik's opinions were inconsistent with Plaintiff's "largely normal" MSEs "from the operative period," noting that "Plaintiff often present[ed as] alert, oriented, pleasant, cooperative, well-groomed, and stable with adequate insight and normal

effect, speech, and thoughts," and with "stable" and "under control" symptoms.[62]  [ECF No. 19 at 16, 18 & n.9].

Because it is the nature of mental impairments to fluctuate and/or to wax and wane over time "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Estrella*, 925 F.3d at 97 (quoting *Garrison*, 759 F.3d at 1017).  Thus, an ALJ errs where he "rest[s] his disability determination on 'a one-time snapshot of a claimant's status' because that episode 'may not be indicative of [his] longitudinal mental health.'"  *Colgan v. Kijakazi*, 22 F.4th 353, 362 (2d Cir. 2022) (finding error, and holding that "[w]hat the ALJ [t]here did, by cherry-picking particular instances of improvement from [the physician's] treatment notes in order to create an inconsistency within her medical opinion[] was precisely what we deemed erroneous in *Estrella*").

Although an ALJ is not required to expressly address each piece of evidence in the record and "is free to make a finding which gives less credence to certain evidence," he may not "simply ignore . . . the 'body of evidence opposed to . . . [his] view.'"  *Dedis v. Chater*, 956 F. Supp. 45, 51 (D. Mass. 1997) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, (1951), and *Diaz v. Sec'y of Health & Hum. Servs.*, 791 F. Supp. 905, 912 (D.P.R. 1992)); *see also Lord v. Apfel*, 114 F. Supp. 2d 3, 13–15 (D.N.H. 2000) (citing *Nguyen v. Chater*, 172 F.3d at 35) (noting that "the First Circuit and district courts within the circuit have held that an ALJ

---

[62] As discussed above, in support, the Commissioner cited to MSEs from record evidence not specifically cited by the ALJ.  [ECF No. 19 at 16, 18 & n.9 (citing Tr. 51, 398, 403, 408, 442, 446, 451, 460–61, 467, 474, 479, 497, 512, 518, 520, 525, 527, 534, 556, 573, 610, 625–26, 694, 946–47, 951,1013, 1023, in support of Plaintiff's "pleasant" and "cooperative" demeanor at times, Plaintiff's "largely normal MSEs," and his "stable, under control symptoms)].  Again, the Court notes that it is required to rely on the reasons offered by the ALJ.

may not simply ignore relevant evidence, especially when that evidence supports a claimant's

cause"). "For a reviewing court to be satisfied that an ALJ's decision was supported by

substantial evidence, that decision 'must take into account whatever in the record fairly detracts

from its weight.'" *Lord*, 114 F. Supp. 2d at 13–15 (quoting *Diaz,* 791 F.Supp. at 912).

　　　Here, the exhibits generally cited by ALJ Ross regarding Plaintiff's MSEs were almost

exclusively from Plaintiff's treatment while in prison or during his post-release treatment from

July 2010 through December 2010, when Plaintiff resided in the halfway house. *See* Tr. 1863–

64, 1864–65, 1855 (citing Ex. 3F–5F, 8F, 12F). These exhibits include medical records

confirming that Plaintiff was receiving psychiatric treatment in prison and at the halfway house,

and that, on occasion, he experienced some improvement in his mental health symptoms.

However, in characterizing the MSEs from these exhibits as "normal" or "stable," ALJ Ross

improperly cherry-picked discreet observations from within those treatment records. While

several of the records note that Plaintiff presented as "cooperative," "oriented," "alert," and

"fairly stable" with a "normal" affect at his mental health appointments, the very same records,

along with other records from the same time period, document that Plaintiff continued to suffer

from mental impairment symptoms during this time, including an increase in depression, panic,

and anxiety. *See, e.g.*, *id.* at 332, 364, 451, 448, 438, 474, 407–08, 436, 533–34.

　　　By ignoring the less favorable findings and records, ALJ Ross erred in failing to consider

the broader context for the so-called "normal" or "stable" observations.[63] *See Estrella*, 925 F.3d

---

[63] The Court further notes that the MSE records cited by the Commissioner—which the Court
has already found constitute improper *post hoc* rationalizations — are no more helpful or
supportive of the ALJ's finding(s) discounting the medical opinions on this basis. *See* [ECF No.
19 at 18 nn.9–10, 16, 14–15 nn.5–7 (citing Tr. 51, 398, 403, 408, 442, 446, 451, 460–61, 467,
474, 479, 497, 512, 518, 520, 525, 527, 534, 556, 573, 610, 625–26, 694, 946–47, 951, 1013, and

at 97 ("When viewed alongside the evidence of the apparently cyclical nature of [the claimant]'s depression, the ALJ's two cherry-picked treatment notes do not provide "good reasons" for minimalizing [the medical] opinion.").

Additionally, the ALJ cited to one October 2011 visit record with Northeast. Tr. 1864–65 (citing Ex. 19F). ALJ Ross, however, erred in characterizing the MSE in that exhibit as "largely normal." *Id.* at 1865. During the October 2011 visit cited by ALJ Ross, the Northeast psychologist, in fact, observed that Plaintiff was, at the time, "experiencing racing thoughts, anger outbursts, poor impulse control, panic attacks, and anxiety," and checked boxes indicating "current" and "present" "mania/hypomania" with "elevated or irritable mood," "racing thoughts," "distractibility," and "increased activity/agitation." *Id.* at 621, 625.

For these reasons, ALJ Ross erred when he rejected the challenged medical opinions based in part on their inconsistency with selective MSE observations.

> **d.**  ***ALJ's Reliance on Plaintiff's ADLs, Past Employment, and Schooling in Rejecting Medical Opinions***

ALJ Ross also found the challenged medical opinions inconsistent with Plaintiff's ADLs, his past employment, and his graduation from high school. Tr. 1852–53, 1854–55, 1863–64, 1865, 1859.

---

1023, in support of Plaintiff's "largely normal MSEs," "stable, under control symptoms," and his "pleasant" and "cooperative" demeanor at times)]. Thus, even if the Court were to consider the evidence cited *post hoc* by the Commissioner, the result would remain the same: ALJ Ross' MSE findings do not provide substantial evidence to support his rejection of the medical opinions.

*Background*

In Plaintiff's August 2010 function report, completed while he was residing at the halfway house, he described his daily activities as eating meals, taking medications, attending group therapy, attending AA, and watching television. Tr. 197–204. He stated that in terms of hobbies and/or interests, he watched television "all the time," and explained that he had "a hard time dealing with people" due to his "mood swings." *Id.* at 201. Plaintiff noted that he required reminders to take his medications, but that he was able to take care of his personal grooming needs without reminders. *Id.* at 199. Plaintiff also stated that he was able to manage his own finances. *Id.* at 200.

Plaintiff clarified in August 2010 that he had not cooked in more than two years, and that "the [halfway house] program" prepared all of his meals. Tr. 199. He was assigned chores while residing at the halfway house, for which he required daily reminders. *Id.* Plaintiff further noted that he did not drive, but that a van picked him up at the halfway house for appointments and shopping. *Id.* at 200.

Subsequently, in November 2010, Plaintiff completed another function report after he moved out of the halfway house. Tr. 228–35. Plaintiff reported that he was living at a group "sober house," and that his daily activities included a morning group meeting, eating meals, and watching television. *Id.* at 228. Again, he stated that he did not cook, and that he had no kitchen. *Id.* at 230.

Plaintiff asserted that he did not do any chores at the sober house, explaining that he "hate[d] being with other people" and that he had to "be push[ed] into things or [he would] not leave the house." Tr. 230. Plaintiff further added that he did not go outside because "there's nothing out there for [him]," that he did not have a car, and that he was not required to shop. *Id.*

88

at 231.  He reported that he had "not talked to [his] family in almost three years," and that he did

not "have any friends."  *Id.* at 233.

In December 2011, Plaintiff similarly testified at his first ALJ hearing that he "pretty

much" just stayed home because he was unable to deal with crowds and often could not take the

bus.  Tr. 52–54.  He noted that if he was required to grocery shop, he went early in the morning

or late at night.  *Id.*

As noted, in evaluating the medical opinion evidence, ALJ Ross preliminarily found that

Plaintiff's "reported and/or documented activities during [the relevant] period" demonstrated that

he was able to "independently perform[] personal care activities, manag[e] his finances,

regular[ly] participat[e] in group therapy. . . , regular[ly] participat[e] in AA meetings, socializ[e]

with family members, shop[ at] stores, and . . . seek care in an emergency department."  Tr.

1852–53 (citing "Ex. 3E, 8E, 5F, 8F," and "Claimant Testimony").[64]

ALJ Ross then relied on this preliminary finding—along with additional findings

regarding Plaintiff's graduation from high school and his past work as an auto mechanic—in

rejecting multiple challenged medical opinions regarding the limitations related to Plaintiff's

memory, his need for a supportive, non-critical supervisor, and his difficulties with sustaining an

ordinary routine, regular attendance, and concentration and persistence.  *See* Tr. 1854–55

(rejecting Dr. Boxer's opined limitations regarding Plaintiff's memory and learning issues based

on Plaintiff's ADLs and ability "to perform highly technical work as an auto-mechanic" (citing

"Ex. 4E, 8E, 21F," and "Claimant Testimony")); *id.* at 1863–64 (rejecting Dr. Horton's opinion

---

[64] ALJ Ross additionally cited at large to "Ex. 3E, 4E, 3F-5F, 8E, 8F, 12F, 19F, 21F, 28D," and
"Claimant Testimony" in his rejection of individual challenged opinions based on Plaintiff's
ADLs.  *See* Tr. 1854–55, 1863–64, 1865, 1869.

regarding Plaintiff's numerous opined limitations based on Plaintiff's ADLs, his ability "to graduate" high school despite "some learning difficulties [while] in school" and his ability "to work in a skilled position as an auto-mechanic for many years following graduation," performing "highly technical auto repair work" (citing "Ex. 28D, 3E, 8E, 3F-5F, 8F, 12F, Claimant Testimony")); *id.* at 1865 (rejecting Dr. Wojcik's opined limitations based on Plaintiff's "reported activities" (citing "Ex. 3F-5F, 8F, 12F, 19F")); *id.* at 1859 (rejecting Dr. Keuthen's opined limitation regarding Plaintiff's need for a "supportive and non-critical employer" based on Plaintiff's ability to "engag[e] in work . . . as an auto mechanic prior to his . . . onset date," where Plaintiff "was able to perform all duties of the job well and was liked by his supervisors and fellow employees" (citing "Ex. 3F, 5F, and 8F")).

*Plaintiff's ADLs During Relevant Period*

Plaintiff argues that his ability to perform "normal daily activities," such as "personal grooming, managing finances, going to therapy, [and] seeing family and shopping" did not mean that he was capable of full-time, competitive work during the relevant period. [ECF No. 22 at 8–9]. In support, Plaintiff additionally notes that ALJ Ross failed to adequately consider how he "actually performed" the ADLs, including, for example, that he completed his grocery shopping at night when no one was around. [*Id.*].

The Commissioner counters that the ALJ properly rejected the medical opinions because Plaintiff's ability to "perform various activities" was "at odds" with the opinions. [ECF No. 19 at 16].[65]

---

[65] Again, as discussed above, the Commissioner cited to ADLs from record evidence not specifically cited by the ALJ. *See* [ECF No. 19 at 11–12, 16, 18 (citing Tr. 47–48, 53–54, 56, 61–62, 197, 199, 200–01, 228, 231–32, 438, 448, 451, 510, 512, 525, 622, 951, 1901–02)].

For the reasons already discussed above, ALJ Ross erred in relying on evidence regarding Plaintiff's ADLs and his participation in therapy, treatment, and AA group meetings while he resided at the halfway house environment, which itself constituted a "highly structured environment," thus requiring the ALJ to consider and explain the role played by the supportive environment itself. The ALJ additionally erred because Plaintiff's ADLs — including those activities while he was at the halfway house — did not demonstrate that Plaintiff was able to engage in full-time, competitive work; and, as such, they did not undercut the opined medical evidence on this basis.

"Examining [a] claimant's daily activities [can] help[] to shed light on the veracity of the claimant's claims of pain and illuminate an RFC decision." *Rohrberg v. Apfel*, 26 F. Supp. 2d 303, 310 (D. Mass. 1998). However, "limited activities do not contradict the impact of [Plaintiff's mental impairments] on [his] life [because] '[d]isability does not mean that a claimant must vegetate in a dark room excluded from all other forms of human and social activity.'" *Id.* (quoting *Waters v. Bowen*, 709 F.Supp. 278, 284 (D. Mass. 1989)). There is a "difference between a person's being able to engage in sporadic physical activities and [his] being able to work eight hours a day five consecutive days of the week." *Ormon*, 497 F. App'x at 87 (citation omitted). In other words, "a claimant's ability to participate in limited household

---

Additionally, the Commissioner cites to documents from Ex. 15F, an exhibit that was not cited in support by the ALJ.

Plaintiff again asserts that the Commissioner offers improper *post hoc* support for the ALJ's decision. [ECF No. 22 at 7]. For the reasons discussed above, the Court agrees, and must rely on the reasons provided by the ALJ. However, the Court notes that even if it were to consider the *post hoc* evidence cited by the Commissioner, the result would, nevertheless, be the same.

chores, in and of itself, does not prove he has the ability to perform substantial gainful activity." *Dedis*, 956 F. Supp. at 54.

Here, the ALJ relied on activities that did not, in fact, undermine the opined limitations he rejected. The ALJ also failed to adequately address or consider contrary evidence regarding Plaintiff's social and adaptation limitations, including evidence that Plaintiff was estranged from his family for a significant portion of the relevant period, that he struggled with homelessness and financial challenges during the relevant period, and that he was unable to remain treatment compliant during the relevant period. *See* Tr. 233, 1009, 764, 1006, 626, 945–46, 773, 762, 950, 953, 1021.

Nor did Plaintiff's "sporadic and transitory" ability to complete the cited ADLs during the relevant period demonstrate that Plaintiff was able to engage in substantial, sustained, and regular employment. *See Dedis*, 956 F. Supp. at 54; *see also Rohrberg*, 26 F.Supp.2d at 311; *Waters*, 709 F.Supp. at 284; *accord Oliveras v. Comm'r of Soc. Sec.*, 354 F. Supp. 3d 84, 93–94 (D. Mass. 2019) (holding that ALJ erred in finding medical opinion inconsistent based on Plaintiff's "ability to cook, drive, or shop for groceries" where ALJ failed to explain how, in fact, the activities were inconsistent); *Graves v. Colvin*, No. 14-cv-14756-MGM, 2016 WL 270382, at *7 (D. Mass. Jan. 21, 2016) (finding "a notable difference between [a claimant's] ability to perform ADLs and the sort of work-specific activities referred to in [physicians'] opinions," and resulting error where "the ALJ provided no explanation as to their apparent contradiction"); *see also Gough v. Saul*, 799 F. App'x 12, 14–15 (2d Cir. 2020) ("The ALJ's reliance on moments when [the claimant] put significant effort into her [hobby] or accomplished household chores [was] misplaced given that as a whole her records show[ed] great fluctuation in energy and motivation.").

*Plaintiff's Graduation from High School and Past Work*

Plaintiff further argues that ALJ Ross erred in rejecting the medical opinions based on his prior work as a mechanic, his high school graduation, and his ability to read and write. [ECF No. 12 at 15]. Plaintiff contends that these findings were "irrelevant" to the opined limitations that ALJ Ross rejected on this basis. [*Id.*] Plaintiff also argues that his past work and high school graduation were too remote and did not shed light on his functioning during the relevant period. [*Id.* at 15–16]. The Commissioner failed to address the remoteness of Plaintiff's performance at past jobs or his high school graduation, noting simply that the ALJ made such findings. [ECF No. 19 at 11–12].

The Court agrees that ALJ Ross erred in relying on findings regarding Plaintiff's past jobs and education to reject the opined memory, social, and adaptation limitations. First, the ALJ summarily dismissed, and, thus, failed to adequately account for additional record evidence that Plaintiff encountered learning difficulties while in school. Second, the ALJ ignored that Plaintiff's high school graduation took place in 1986, twenty-three years prior to the commencement of the relevant period this case. Tr. 191.

Moreover, ALJ Ross erred in rejecting the medical opinions based on Plaintiff's past work as an auto mechanic. The record is undisputed that Plaintiff last worked in 2005 — years prior to the April 2009 commencement of the relevant period. Tr. 43, 1621, 1626, 191. Given the remote nature of Plaintiff's past work and the existence of intervening events — including Plaintiff's additional mental health symptoms and the remission of his substance use disorder —

ALJ Ross erred in relying on Plaintiff's 2005 work to support his rejection of the medical opinions regarding Plaintiff's limitations during the relevant period.[66]

ALJ Ross, therefore, erred when he rejected medical opinions based in part on their inconsistency with Plaintiff's past work, his high school graduation, and his ADLs from the relevant period.

In sum, to the extent that he did so, ALJ Ross erred in rejecting the challenged opinions as inconsistent with record evidence of Plaintiff's non-treatment or "conservative" treatment, his improvement with conservative treatment and/or while residing in a "highly structured environment," his alleged clinical stability and routine MSE findings from the relevant period, and his ADLs, past jobs, and schooling. Below, the Court turns to the additional reasons offered by ALJ Ross unique to the individual, challenged opinions.

### 4. ALJ's Additional Unique Findings Regarding Individual Challenged Medical Opinions

As noted, Plaintiff specifically challenges ALJ Ross' evaluation of the following five medical opinions: (1) non-examining state agency psychologists Drs. Keuthen's and Fierman's October 2010 and February 2011 opinions, to which ALJ Ross stated he afforded "partial weight;" (2) examining psychologist Dr. Horton's September 2012 opinion, to which ALJ Ross stated he gave "little weight;" (3) examining psychologist Dr. Wojcik's March 2019 opinion, to

---

[66] The Court notes that while relying on this remote evidence (approximately four to twenty years old) in support of his rejection of several opined limitations, ALJ Ross simultaneously rejected *all* of the 2012 medical opinions themselves as too remote — based on their completion only months after the February 2012 expiration of the relevant period. *See* Tr. 1859–61, 1862–64 (rejecting 2012 opinions from Drs. Horton, Kiley, Shestopal, and Powers).

which ALJ Ross afforded "no weight;" and (4) non-examining, testifying ME, Dr. Boxer's July

2023 opinion, to which the ALJ stated he gave "partial weight."  *See* [ECF No. 12].

> **a.    *Dr. Keuthen's October 2010 Opinion and Dr. Fierman's February 2011 Opinion***

As noted, there have been repeated errors in evaluating Dr. Keuthen's opined limitations

throughout the fifteen-year history of this case.[67]  The ALJs, including ALJ Ross, have

essentially treated Dr. Keuthen's opinion as including two "groups" of limitations:  (1) Dr.

Keuthen's opined limitations to "predictable work routines" in an "unpressured setting" with

"low interpersonal demands;" and (2) Dr. Keuthen's limitation requiring work with a

"supportive, non-critical employer" or supervisor.  Tr. 427.  For the same reasons articulated

above, the Court declines the Commissioner's request that it ignore the lengthy procedural

history and decide this particular issue in a vacuum.  *See* [ECF No. 19 at 25].  Accordingly, the

Court sets forth below the procedural history relevant specifically to ALJ Ross' evaluation of Dr.

Keuthen's opinion.

*Prior Proceedings and Rulings Regarding Dr. Keuthen's Opinion*

In the first January 2012 ALJ decision, ALJ Fulton afforded Dr. Keuthen's opinion "great

weight," finding that it was "consistent with the record as a whole."  Tr. 27.  Subsequently, in a

January 2014 order remanding the case, Judge Dien ordered the ALJ to reevaluate Dr. Keuthen's

opinion on remand.  *Id.* at 716.  Thereafter, in its related June 2014 order remanding the case, the

Appeals Council explained that remand was necessary because, while ALJ Fulton ascribed

"great weight" to Dr. Keuthen's opinion, he failed to address her specific opined functional

---

[67] Because Dr. Fierman simply adopted Dr. Keuthen's opined limitations, for simplicity, the Court refers to the two opinions collectively as "Dr. Keuthen's opinion."

limitations.  *Id.* at 752.  The Appeals Council thus ordered the ALJ to address Dr. Keuthen's "full restrictions" on remand.  *Id.*

Subsequently, in his March 2015 decision, ALJ Fulton again gave "great weight" to Dr. Keuthen's opinion, finding it "consistent with the record as a whole."  Tr. 655.  ALJ Fulton, however, failed to comply with the Appeals Council's remand order and again did not address Dr. Keuthen's specific opined limitations.  *Id.*

On the second appeal, Judge Gorton ordered remand, noting explicitly that the ALJ was required to "re-evaluate the opinions of Drs. Keuthen and Fierman."  Tr. 1228.  In its related October 2016 remand order, the Appeals Council found that ALJ Fulton again failed to address the issues associated with Dr. Keuthen's opinion as required by its prior 2014 order, and ordered remand for re-evaluation of the specific limitations contained in Dr. Keuthen's opinion.  *Id.* at 1231–32.

In the third round of proceedings, ALJ Rodgers gave "partial weight" to Dr. Keuthen's opinion in her August 2017 decision.  Tr. 985.  In particular, ALJ Rodgers found that Dr. Keuthen's limitation to "a setting with low interpersonal demands" translated to work that did not "require[] close coordination or teamwork with coworkers and only occasional interactions with the general public."  *Id.*  ALJ Rodgers additionally found that Dr. Keuthen's limitation to "an unpressured setting" correlated with a "restriction to simple instructions and simple tasks." *Id.*  As for "predictable work routines," ALJ Rodgers limited Plaintiff to "simple changes."  *Id.* However, ALJ Rodgers gave "very little weight to Dr. Keuthen's opinion that [Plaintiff] could work with a supportive, non-critical employer," reasoning that the terms were not "vocationally relevant" because "[w]hat one individual may find supportive and non-critical may not be considered as such by another individual."  *Id.*

Judge Casper's subsequent February 2019 remand order required the ALJ to "further evaluate the opinion evidence from the non-examining state agency psychological consultants." *See* [18-cv-11556-DJC, ECF No. 17].[68]  The Appeals Council's related May 2019 remand order noted that ALJ Rodger's 2017 decision failed to "adequately evaluate [Dr. Keuthen's] opinion that [Plaintiff] could focus for two-hour blocks during an eight[-]hour workday in an unpressured setting."  *Id.* at 1285 (citing Dr. Keuthen's opinion).  The Appeals Council found that ALJ Rodgers' assessed RFC restriction "to simple instructions and simple tasks" did not "necessarily address[]" Dr. Keuthen's "unpressured setting" limitation, noting that Dr. Keuthen's limitation, in fact, "could pertain to [simple] work that demands specific production quotas or time-sensitive tasks."  *Id.*  In support, the Appeals Council cited Plaintiff's 2017 testimony and medical records that "indicate[d] [Plaintiff] has some problems with such tasks."  *Id.* (citing *id.* at 550).  Accordingly, the Appeals Council ordered the ALJ on remand to "adequately explain why a restriction to simple work" accounted for Dr. Keuthen's limitation to work in "an unpressured setting."  *Id.* at 1285.

In the subsequent fourth round of proceedings before ALJ Klibaner, the ALJ afforded Dr. Keuthen's opinion "substantial weight, but not great weight," stating in a conclusory manner that "portions of [Dr. Keuthen's] assessment [were] vague, unclear and not vocationally meaningful (e.g., unpressured setting, supportive and non-critical supervisor)."  Tr. 1306.

Judge Kelley reversed and remanded on appeal in August 2021, and the Appeals Council's related September 2021 remand order instructed the ALJ, among other things, to again reconsider the relevant evidence.  Tr. 1729–30, 1761.

---

[68] As noted previously, the document included in the administrative record at Tr. 1281-82, is not, in fact, Judge Casper's order, as represented by the Court Transcript Index.

In the fifth March 2022 decision, ALJ Klibaner again afforded Dr. Keuthen's opinion "substantial weight, but not great weight," making a nearly identical finding to that in his 2020 decision, again stating that "portions of [Dr. Keuthen's] assessment [were] unclear, lack support, and [were] not vocationally meaningful (e.g., 'unpressured' setting, 'supportive and non-critical' supervisor)." Tr. 1713.

Following Judge Boal's order remanding for further proceedings, in its related February 2023 remand order, the Appeals Council rejected ALJ Klibaner's finding that Dr. Keuthen's opined restrictions were "not vocationally relevant," noting that it had, in fact, previously concluded that Dr. Keuthen's opined limitations "were vocationally relevant." Tr. 1942–43 (asserting that the limitation "could pertain to work that demands specific production quotas or time-sensitive tasks"). The Appeals Council further pointed out that ALJ Klibaner did not, as stated, afford Dr. Keuthen's opinion "substantial weight" because all of his proffered reasons constituted "reasons to discount the opinion." *Id.* at 1942.

The Appeals Council ordered the ALJ to further reconsider the opinion on remand. Tr. 1943.

On remand, ALJ Ross stated that he gave Drs. Keuthen's opinion "partial weight," ruling as follows regarding the two groups of opined limitations. Tr. 1858.

          i.      Opined Limitations to "Predictable Work Routines" in an "Unpressured Setting" with "Low Interpersonal Demands"

Regarding the first group of Dr. Keuthen's opined limitations, ALJ Ross asserted that although "none [of the above limitations were] vocationally relevant," he had nevertheless accounted for Dr. Keuthen's opined limitations to "predictable work routines" in an "unpressured setting" with "low interpersonal demands." Tr. 1858. In support, ALJ Ross noted

that he had assessed RFC restrictions limiting Plaintiff to "simple work-related decisions," "simple routine changes in the work setting," and prohibiting the "perform[ance of] time pressured tasks such that [Plaintiff] was limited to goal-oriented work, not time sensitive, strict production quotas, such as [that] found in assembly line work." *Id.* ALJ Ross contended that these limitations adequately accounted for Dr. Keuthen's above three opined limitations.[69] *Id.*

Plaintiff argues that ALJ Ross erred in evaluating Dr. Keuthen's first group of limitations because they were indeed "vocationally relevant." [ECF No. 12 at 19]. In support, Plaintiff cites to 2014 hearing testimony from VE James Scorzelli, 2022 hearing testimony from VE Stark, and to the August 2023 declaration from vocational rehabilitation counselor, Mr. Meuse. [*Id.* (citing Tr. 707–08, 2110–11)]; Tr. 1858. Plaintiff, however, failed to address on the merits in his opening brief or in reply the sufficiency of ALJ Ross' translation of Dr. Keuthen's first group of opined limitations. [ECF No. 12 at 17–23]; *see also, e.g.*, [ECF No. 22].

The Commissioner counters that ALJ Ross' "exhaust[ive]" decision adequately addressed Dr. Keuthen's opined limitations. [ECF No. 19 at 22]. The Commissioner argues that ALJ Ross "reasonably found" the terms ambiguous and "non-vocationally relevant," noting that even Plaintiff's expert, Mr. Meuse, had to translate Dr. Keuthen's limitations to "real world terms" prior to discussing their impact on Plaintiff's RFC. [*Id.* at 22, 24 (citing Tr. 2111)].

_____

[69] Prior ALJs, including ALJ Rodgers and ALJ Klibaner, had previously assessed RFCs limiting Plaintiff to "simple tasks, "simple instructions," and simple changes." *See* Tr. 975 (ALJ Rodgers' assessed RFC); *see also id.* at 1298, 1706 (ALJ Klibaner limits Plaintiff to "simple, routine, repetitive tasks," and "simple changes"). ALJ Ross, however, was the first ALJ to limit Plaintiff to "goal-oriented work" that was "not time-sensitive," and that did not require "strict production quotas, such as [those] found in assembly-line work." *Id.* at 1841.

Regardless, the Commissioner asserts that ALJ Ross nevertheless gave "some limited weight" to Dr. Keuthen's opined limitations regarding the necessity of "predictable work routines," an "unpressured work setting," and "low interpersonal demands." [ECF No. 19 at 22 (citing Tr. 1858)]. He argues that ALJ Ross' interpretation or translation of the limitations into "less vague" terms was reasonable and supported. [*Id.*].

ALJ Ross erred in finding Dr. Keuthen's group one limitations not "vocationally relevant," but not necessarily for the reasons stated by Plaintiff. Tr. 1858–59. Instead, ALJ Ross erred when he ignored prior Appeals Council findings that Dr. Keuthen's opined limitations were indeed vocationally relevant. *Id.* at 1942–43. Those findings were law of the case, and ALJ Ross was not free to simply readjudicate the vocational relevance of Dr. Keuthen's opined limitations. *See Rivera-Martinez*, 931 F.2d at 151; *Day*, 2012 WL 6913439, at *4–9; *Santiago v. O'Malley*, 2024 WL 1258563, at *7.

As noted, ALJ Ross nevertheless accounted for Dr. Keuthen's first group of limitations, adding, for the first time in this case, an RFC restriction limiting Plaintiff to "goal-oriented work" that was "not time-sensitive," and that did not require "strict production quotas, such as [those] found in assembly-line work." Tr. 1841. Another judge on this court previously found that an ALJ's nearly identical translation of Dr. Keuthen's similar limitations adequately captured the opined limitations in that case. *See Le Thi Bui v. Berryhill*, No. 17-cv-11128-WGY, 2018 WL 4693961, at *9–10 (D. Mass. Sept. 28, 2018) (agreeing that "'an unpressured setting' could 'include work that does not have production quotas, work that allowed for breaks . . . and work with a supportive supervisor'"). In the absence of any substantive argument from Plaintiff on the issue, the Court agrees with the *Bui* court and finds that ALJ Ross' 2023 interpretation of Dr. Keuthen's first group of opined limitations was reasonable.

100

ii.     Limitation to a "Supportive, Non-Critical Employer"

The same is not the case with ALJ Ross' evaluation of Dr. Keuthen's second limitation.

Like Dr. Keuthen's first group of limitations, ALJ Ross similarly found that Dr. Keuthen's limitation to a "supportive, non-critical employer" was not "vocationally relevant." Tr. 1858, 1942–43.  Unlike Dr. Keuthen's other three opined limitations, ALJ Ross made no attempt to incorporate this limitation into his assessed RFC.  Instead, ALJ Ross found that the record evidence was inconsistent with the opined limitation.  *Id.* at 1859.

In support, ALJ Ross cited to Dr. Griffin's 2020 testimony.  Tr. 1856.  He further cited to his own finding that Plaintiff possessed a "documented ability to adapt and manage himself in various environments and situations . . . during the relevant period."  *Id.* at 1859 (citing "Ex. 3F, 5F, 8F").  That finding, in turn, was based in part on ALJ Ross' prior findings that Plaintiff "was consistently observed to be appropriate and cooperative with his treatment providers throughout the relevant period and continued to independently perform all activities of daily living, including self-care, with [Plaintiff] consistently noted to appear well[-]groomed with good hygiene throughout his treatment records, remaining compliant with his prescribed medications through March 2011, and regularly attending AA/12-step program meetings to maintain his abstinence/sobriety from substances;" and that there was "no evidence establishing that [Plaintiff] was unable to adapt or manage himself appropriately" while incarcerated and living in the halfway house.  *See id.* (referring to "Finding 4 of this decision"); *id.* at 1840 ("Finding 4").

ALJ Ross additionally pointed to Plaintiff's mental health at the time he engaged in work activity as an auto mechanic, which he last did in 2005.  Tr. 1859.  ALJ Ross then reasoned that Dr. Keuthen's opined limitation was undermined by Plaintiff's ability to "perform all the duties of [his past] job well" and that he was "liked by his supervisors and fellow employees," even

though he was "ultimately . . . terminated as a result of his attendance issues/reliability related to his then active substance use."[70]  *Id.*; *see also id.* at 42, 951, 185.

Plaintiff argues that ALJ Ross erred because Dr. Keuthen's opined limitation was vocationally relevant, citing to Mr. Meuse's declaration and to 2014 VE testimony.  [ECF No. 12 at 19].  Plaintiff further argues that the ALJs' repeated failure to properly evaluate Dr. Keuthen's opinion on this issue violates the rule of mandate, which itself constitutes error.[71]  [*Id.* at 20].

The Commissioner again counters that ALJ Ross reasonably found the limitation ambiguous and/or not "vocationally relevant."  [ECF No. 19 at 24 (citing Tr. 2111)].  Moreover, the Commissioner argues that the ALJ's rejection of Dr. Keuthen's opined restriction was supported by record evidence, namely, the ALJ's related findings regarding Plaintiff's ability to "manage himself appropriately while incarcerated" and "in post-release treatment" at the halfway house.  [*Id.* at 23–24].

Again, for the reasons above, the Appeals Council's prior finding that Dr. Keuthen's limitation was vocationally relevant was law of the case as to this limitation as well, and ALJ Ross was not permitted to readjudicate that finding.  *See Rivera-Martinez*, 931 F.2d at 151; *Day*, 2012 WL 6913439, at *3–9; *see also Ashley B. v. Comm'r of Soc. Sec.*, No. 2:18-cv-34-RMP, 2019 WL 1768156, at *1–2 (E.D. Wash. Apr. 22, 2019) (holding that ALJ erred when he neglected to incorporate into his assessed RFC the claimant's psychologist's opined limitation that claimant required a "tolerant and supportive supervisor[]"); *Michael D. v. Comm'r of Soc.*

---

[70] ALJ Ross did not mention that Plaintiff admitted to multiple altercations with his coworkers, including at least one serious assault, during his past work.  *See* Tr. 698–700, 1905–09.

[71] The Court has addressed below ALJ Ross' failure to follow the mandate of the Appeals Council's prior orders in the remedy section of this Order.

*Sec.*, No. 22-cv-222-BAT, 2022 WL 3644433, at *1 (W.D. Wash. Aug. 24, 2022) (ALJ erred in failing to incorporate into VE hypothetical and/or RFC assessment claimant's psychologists' opinions that claimant required a "supportive supervisor"). Because Dr. Keuthen's opined limitation regarding Plaintiff's need for a supportive, non-critical employer was vocationally relevant, ALJ Ross was required to account for it in his RFC assessment, unless he was able to provide other valid reason(s) for rejecting the limitation.

None of the additional reasons proffered by ALJ Ross, however, provided substantial evidence in support of his rejection of Dr. Keuthen's opined limitation. First, review of Dr. Griffin's testimony does not demonstrate the degree of conflict with Dr. Keuthen's opinion as described by ALJ Ross. *See* Tr. 1856 (citing to "Hearing Recording," and asserting that Dr. Griffin stated that, "in his opinion, [Plaintiff] did not require special supervision as suggested by Dr. Keuthen, [but rather] that [Plaintiff] required *no more than ordinary supervision in terms of quantity and quality for the performance of simple, routine tasks*" (emphasis added)); *see also* Tr. 1858. Significantly, as ALJ Ross acknowledged, Dr. Griffin testified that his opinion was "essentially consistent" with Dr. Keuthen's overall opinion. *Id.* at 1176, 1856. It is not clear from Dr. Griffin's subsequent testimony that, in contrast to that statement, he thereafter disagreed with Dr. Keuthen's particular opined limitation. Dr. Griffin's answers to the ALJ's questions were somewhat nonresponsive, and the hearing transcripts reflect inaudible questions from the ALJ and inaudible responses from Dr. Griffin on the issue.[72] *Id.* at 1177–78.

---

[72] ALJ Ross asked Dr. Griffin, "[w]hat's your opinion about whether [Plaintiff] needs any particular accommodations in the work environment with regard to special supervision?" Tr. 1177. Dr. Griffin replied, "[n]o, not beyond those I've mentioned. Nobody should have a critical supervisor." *Id.* Dr. Griffin's testimony is subsequently marked as "[inaudible]" in the hearing transcripts. ALJ Ross then adds, "I'm sorry, say that again," to which Dr. Griffin replies

Second, the Court has already found that ALJ Ross erred in rejecting the challenged opinions based on Plaintiff's non-treatment or "conservative" treatment, "his improvement with conservative treatment and/or while residing in a 'highly structured environment,'" his alleged clinical stability and routine MSE findings from the relevant period, and his ADLs and past jobs and schooling. This includes Dr. Keuthen's opinion regarding Plaintiff's need for a supportive, non-critical supervisor.[73]

For these reasons, the ALJ erred in rejecting Dr. Keuthen's and Dr. Fierman's opined restriction limiting Plaintiff to a supportive and non-critical supervisor.

      **b.**    ***Examining Psychologist Dr. Horton's September 2012 Opinion***

Plaintiff also challenges ALJ Ross' evaluation of Dr. Horton's September 2012 opinion. At issue are Dr. Horton's opined limitations regarding Plaintiff's "extremely low range" memory, his ability to learn and recall work procedures, his difficulty with attendance, work rate/persistence, tolerance for change, and his ability to sustain work relationships as a result of anxiety symptom interference. Tr. 953–54.

Plaintiff challenges only ALJ Ross' evaluation of Dr. Horton's September 2012 opinion. The Court nevertheless discusses below ALJ Ross' evaluation of Dr. Power's May 2012 opinion

---

"[t]hat'd be nonspecific in the sense that supervisors should be supportive." *Id.* at 1178. ALJ Ross' follow-up question is also then "[inaudible]." *Id.* ALJ Ross thereafter inquires, "[i]s [Plaintiff] able to deal *with ordinary quality and quantity standards of the — appropriate for simple, routine, repetitive tasks*?" *Id.* (emphasis added). Dr. Griffin responds, "I would say yes." *Id.*

[73] Additionally, the Court notes that it has addressed below — following its discussion of all of the challenged opinions — Plaintiff's argument that the ALJ erred in playing doctor with respect to Dr. Keuthen's opinion. This was a common issue that pertained generally to the ALJ's assessment of Plaintiff's RFC in light of his evaluation of all of the challenged individual medical opinions.

and Dr. Shestopal's October 2012 opinion as well because ALJ Ross' evaluation of Dr. Horton's September opinion is heavily intertwined with the ALJ's evaluation of the other two unchallenged opinions.[74]  *See* Tr. 1859–61, 1862–64.

As noted above in the Relevant Medical Evidence section, both Drs. Power and Horton examined Plaintiff in conjunction with their opinions.  Tr. 949–54, 945–47.  In particular, in 2012, Dr. Powers interviewed Plaintiff and conducted an MSE, and Dr. Horton reviewed records, interviewed Plaintiff, conducted an MSE, and administered additional cognitive and psychological tests, including the Gestalt test, the Trailmaking test, and the Wechsler memory test.  *Id.*  Thereafter, in October 2012, state agency non-examining psychologist, Dr. Shestopal, reviewed Plaintiff's records, including the examination and testing records from Drs. Powers and Horton.  *Id.* at 775–77.  Dr. Shestopal and the DDS, in turn, relied heavily on Drs. Powers' and Horton's opinions in finding Plaintiff disabled on his 2012 claim effective February 6, 2012.  *Id.* at 776–80.

ALJ Ross, by contrast, rejected Drs. Power's and Horton's opinions in evaluating the 2010 claims at issue here, and also gave "no weight" to Dr. Shestopal's opinion, which the DDS itself relied upon to establish disability.  Tr. 1859–60.

---

[74] It is unclear why Plaintiff failed to challenge Dr. Shestopal's and/or Dr. Powers' 2012 opinions.  *See* [ECF No. 12 at 1, 15–17]; [ECF No. 22 at 10].  The Court notes, however, that it has adjudicated only ALJ Ross' evaluation of Dr. Horton's opinion — the sole opinion from 2012 challenged by Plaintiff.

Additionally, unlike Dr. Powers' 2012 opinion, the ALJ's evaluation of Dr. Powers' subsequent, more remote 2017 opinion is *not* intertwined with the ALJ's evaluation of Dr. Horton's opinion.  Accordingly, the Court has not addressed ALJ Ross' evaluation of that unchallenged 2017 opinion.

ALJ Ross first rejected Dr. Shestopal's October 2012 opinion, finding Dr. Shestopal's opined marked limitations inconsistent with the record for all of the reasons the Court has already found to be invalid — e.g., Plaintiff's ADLs, his work history, and the absence of treatment from October 2011 through February 2012.[75]  Tr. 1860–61 (finding the opinion was "not consistent with observations of [Plaintiff] in his treatment records during the relevant period, his reported activities during this period, or even with [Plaintiff's] long documented history of highly technical and skilled work as an auto mechanic and [Plaintiff's] own testimony that there was no problem with the quality of his highly technical and skilled work as an auto mechanic").

ALJ Ross also rejected Dr. Shestopal's opinion based on its October 2012 completion date and the fact that Dr. Shestopal relied in part on Drs. Powers' and Horton's opinions, which also post-dated February 5, 2012.[76]  Tr. 1860.

---

[75] Dr. Shestopal rendered his October 2012 opinion after ALJ Fulton's January 2012 decision in this case, and it was therefore not addressed by ALJ Fulton in that decision.  Tr. 13–30.  ALJ Fulton's subsequent, second March 2015 decision is the only other ALJ decision to address Dr. Shestopal's opinion.  *See id.* at 655–66 (affording "less weight" to opinions from Drs. Shestopal and Horton).  In all four of the other prior ALJ decisions, the respective ALJs mistakenly failed to consider and evaluate Dr. Shestopal's opinion.  *See id.* at 966–88, 1292–1301, 1713–15.  The Appeals Council specifically found this to be error and instructed ALJ Ross to consider the opinion.  *Id.* at 1943.

[76] This was in spite of the fact that Dr. Shestopal himself stated that his opinion dated back to January 2012, a time that was, in fact, prior to the expiration of the relevant period.  *See* Tr. 780. Although ALJ Ross recognized Dr. Shestopal's opined pre-expiration onset date, ALJ Ross summarily dismissed it based on the May 2012 and September 2012 completion dates of Drs. Powers and Horton's opinions, respectively, upon which Dr. Shestopal "heavily" relied.  *See id.* at 1860 (noting that Dr. Shestopal's onset date "is based primarily on . . [Drs. Power's and Horton's] psychological consultative examinations that [Plaintiff] attended in May 2012 and September 2012").

Additionally, ALJ Ross rejected Dr. Shestopal's opinion as inconsistent with Drs. Boxer's and Griffin's opinions regarding Plaintiff's limitations. Tr. 1860. ALJ Ross also suggested that Drs. Boxer's and Griffin's opinions were more supportable because they had "the opportunity to review the entirety of the medical evidence for the period of April 2, 2009, through February 5, 2012, unlike Dr. Shestopal."[77]  *Id.*

Following his evaluation of Dr. Shestopal's 2012 opinion, ALJ Ross subsequently gave Dr. Powers' 2012 opinion "no weight." Tr. 1862. He specifically rejected Dr. Powers' assessed GAF score of 45–50, reasoning that it was "based solely on the one-time examination," which was "conducted three months after the end of the relevant period" and was not consistent with Plaintiff's records from the relevant period. *Id.* Again, in support, ALJ Ross cited to all of the consistency reasons already rejected by the Court, including Plaintiff's absence of treatment at the time Dr. Powers examined him. *Id.* at 1862–63 (finding that Plaintiff's "presentation at [the May 2012] evaluation [was] not consistent with or supported by [his] presentation, mental status examinations, or reported functioning during [Plaintiff's] actual treating records during the period between April 2, 2009, through February 5, 2012, as discussed earlier").

---

[77] This reason makes little sense given that Dr. Shestopal's opinion itself was issued in October 2012, following the expiration of the February 2012 relevant period. The disability determination explanation associated with Dr. Shestopal's opinion includes four pages of "evidence of record" that Dr. Shestopal considered, which was current through Dr. Horton's September 29, 2012 opinion. Tr. 772–75. The only "evidence" missing at the time of Dr. Shestopal's October 2012 opinion were the more remote 2017 and 2019 opinions from examining psychologists, Drs. Powers and Wojcik, respectively, and the 2020, and 2023 opinions from non-testifying MEs, Drs. Griffin and Boxer. All four of the remote opinions, however, purport to be retrospective and are themselves based on evidence from the relevant period — the very same evidence considered by Dr. Shestopal. As noted above, the last treatment record in this Court's longitudinal record was from October 2011 — which itself predated Dr. Shestopal's opinion. *See id.* at 621–26.

Turning then to Dr. Horton's challenged 2012 opinion, ALJ Ross afforded the opinion "little weight," again asserting the same consistency reasons already rejected by the Court above.[78]  *See* Tr. 1863 (noting Plaintiff's high school records, his past work, his ADLs, and MSEs).  As with Drs. Shestopal's and Power's opinions, ALJ Ross also rejected Dr. Horton's opinion based on its September 2012 completion date.  *Id.*  Additionally, like Dr. Shestopal's opinion, ALJ Ross found that Dr. Horton's opinion was inconsistent with non-examining psychologist Dr. Boxer's opinion.  *Id.* at 1864.  Finally, like Dr. Powers' opinion, ALJ Ross discounted Dr. Horton's opinion on supportability grounds, characterizing the opinion as based solely on Dr. Horton's own "one-time" examination and his review of the "single consultative examination" from Dr. Powers.  *Id.* at 1863.

The Court addresses below each of ALJ Ross' reasons for rejecting Dr. Horton's opinion.

*Timing Issue*

Plaintiff argues that the ALJ erred in rejecting Dr. Horton's opinion based on its timing, noting that Dr. Horton's testing and opinion took place only months after the February 2012 expiration of the relevant period, at a time when his chronic mental impairments were the same as they were pre-February 2012.  *See* [ECF No. 12 at 16].

The Commissioner counters that the ALJ afforded Dr. Horton's opinion proper weight, asserting that it "could not possibly speak to Plaintiff's limitations as of February 2012."  [ECF

---

[78] In the two ALJ decisions immediately prior to ALJ Ross' current decision at issue, ALJ Klibaner erroneously overlooked Dr. Horton's opinion, thus failing to consider or evaluate the opinion at all.  *See* Tr. 1292–1310 (2020 decision); *id.* at 1700–17 (2022 decision).  Prior to those decisions, ALJs Fulton and Rodgers afforded Dr. Horton's opinion "less weight" and "little weight," respectively, in the second and third ALJ decisions, concluding that the results of Dr. Horton's memory testing were inconsistent with Plaintiff's past level of functioning and work history.  *Id.* at 655–56, 986.  ALJ Fulton did not evaluate the opinion in connection with the first January 2012 decision because the opinion did not exist at the time.

No. 19 at 17]. The Commissioner characterizes the opinion as "based exclusively on two records" that "post-date the end of the relevant period." [*Id.* (presumably referring to Dr. Horton's own examination findings as one of the two "records," and Dr. Powers' May 2012 opinion)].

The Court concludes that ALJ Ross erred to the extent that he rejected Dr. Horton's opinion simply because his testing and opinion were completed months after the end of the relevant period. *See* Tr. 1862–63. As noted above, ALJ Ross offered the same reasoning in rejecting Dr. Shestopal's October 2012 opinion. In doing so, ALJ Ross ignored the Appeals Council's February 2023 finding that Dr. Shestopal's October 2012 medical opinion — which itself post-dated Dr. Horton's September 2012 opinion — "addressed the relevant period at issue," and thus required consideration on the merits. *See id.* at 1943 (concluding that ALJ Klibaner erred in failing to consider Dr. Shestopal's October 2012 opinion). ALJ Ross' contrary determination regarding the timing and retrospectivity of Dr. Shestopal's opinion thus violated the rule of mandate, and the Appeals Council's finding otherwise was law of the case. *See Rivera-Martinez*, 931 F.2d at 151; *Day*, 2012 WL 6913439, at *4-9; *Santiago v. O'Malley*, 2024 WL 1258563, at *7. However, as noted, Plaintiff has not challenged ALJ Ross' evaluation of Dr. Shestopal's opinion, and the Court, therefore, declines to adjudicate the ALJ's evaluation of that opinion.

The Appeals Council's finding regarding the timing of Dr. Shestopal's opinion is nevertheless persuasive as to Dr. Horton's similarly-timed September 2012 opinion, even though that finding is not technically law of the case as it applies to Dr. Horton's opinion. The First Circuit has explicitly recognized that "[m]edical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question whether

claimant's impairment(s) reached disabling severity before claimant's insured status expired."

*Moret Rivera v. Sec'y of Health & Hum. Servs.*, 19 F.3d 1527, 1994 WL 107870, at *5 (1st Cir.

1994) (unpublished table decision) (citing *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir.

1988)(collecting cases, and holding that "medical evaluations made after the expiration of a

claimant's insured status are relevant to an evaluation of the pre-expiration condition [because]

medical reports are inevitably rendered retrospectively and should not be disregarded solely on

that basis")).

Here, ALJ Ross improperly discounted Drs. Horton's opinion and test results based

solely on their date of completion without adequately considering their retrospective effect.  Tr.

1862–63; [ECF No. 19 at 17]; *see also Lord*, 114 F. Supp. 2d at 15 n.17; *Hayes v. Saul*, No.

4:18-cv-40020-DHH, 2020 WL 13587946, at *2–4 (D. Mass. May 11, 2020) (holding that ALJ

erred in rejecting potentially retrospective opinion based on date only, and noting that ALJ did

not reject other similar source opinions).[79]  Dr. Horton's September 2012 opinion concerned

Plaintiff's chronic mental impairments that existed during the relevant period, and it was also

"corroborated by evidence contemporaneous with the eligible period," such as Plaintiff's

treatment records, medical evidence from Plaintiff's treating nurse practitioners, mental health

counselors, and social workers, and numerous other medical opinions, including the challenged

opinions in this case from Dr. Keuthen, Dr. Boxer, and Dr. Wocjik.  *See Marcotte v. Callahan*,

---

[79] The Commissioner's cited authority does not suggest otherwise.  The instant case is
distinguishable from the undersigned judge's prior decision in *Dias v. Colvin*, given that the
challenged opinion in that case was completed six years — not six months — following the end
of the relevant period.  *See* No. 15-cv-13003-ADB, 2018 WL 988053, at *4–5, 11 (D. Mass. Feb.
20, 2018) (relevant period ended with claimant's 2007 DLI, but psychologist's opinion was
completed in 2013).

992 F. Supp. 485, 491 (D.N.H. 1997) (citing *Evangelista v. Sec'y of Health & Hum. Servs.*, 826 F.2d 136, 140 (1st Cir. 1987)); *accord Lord*, 114 F. Supp. 2d at 15 n.17.  Accordingly, ALJ Ross erred in rejecting Dr. Horton's opinion on this basis.

*Alleged Inconsistency with Dr. Boxer's Opinion*

Like Dr. Shestopal's opinion, in finding Dr. Horton's opinion inconsistent with other record evidence, ALJ Ross cited to non-examining ME Dr. Boxer's 2023 opinion.[80]  Tr. 1864–65 (no specific citation provided); *see also id.* at 1912–21.  In finding Dr. Horton's opinion inconsistent with Dr. Boxer's opinion, however, ALJ Ross misconstrued Dr. Boxer's testimony. *See id.* at 1855.  Similar to Dr. Horton's opinion regarding the negative impact of Plaintiff's memory skills and anxiety symptoms on his work rate and persistence, Dr. Boxer testified that during the relevant period, Plaintiff would likely have experienced limitations in "concentration, persistence and pace," noting the "very poor results" on Dr. Horton's September 2012 tests, and Plaintiff's possible "learning issues."  *Id.* at 1916–17.

Accordingly, this was not a valid reason to support ALJ Ross' rejection of Dr. Horton's opinion.

*Supportability of Opinion*

Plaintiff also argues that the ALJ erred in rejecting Dr. Horton's opinion based on Dr. Horton's failure to review records given that the "purpose of [Dr. Horton's] exam" was, in fact,

---

[80] As noted, ALJ Ross rejected multiple opined limitations from Dr. Boxer, adopting and affording weight solely to Dr. Boxer's opinion that Plaintiff "was able to understand, remember, and carry out simple tasks" — an opinion that Dr. Boxer, in fact, shared with Dr. Griffin.  *See* Tr. 1854, 1841.  In relying on Dr. Boxer's testimony to discount Dr. Horton's opinion, ALJ Ross ignored the fact that he simultaneously gave no weight to Dr. Boxer's similarly opined limitation.  *See id.* at 1855 (rejecting Dr. Boxer's opinion to the extent that Dr. Boxer opined that Plaintiff was unable to "sustain concentration and persistence to carry out simple tasks"); *cf. id.* at 1864–65, 1854, 1841.

to conduct "specific, objective" testing, which Plaintiff asserts Dr. Horton completed. [ECF No. 12 at 16]. According to Plaintiff, Dr. Horton then "translated those objective [test] results into functional workplace limitations," which formed the bases for his opinion. [*Id.*]. Plaintiff further contends that ALJ Ross, as a layperson, was not permitted to reinterpret Dr. Horton's raw medical data as he did. [*Id.* at 16–17].

In opposition, the Commissioner acknowledges that Dr. Horton's tests indeed "served as the basis for some of his conclusions," noting the multiple tests administered by Dr. Horton, including the memory test, "a psychodiagnostic interview, a Bender Gestalt [t]est that measured Plaintiff's visual-motor functioning, and a Trail Making [t]est that measured Plaintiff's cognitive functioning, attention, sequencing, visual search, mental flexibility, and motor function." [ECF No. 19 at 19]. The Commissioner, however, characterizes the ALJ's rejection of Dr. Horton's test results as a "resolution of conflicts in objective medical evidence," as opposed to the interpretation of raw medical data. [*Id.* at 18–19]. The Commissioner also suggests that it was proper for the ALJ to rely on Plaintiff's ADLs as undercutting Dr. Horton's test findings, and, therefore, in giving the opinion little weight. [*Id.* at 19].

Plaintiff, in reply, argues that Dr. Horton's test findings were from "uncontroverted, objective testing that[,] by its nature, did not require reliance on review of other medical records." [ECF No. 22 at 10]. He contends that Dr. Horton produced valid testing and that the ALJ was either required to accept the test results as valid "or [alternatively, to] explain what objective evidence controverted these test results." [*Id.*]. Plaintiff asserts that the ALJ did neither, claiming that both the Commissioner and ALJ failed to identify any "conflicts in objective medical evidence." [*Id.*].

A close review of Dr. Horton's opinion confirms that it is indeed based primarily on Dr. Horton's own test results and raw data — a fact acknowledged by the Commissioner. *See* Tr. 949–54; [ECF No. 19 at 19]. The ALJ erred to the extent he found otherwise. *See* Tr. 1863. Additionally, the ALJ erred in discounting Dr. Horton's opinion as based on a "one-time" examination given that the other opinions to which the ALJ compared Dr. Horton's opinion were from non-examining psychologists — not *treating* opinions.[81] *Id.*; *see also Alberts*, 2013 WL 1331110, at *10 (citing 20 C.F.R. § 404.1527(c)(1))); *Arroyo*, 2016 WL 632232, at *5 (quoting *Lester*, 81 F.3d at 831) ("[t]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician"). In doing so, the ALJ, without adequate support, essentially favored non-examining source opinions over examining source opinions only because the non-examining psychologists did not examine Plaintiff at all — a result that is contrary to the applicable legal standards governing the evaluation of medical opinions in effect at the time. *See* 20 C.F.R. § 404.1527(c)(1).

In discounting Dr. Horton's opinion, ALJ Ross also reinterpreted Dr. Horton's test findings and observations that constituted raw medical data. *See Staples v. Maine*, No. 09-cv-440-P-S, 2010 WL 2680527, at *4 (D. Me. June 29, 2010) (holding that ALJ erred in "translating nuanced raw medical evidence into a functional capacity assessment"); *Westhaver v. Astrue*, No. 09-cv-12032-DPW, 2011 WL 3813249, at *12 (D. Mass. Aug. 26, 2011) (holding that ALJ erred "[t]o the extent that the ALJ relied on physicians' observations regarding [the claimant's] range

---

[81] With the exception of the opinions from LMHC Berrios and NP Kassirer — clinicians who were not "acceptable medical sources" under the controlling regulations — there were no treating opinions in this case. *See* Tr. 1831, 1861–62. The remaining opinions were all from one-time examining medical sources or non-examining medical sources.

of motion, strength, and lack of suitability for surgical intervention[] [because] those observations were raw medical data and not functional assessments").  In doing so, ALJ Ross erred.  *See Gordils v. Sec'y of Health & Hum. Servs*., 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record."); *Spaulding v. Saul*, No. 4:18-cv-10477-TSH, 2020 WL 1931636, at *9 (D. Mass. Jan. 21, 2020) , *report and recommendation adopted sub nom Spaulding v. Soc. Sec. Admin.*, No. 4:18-cv-10477-TSH, 2020 WL 1932196 (D. Mass. Apr. 3, 2020) (ALJ erred in "craft[ing] her finding of the plaintiff's. . . RFC from the raw treatment and assessment evidence of record" because she "was not qualified, as a layperson, to make that assessment, which should have been entrusted to an expert or experts").

For these reasons, the ALJ erred in evaluating Dr. Horton's opinion.

### c.    Examining Psychologist, Dr. Wojcik's April 2019 Opinion

Plaintiff additionally challenges ALJ Ross' evaluation of Dr. Wojcik's 2019 opinion.

At issue are multiple opined limitations from Dr. Wojcik, including his opinions that: (1) Plaintiff has suffered from chronic mental impairments since high school, and that his "depression, anxiety, and . . . panic disorder" symptoms have been "continuous" since 2005,  Tr. 1625–26; (2) Plaintiff suffered from marked limitations in his abilities to handle conflicts with others, to sustain an ordinary routine and regular attendance at work, to work a full day without more than the allotted number or length of breaks, to distinguish between acceptable and unacceptable work performance, to set realistic goals, to make plans for himself independently of others, and to be aware of normal hazards and to take appropriate precautions, *id.* at 1627–28; and (3) that due to his symptoms, Plaintiff would be off-task fifteen to twenty percent of the time

114

every eight-hour work day, and he would be absent approximately four days per month, *id.* at 1628.

ALJ Ross afforded Dr. Wojcik's 2019 opinion "no weight," finding that the opinion was inconsistent with Plaintiff's "longitudinal treatment records [from] the relevant period," which the ALJ stated revealed "largely normal [MSEs], [Plaintiff's] own report[sic] regarding his reduced symptomology with treatment, and his reported activities during this period."  Tr. 1864–65.  ALJ Ross additionally rejected the opinion because it was based on an examination seven years after the relevant period, and "provide[d] no insight into [Plaintiff's] functioning during the relevant period."[82]  *Id.* at 1864.  Finally, he questioned the supportability of Dr. Wojcik's opinion, discounting it because it was arranged by Plaintiff's "representative" who, in turn, provided the records reviewed by Dr. Wojcik.  *Id.*

Again, the Court finds ALJ Ross erred regarding his consistency findings for the reasons already stated above.  Nor do the ALJ's additional two reasons provide substantial support for the ALJ's rejection of Dr. Wojcik's opinion.

Plaintiff argues that ALJ Ross' rejection of Dr. Wojcik's opinion based on its retrospective nature was in error and contrary to his treatment of similar retrospective medical opinions — including, for example, Drs. Griffin's and Boxer's 2020 and 2023 opinions, to which the ALJ gave "partial weight."  [ECF No. 12 at 14 (citing Tr. 1916–17)].  Plaintiff notes that Dr. Wojcik's opinion expressly states that Plaintiff's mental impairments have been chronic since high school, thus demonstrating that the opinion was applicable to the relevant period.  [*Id.*].

---

[82] Prior to ALJ Ross, ALJ Klibaner also found in his 2020 and 2022 decisions that the "purportedly" retrospective opinions from Dr. Wojcik were "of no probative value for the period at issue on remand."  Tr. 1307, 1714–15.

Plaintiff additionally highlights that throughout the fifteen-year history of this case, this Court and the Appeals Council have found that retrospective medical opinions from consultants and MEs, like Dr. Wojcik and Dr. Boxer, were warranted. [ECF No. 12 at 11–12]. He further argues that to find otherwise, as the ALJ did, in essence, "make[s] [irrelevant] any additional testimony or evidence submitted after February 5, 2012 (including the entirety of Drs. Boxer's and Griffin's testimony)." [*Id.* at 11].

The Commissioner offers somewhat conflicting arguments regarding the timing of Dr. Wojcik's opinion. [ECF No. 19 at 15–17]. On the one hand, the Commissioner mistakenly asserts that ALJ Ross did *not* discount Dr. Wojcik's opinion based on timing or "retroactiv[ity]," contrary to the clear language from ALJ Ross. [*Id.* at 16]; *see* Tr. 1864 (ALJ Ross' finding that "Dr. Wojcik's report and associated functional questionnaire [were] based on an examination conducted in March 2019, . . . more than seven years after the end of the relevant period" and, as such, "provide no insight into [Plaintiff's] functioning during the relevant period for purposes of this decision"). Alternatively, the Commissioner argues that Dr. Wojcik's opinion was based on "personal observations" pertaining solely to the time it was completed in March 2019, when Dr. Wojcik examined Plaintiff, noting that ALJ Ross properly discounted it on this basis. [ECF No. 19 at 15].

ALJ Ross erred in discounting Dr. Wojcik's opinion based on the fact that Dr. Wojcik examined Plaintiff in March 2019. In his opinion, Dr. Wojcik discussed in detail the chronic nature of Plaintiff's mental impairments and their symptoms, and expressly opined that while Plaintiff was experiencing the symptoms at "the current time," his impairments and their symptoms dated back as far as high school. Like the 2020 and 2023 opinions from Drs. Boxer and Griffin, respectively, whose retrospective opinions ALJ Ross afforded partial weight, Dr.

Wojcik's opinion was based on his review of Plaintiff's longitudinal medical record — not simply his March 2019 observations. *See Weeks v. Berryhill*, No. 18-cv-11553-JGD, 2019 WL 2441848, at *7 (D. Mass. June 11, 2019) (quoting *Marcotte*, 992 F. Supp. at 491) ("An ALJ may consider retrospective diagnoses 'to the extent that such opinions both substantiate a disability that existed during the eligible period and are corroborated by evidence contemporaneous with the eligible period.'"); *see also Moret Rivera*, 1994 WL 107870, at *5.

Moreover, as Plaintiff notes, ALJ Ross erred to the extent he suggested that Dr. Wojcik failed to review a full record. [ECF No. 12 at 14 & n.8]. A review of Dr. Wojcik's opinion confirms Plaintiff's assertion that Dr. Wojcik was "provided with the entire SSA e-file, as it existed in April 2019." [*Id.* (citing Tr. 1621–22) (listing numerous medical and incarceration records reviewed by Dr. Wojcik)]. Furthermore, ALJ Ross was not permitted to discount Dr. Wojcik's opinion "simply because it was solicited" by Plaintiff's representative or attorney.[83] *Gonzalez v. Astrue*, No. 11-cv-30201-KPN, 2012 WL 2914453, at *3 (D. Mass. July 5, 2012) (discussing *Gonzalez Perez v. Sec'y of Health & Hum. Servs.*, 812 F.2d 747, 749 (1st Cir. 1987) (holding that "[s]omething more substantive than just the timing and impetus of medical reports obtained after a claim is filed must support an ALJ's decision to discredit them.")).

For these reasons, ALJ Ross erred in evaluating Dr. Wojcik's opinion, and his rejection of the opinion was not supported by substantial evidence.

─────────────────────

[83] The Commissioner misstates the ALJ's findings, asserting that "ALJ Ross did not discount Dr. Wojcik's opinion because it was requested by Plaintiff's attorney." [ECF No. 19 at 16]. That was, in fact, one of the reasons offered by ALJ Ross in discounting the opinion. *See* Tr. 1864 (noting that Dr. Wojcik's report was "based on an examination . . . to which [Plaintiff] *was referred by his representative*" and "a review of treatment records and consultative examination reports that were *provided to Dr. Wojcik by [Plaintiff's] representative*," and further suggesting that "what records were provided to [Dr. Wojcik] *by [Plaintiff's] representative*" were not "consistent with" Plaintiff's "*actual*, longitudinal treatment records" (emphases added)).

**d.**    ***2023 Opinion From Non-Examining, Testifying ME, Dr. Boxer***

Finally, Plaintiff challenges ALJ Ross' evaluation of Dr. Boxer's 2023 opinion.

At issue are Dr. Boxer's opinions that: (1) Plaintiff was unable to "be around large groups of people" due to his anxiety, such that he was "limited to work" involving only "smaller groups of people with whom he [was] familiar;" (2) Plaintiff would need to "excuse himself" for "anywhere . . . [from] five minutes to . . . [twenty to thirty] minutes . . . if he were to have a panic attack," the frequency of which Dr. Boxer stated was "hard to tell" given the limited documentation, but that he estimated, based on the available records, would be once every two weeks; (3) Plaintiff was unable to adapt to changes related to "coworkers or . . . supervisors he [was] unfamiliar with, [or] not comfortable with;" and, (4) Plaintiff was significantly limited in "remembering complex instructions" and "carrying them out." *See* Tr. 1915-17.

As noted, in his December 2023 decision, although ALJ Ross gave Dr. Boxer's opinion "partial weight," he accepted only one of Dr. Boxer's opined limitations and rejected all of the four above opined limitations.[84]  Tr. 1854–55.

Plaintiff contests ALJ Ross' rejection of the four opined limitations listed above, each of which the Court addresses in turn.

i.    Memory/Cognitive Limitations

The ALJ rejected Dr. Boxer's opinions regarding Plaintiff's memory limitations and learning issues as inconsistent with and unsupported by the record for reasons identical to those the ALJ provided in rejecting Dr. Horton's opinion.  Tr. 1854–55.  Specifically, ALJ Ross

---

[84] Plaintiff does not contest the ALJ's adoption of Dr. Boxer's simple work limitation, but he argues that, to do this sort of work, he would require additional opined RFC limitations that ALJ Ross rejected.  *See* [ECF No. 22].

suggested that Dr. Horton's memory test findings were inconsistent with Plaintiff's ADLs, his past work as an auto mechanic, and select MSEs. *Id.* at 1855. He also suggested that, to the extent that Dr. Boxer relied on Dr. Horton's opinion, Dr. Horton's test results and the "degree of limitation in memory" opined to by Dr. Horton were untimely and did not pertain to the relevant period. *Id.* at 1855–56. The Court's analysis of these reasons with respect to Dr. Horton's opinion applies with equal force to the ALJ's evaluation of Dr. Boxer's opinion. For the same reasons, ALJ Ross' findings did not support his rejection of Dr. Boxer's opined memory and cognitive limitations.[85]

ii.    Social and Adaptation Limitations

The ALJ also rejected Dr. Boxer's opined limitation that Plaintiff should be limited to working around smaller groups of people with whom he was familiar, and subject to limited changes in co-workers and supervisors. Tr. 1854 (no record citations). In support, the ALJ found this limitation was not supported by the relevant record evidence, citing to Plaintiff's 2008–2010 incarceration records, and to his participation in daily treatment groups at the halfway house and AA. *Id.*

Again, for the reasons discussed above, the Court finds that these consistency reasons were not supported by substantial evidence, and that the ALJ erred in relying on the evidence from Plaintiff's incarceration and stay at the halfway house given that he failed to consider the role played by the "highly structured environment" in Plaintiff's alleged stability and/or improvement during those times.

---

[85] The Court further notes that Dr. Boxer, like Dr. Wojcik, expressly testified that Plaintiff's mental and cognitive issues were "chronic," as demonstrated by Plaintiff's treatment records. *See* Tr. 1917.

iii.    Plaintiff's Need for Breaks Based on His Panic Attacks

Finally, the ALJ rejected Dr. Boxer's opinion that Plaintiff required additional breaks and would have been off-task for up to thirty minutes every two weeks as a result of his panic attacks.  Tr. 1855.

*Background*

In support of this opined limitation, Dr. Boxer reviewed Plaintiff's entire medical record, and concluded, based on that review, that Plaintiff's panic disorder constituted an MDI.  Tr. 1913.  In response to the ALJ's questioning, Dr. Boxer testified that the "most detailed record" he had regarding Plaintiff's panic attacks showed that in September 2010, Plaintiff "was having panic attacks every couple of weeks."  *Id.* at 1914-16 (citing Exhibit "8F").  He further noted that Plaintiff continued to have panic attacks in November 2010.  *Id.* at 1914.  He also acknowledged that Plaintiff's panic attacks were "less severe" when he was on medication.  *Id.*

Based on the records he reviewed, Dr. Boxer estimated that Plaintiff's panic attacks "lasted about five minutes[,] and as long as he was able to get out of a situation and take his mind off it, he would be . . . fully better within an hour."  Tr. 1914-16.  In response to the ALJ's follow-up questioning, Dr. Boxer offered his opinion regarding Plaintiff's need for breaks as stated above.  *Id.* at 1915–16.

In his 2023 decision, ALJ Ross found that Dr. Boxer's opined limitation was "unsupported by and inconsistent with [Plaintiff's] longitudinal treatment records for the relevant period."  Tr. 1855.

*Supportability of Dr. Boxer's Opined Limitation re Need for Breaks*

ALJ Ross suggested that Dr. Boxer's opinion was unsupported because Dr. Boxer had relied on only one treatment record in describing the frequency of Plaintiff's panic attacks.  Tr.

1855 (citing generally to Dr. Boxer's testimony). This, however, misstated Dr. Boxer's

testimony. Although Dr. Boxer specifically mentioned one exhibit — 8F — at one point in his

testimony regarding Plaintiff's panic disorder, Dr. Boxer nevertheless repeatedly affirmed that

his opinion was based on his review of the entire medical record. *See, e.g.*, Tr. 1913, 1915

(testifying regarding Plaintiff's limitations "[b]ased on [his] review of the record"). In fact,

during follow-up questions regarding the frequency of Plaintiff's panic attacks, Dr. Boxer

explicitly referred to additional exhibits in the record. *See id.* at 1915. Moreover, Dr. Boxer

admitted there was not a lot of "detail" in the record regarding the frequency of Plaintiff's panic

attacks in response to repeated questioning from the ALJ. *Id.* at 1916.

       Accordingly, ALJ Ross' above finding characterizing the support for Dr. Boxer's opinion

was not supported by substantial evidence.

       *Consistency of Dr. Boxer's Opined Limitation re Need for Breaks*

       Turning to consistency, ALJ Ross found that for "the almost three-year period between

April 2, 2009, through February 5, 2012 [sic],"

> aside [from] . . . *one reference in the entirety of [Plaintiff's]
> treatment records*, the record evidence fails to objectively or
> clinically document a regular pattern of even biweekly panic attacks
> during the relevant period as a whole, or for any period of twelve
> consecutive months within the relevant period, with most [of] the
> record either containing only intermittent assertions of panic attacks
> with no reports of frequency or severity, and by late-2010, [Plaintiff]
> [was] either not reporting or denying that he continued to have some
> panic attacks with his prescribed medication regimen.

Tr. 1855 (emphasis added) (citing to "Ex. 8F," Plaintiff's July through December 2010 treatment

records with Norton Family Practice); *see also* Tr. 1853 (characterizing Plaintiff as "clinically

stable throughout the relevant period"). ALJ Ross further stated that Dr. Boxer's testimony

corroborated the ALJ's above finding that additional record evidence regarding the panic attacks did not exist. *Id.* at 1855.

As noted above, ALJ Ross mischaracterized Dr. Boxer's testimony regarding the record support for Plaintiff's panic disorder. Contrary to the ALJ's suggestion, Dr. Boxer did not testify that there was only one reference to Plaintiff's panic attacks in his treatment record. *See* Tr. 1914–17. Moreover, that was not the case. Instead, as noted by Plaintiff, the longitudinal record contains additional evidence documenting Plaintiff's panic attacks, including but not limited to records from a 2009 emergency room visit for a panic attack, 2009–2010 social worker and NP records, notes from Plaintiff's psychopharmocologist, Dr. Nardolillo, and notes from examining psychologist, Dr. Hennessey, stating that Plaintiff was suffering from "multiple panic attacks per day" in October 2010. [ECF No. 12 at 12–13 (citing Tr. 280, 332, 406–09, 460–61, 451, 51–52, 57)]. In addition to these records, the materials that Dr. Boxer reviewed included additional evidence and opinions stating that Plaintiff's mental impairments were "chronic" and "continuous." *See, e.g.*, Tr. 1625–26.

ALJ Ross' findings regarding Dr. Boxer's opinion further ignore, as set forth above, that Plaintiff received treatment for his mental impairments — including the panic attacks — for only a portion of the relevant period and that, when he was not receiving treatment, his mental impairment symptoms — including his panic attacks — worsened.[86] Moreover, for the reasons above, the Court has already found error in ALJ Ross' consistency findings regarding Plaintiff's non-treatment or "conservative" treatment, his improvement with conservative treatment and/or

---

[86] As discussed, the record suggests that Plaintiff's lack of compliance was caused at least in part by financial issues, a lack of health insurance, and/or his mental impairments themselves.

while residing in a "highly structured environment," his alleged clinical stability and routine MSE findings from the relevant period, and his ADLs and past jobs and schooling.

Accordingly, ALJ Ross failed to provide a valid reason supported by substantial evidence for rejecting Dr. Boxer's opined limitation regarding Plaintiff's need for breaks.

In conclusion, ALJ Ross erred in rejecting all four of Dr. Boxer's above opined limitations.

### 5.    Additional Issue Regarding Challenged Medical Opinions

In challenging the ALJ's evaluation of the above five medical opinions, Plaintiff also repeatedly argues that ALJ Ross improperly "play[ed] doctor" in assessing his RFC.[87]  *See* [ECF No. 12 at 10, 19–20].  Because the issue is more appropriately considered as a challenge to ALJ Ross' assessed RFC, the Court addresses it below in conjunction with its discussion of the RFC.

In conclusion, for the reasons above, the Court finds that the ALJ erred in his evaluation of the challenged opinions from Drs. Keuthen and Fierman, Dr. Horton, Dr. Wojcik, and Dr. Boxer, and that the ALJ's findings regarding his evaluation of those opinions were not supported by substantial evidence.  ALJ Ross' rejection of the opinions constituted harmful error because those errors also impacted his formulation of Plaintiff's RFC, his VE hypothetical, and his resulting step five findings.

---

[87] The Court notes that this argument is in addition to Plaintiff's similar argument that ALJ Ross erred in interpreting "raw data" from Dr. Horton's test findings, which the Court has already addressed above.  This second similar challenge asks whether ALJ Ross' RFC included the requisite opined limitations, and whether the ALJ erred to the extent that his assessed RFC included limitations that were not derived from medical opinion evidence.

**D.    The ALJ Erred in Assessing Plaintiff's RFC at Step Four.**

The Court has already concluded that the ALJ erred in evaluating Drs. Keuthen's, Fierman's, Boxer's, Horton's, and Wojcik's opinions.  As noted, those errors were harmful in part because they undermined ALJ Ross' assessment of Plaintiff's RFC.

Plaintiff additionally argues that ALJ Ross improperly "play[ed] doctor" in assessing his RFC.  *See* [ECF No. 12 at 10, 19–20].  The Commissioner counters that the ALJ did not "play doctor" but instead weighed the opinions according to his prerogative.  [ECF No. 19 at 25].

Here, as noted, ALJ Ross assessed Plaintiff's RFC after discounting in part *all* of the medical opinions.  ALJ Ross then crafted Plaintiff's RFC based on his selection of a hodge podge of opined limitations from the medical opinions — mostly Dr. Griffin's — while simultaneously refusing numerous opined limitations from the medical opinions that the ALJ erroneously evaluated.  *See* Tr. 1841.  Significantly, after rejecting medical opinions and/or portions of the medical opinions, ALJ Ross did not fill all of the remaining voids in Plaintiff's assessed RFC with limitations from other medical opinions.[88]  Rather, in several instances, he simply created additional RFC limitations based on his lay opinion regarding Plaintiff's functional limitations (e.g., ALJ Ross' assessment that Plaintiff had no need for special supervision, that Plaintiff "could not work in the context of a work team" with "constant"

---

[88] The ALJ afforded Dr. Hennessey's GAF report "some weight;" however, it is undisputed that Dr. Hennessey did not opine regarding any functional limitations.  Tr. 1865.  Additionally, non-examining state agency psychologist, Dr. Kiley's May 2012 opinion contained opined functional limitations that contradicted those in the erroneously-rejected medical opinions.  *See id.* at 764–67.  ALJ Ross, however, gave Dr. Kiley's opinion "no weight," and, as such, did not rely on that opinion in formulating Plaintiff's RFC.  *Id.* at 1859.

interactions or "constant" physical proximity, and that Plaintiff was "limited to working with things and objects rather than people").[89]  *See id.*  This was error.

Numerous courts have recognized that an ALJ must "clarif[y] how []he derived the specific components of his RFC from record sources."  *Staples*, 2010 WL 2680527, at *3-4 ("The [ALJ] essentially rejected all of the[] expert reports. . . . Thus, in essence, she crafted the finding of the plaintiff's mental RFC from the raw treatment and assessment evidence of record. . . . Her mental RFC finding accordingly was unsupported by substantial evidence."); *see also Joyner v. Colvin*, No. 13-cv-12265-MBB, 2014 WL 12769266, at *15 (D. Mass. Dec. 12, 2014) (finding that "the ALJ's RFC used at step four and step five lacked substantial evidence because the ALJ discounted the only mental RFC in the record as well as the other functional assessments of plaintiff's mental impairments."); *White v. Colvin*, No. 12-cv-419-SM, 2014 WL 768860, at *4 (D.N.H. Feb. 26, 2014) (finding error where, by giving only "little weight" and "some weight" to expert opinions, the ALJ "was thereby left with no expert opinion to support the functional limitations contained in her RFC"); *accord Westhaver*, 2011 WL 3813249, at *12 (same).

Here, in assessing Plaintiff's RFC, ALJ Ross "overstep[ped] the bounds of" his expertise as "a lay person," and devised several RFC limitations that were based *not* on medical opinion evidence but "solely on [his] own interpretation of the medical evidence."  *Westhaver*, 2011 WL 3813249, at *11–12; *see also Giandomenico v. U.S. Soc. Sec. Admin., Acting Comm'r*, No. 16-cv-506-PB, 2017 WL 5484657, at *4–5 (D.N.H. Nov. 15, 2017) (quoting *Manso–Pizarro*, 76

---

[89] As discussed above, to the extent that ALJ Ross stated that these RFC limitations were derived from Drs. Boxer's and Griffin's testimony, the Court has already found that Dr. Griffin's testimony was not as clear as suggested by the ALJ and that the ALJ misstated Dr. Boxer's testimony.

F.3d at 17, and *Roberts v. Barnhart*, 67 Fed. Appx. 621, 622–23 (1st Cir. 2003)) (holding that "unless the extent of [Plaintiff's] functional loss, and its effect on job performance, would be apparent even to a lay person, an expert is needed to assess the extent of functional loss").

The Court notes that the determination regarding the appropriate functional limitations associated with Plaintiff's mental impairments has been bogged down by proceedings in this case for fifteen years. During that time, more than a dozen experts have opined on Plaintiff's functional limitations. As such, Plaintiff's mental impairment symptoms may not be considered so "mild," nor their functional limitations so "apparent," that ALJ Ross was permitted to assess the requisite limitations using "'commonsense judgments' . . . within 'the bounds of a lay person's'" eye. *Giandomenico*, 2017 WL 5484657, at *4 (citing numerous cases, and quoting *Gordils*, 921 F.2d at 329, and *Manso–Pizarro*, 76 F.3d at 17); *see also Roberts*, 67 F. Appx. at 623 (citations omitted) (holding that "an ALJ can only make the required RFC assessment without supportive expert opinion where the evidence shows a 'relatively mild physical impairment posing, to the layperson's eye, no significant restrictions'").

For these reasons, ALJ Ross erred in assessing Plaintiff's RFC.[90]

_____

[90] The Court notes that Plaintiff raises an additional challenge to ALJ Ross' assessment of his RFC that Plaintiff has not raised previously in any of his prior appeals before this Court. Plaintiff now argues that ALJ Ross erred in his RFC assessment because he failed to adequately consider "how stress impacted" Plaintiff's functional limitations, including his ability to interact with others and his memory, concentration, and pace-related limitations. [ECF No. 12 at 23]. It is unclear to the Court why Plaintiff failed to raise the issue previously on appeal. Nevertheless, the Court declines to find waiver of the issue as a whole. That said, the Court agrees with the Commissioner that Plaintiff appears to have waived at least one sub-issue (the ALJ's failure to find that his amnestic disorder was a severe impairment at step two), and possibly more sub-issues, because Plaintiff's single sentence mention of the sub-issue fails to adequately develop an argument. *See* [ECF No. 19 at 29 n.20]. *See Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 36-37 (1st Cir. 2007) (citations omitted) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

**E.    The ALJ Erred in His Step Five Findings, Including in His Evaluation of the Meuse Declaration.**

As noted above, ALJ Ross' errors in evaluating the challenged medical opinions and in assessing Plaintiff's RFC also necessarily undermined the ALJ's corresponding VE hypotheticals and his ultimate step five findings.[91]

Plaintiff, however, raises an additional related issue regarding ALJ Ross' step five findings.  Plaintiff argues ALJ Ross erred as a matter of law when he refused to accept and consider on the merits the Meuse declaration.  [ECF No. 12 at 21–23].  For the reasons below, the Court agrees.

In his December 2023 decision, ALJ Ross ruled that, "Mr. Meuse's opinion is not accepted and [has] been given no weight." Tr. 1869.  ALJ Ross acknowledged the existence of the post-hearing declaration, cutting and pasting verbatim the contents of the declaration into the decision.  *See id.* at 1868–69 (stating that he had "considered [the] opinion in accordance with 20 C.F.R. § 404.1527(f)").  Contrary to this statement, however, ALJ Ross, in fact, failed to address Mr. Meuse's declaration on the merits, instead rejecting it based on: (1) a lack of foundation or supportability; (2) its improper "interpretation of medical evidence," and (3) its lack of

---

Moreover, given the Court's other RFC-related findings of error, along with its conclusion that the ALJ's already-established errors in evaluating the medical opinion evidence warrant remand for an award of benefits, the Court finds it unnecessary to adjudicate the additional challenge to the ALJ's assessed RFC.  In so finding, the Court further notes that, unlike other repeating errors, any error associated with this particular issue would not warrant the extraordinary remedy of an award of benefits.  That is because this is the first time that Plaintiff has raised the issue and, thus, it is not an error that an ALJ has been afforded an opportunity to correct on remand.

[91] These constituted errors at step five regardless of the outcome of Plaintiff's below challenge to ALJ Ross' evaluation of the Meuse declaration.

relevance.  *Id.* at 1869.  In rejecting Mr. Meuse's declaration, ALJ Ross additionally found that

Mr. Meuse's opinions were contradicted by testifying VE, Dr. Vercillo, "a well-qualified [VE]."

*Id.* (finding that Mr. Meuse's affidavit did not provide any "rationale or explanation" as to why

VE Vercillo's testimony should be disregarded).

In particular, ALJ Ross failed to consider on the merits Mr. Meuse's opinions regarding

the vocational impact of Dr. Horton's opined memory limitations — opined limitations that this

Court has already held were erroneously rejected by ALJ Ross.[92]  In support of his opinions, Mr.

Meuse first acknowledged Dr. Horton's own findings, that:

> [Plaintiff's] auditory memory, immediate memory, and delayed memory were all
> below the first percentile while visual memory was in the first percentile.  In other
> words, more than [ninety-nine] percent of the entire population would be able to
> remember instructions, demonstrations, and directions better than [Plaintiff].

---

[92] The Court has limited its consideration of the ALJ's evaluation of Mr. Meuse's declaration to
Mr. Meuse's statements and opinions solely as they pertained to Dr. Horton's opined limitations.

As discussed above in the background section regarding Vocational Expert Testimony, Mr.
Meuse additionally set forth in his declaration his opinions regarding the impact of Dr.
Keuthen's opined limitations on Plaintiff's ability to sustain competitive employment.  *See* Tr.
2111.  In doing so, Mr. Meuse considered all of Dr. Keuthen's opined limitations in combination,
referring to them as "the impact of [Plaintiff's] need to work in an unpressured setting with lower
interpersonal demand *and* a supportive, non-critical supervisor."  *Id.* (emphasis added).  Mr.
Meuse then concluded that Dr. Keuthen's limitation*s* "would preclude the performance of any of
the three jobs [testified to by VE Vercillo]."  *Id.*

However, for the reasons set forth above, the Court has already concluded that ALJ Ross did *not*
err in his evaluation of Dr. Keuthen's opined limitations restricting Plaintiff to "an unpressured
setting with low interpersonal demand" (contrary to the Court's finding of error with ALJ Ross'
evaluation of Dr. Horton's opinion and Dr. Keuthen's opinion regarding Plaintiff's need for a
supportive non-critical supervisor).  *See* Tr. 2111.  Accordingly, the Court finds that any error by
ALJ Ross in failing to adequately consider Mr. Meuse's declaration regarding Dr. Keuthen's
opined limitations was harmless.  The Court notes that, in so finding, it was unable to separate
out Mr. Meuse's opinion regarding Dr. Keuthen's limitation to a supportive, non-critical
supervisor — the limitation upon which the Court found ALJ Ross erred — from Mr. Meuse's
opinion on Dr. Keuthen's other opined limitations because Mr. Meuse evaluated the impact of
Dr. Keuthen's multiple opined limitations in combination, but not separately.  *See id.*

Tr. 2110; *see also id.* at 952 (Dr. Horton notes in his September 2012 opinion that Plaintiff "earn[ed] an Auditory Memory Index (AMI) of 55 (below the [first] percentile, with a 95% confidence interval of 51 to 63), [and] a Visual Memory Index (VMI) of 63 ([first] percentile, with a 95% confidence interval of 59 to 70)").

Mr. Meuse then opined:

> Those memory difficulties [opined to by Dr. Horton] would, in my vocational opinion, preclude the three jobs cited [by VE Vercillo] in any full-time competitive employment. At a minimum, these memory limitations would require a special accommodation such as learning the job in a sheltered workshop or with the support of a job coach.
>
> In my professional opinion, based upon my education, experience and training, a person with such a poor memory, at or below the [first] percentile, would typically have a very difficult time remembering what steps and in what sequence to take on a job and would require frequent supervision, reminders and redirection at a level that would not be tolerated in competitive full-time employment, especially in the first phases of learning a new job.

Tr. 2110–11.

Plaintiff argues that the ALJ erred in rejecting Mr. Meuse's affidavit, which Plaintiff contends "rebutt[ed] the [VE] testimony that there were jobs existing in significant numbers that he could still perform." [ECF No. 12 at 21]. In opposition, the Commissioner simply restates the ALJ's reasons for rejecting Mr. Meuse's affidavit.[93] [ECF No. 19 at 27–28].

---

[93] The cases cited in support by the Commissioner are distinguishable from the case at hand because, in those cases, the courts did not find that the ALJ erred in evaluating the medical opinion evidence or in assessing the RFC. *See Prescott v. Colvin*, No. 15-cv-13433-LTS, 2017 WL 388802, at *12 (D. Mass. Jan. 27, 2017) (upholding ALJ's implicit rejection of Mr. Meuse's affidavit where "[t]he ALJ's hypothetical mirrored the RFC and his RFC finding was supported by substantial evidence"); *accord Hoag v. Saul*, 531 F. Supp. 3d 462, 467 (D. Mass. 2021); *Zaragoza v. Saul*, 474 F. Supp. 3d 378, 384 (D. Mass. 2020) (same).

At the outset, the Court notes that Mr. Meuse's declaration did not, in fact, "rebut" VE Vercillo's testimony regarding the vocational impact of Dr. Horton's opined memory limitations. Rather, Mr. Meuse more accurately "supplemented" VE Vercillo's testimony on that issue. *See* Tr. 1922–35.

Neither ALJ Ross nor Plaintiff's counsel posed a hypothetical to VE Vercillo that contained memory limitations identical to those considered by Mr. Meuse. *See* Tr. 1922–35; *see also id.* at 954 (Dr. Horton's opinion that Plaintiff's "[s]evere deficits in memory function (for both newly learned and historical information)[] suggests [Plaintiff] will find it difficult to learn and recall work procedures"). Plaintiff's counsel, however, posed a *similar* hypothetical to VE Vercillo incorporating in part Dr. Horton's opined memory limitations. *Id.* at 1933 (asking whether there would be competitive jobs for a claimant who "was hired to work a [new] job and . . . was trying to learn a new job" but "had . . . difficulty with learning and just constantly require[d] reminders and retraining and redirection"). Much like Mr. Meuse, VE Vercillo, opined that such limitations would undermine Plaintiff's ability to work, noting that claimants typically have only "up to [thirty] days to learn a task," and that if reminders and retraining were necessary after those thirty days, that would constitute "special supervision," which was not consistent with "competitive employment and not likely to be tolerated." *Id.* at 1934.

Even though Mr. Meuse's declaration did not directly contradict VE Vercillo's testimony regarding the impact of Dr. Horton's memory limitations, it did raise a serious challenge to VE Vercillo's ultimate opinion regarding the jobs available to Plaintiff at step five (and to ALJ Ross'

corresponding step five findings).[94]  Accordingly, absent other valid reasons, ALJ Ross erred

when he failed to consider on the merits Mr. Meuse's opinion regarding the vocational impact of

Dr. Horton's memory limitations.  *See* SSR 96-9p, 1996 WL 374185, at *9 n.8 (July 2, 1996)

("Whenever a [vocational expert] is used, the individual has the right to review and respond to

the VE evidence prior to the issuance of a decision."); *see also Pate v. Saul*, No. 19-cv-11594-

PBS, 2020 WL 3105075, at *10 (D. Mass. June 11, 2020) (alteration in original) (ALJ erred in

rejecting Mr. Meuse's declaration for invalid reasons where the affidavit "raised legitimate

challenges to the VE's job estimates"); *Santiago v. Saul*, No. 20-cv-10266-LTS, 2021 WL

11704593, at *6 (quoting *Pate*, 2020 WL 3105075, at *8) (holding that ALJ erred when he

"failed to consider evidence that the VE testimony was either flawed or incomplete for the

reasons set forth in the Meuse affidavit"); *Williams v. Saul*, No. 18-cv-10547-MGM, 2019 WL

9244979, at *3–4 (D. Mass. Dec. 31, 2019) (ALJ erred in failing to consider Mr. Meuse's post-

hearing affidavit that contained "glaring differences" in job number data than that provided by

the testifying VE).

The Court thus turns to the specific reasons offered by ALJ Ross for rejecting Mr.

Meuse's declaration as they pertained to his opinions regarding the vocational impact of Dr.

Horton's opined limitations.

---

[94] ALJ Ross' step five finding was itself based on VE Vercillo's testimony that Plaintiff was able to perform the jobs of janitor/cleaner, night cleaner/office cleaner, and laundry laborer and folder — testimony that was inaccurate given that ALJ Ross' preceding hypothetical to VE Vercillo was incomplete and/or inaccurate.  *See Arocho v. Sec'y of Health & Hum. Servs.*, 670 F.2d 374, 375 (1st Cir. 1982) (holding that VE's response to ALJ's hypothetical constitutes substantial evidence only if hypothetical corresponds to claimant's RFC); Tr. 1867–68.

*Lack of Foundation/Supportability*

ALJ Ross questioned the foundation or supportability for Mr. Meuse's opinions, noting that it appeared Mr. Meuse was only "'informed' of testimony [from] the hearing," and, that in formulating his opinion, Mr. Meuse was "only provided with [Dr. Horton's] assessment." Tr. 1869. ALJ Ross found that there was no "indication[] in [Mr. Meuse's] affidavit that he was provided with the entirety of the record to provide an opinion." *Id.*

As Plaintiff accurately notes, however, this reason ignores the purpose of Mr. Meuse's declaration and treats the declaration as if Mr. Meuse was a medical source rather than a vocational expert. *See* [ECF No. 12 at 21]; *see also Gurney v. Soc. Sec. Admin. Comm'r*, 880 F. Supp. 2d 174, 178 (D. Me. 2012) (rejecting the Commissioner's argument that VE "exceeded the bounds of his expertise" or that he "translate[d] . . . raw evidence into functional capacity" where the VE resolved a discrepancy in evidence at the hearing, "testif[ying], in effect, that in his experience, people with aptitude/IQ scores such as those of the plaintiff had difficulty performing the jobs at issue").

Just like VE Vercillo, Mr. Meuse responded in declaration form to the hypotheticals propounded to him, which, in his case, concerned Dr. Horton's opined memory limitations.

Accordingly, this reason fails.

*Improper Interpretation of Medical Evidence*

Regarding Dr. Horton's memory limitations, ALJ Ross additionally found that Mr. Meuse improperly "interpret[ed] medical evidence" and offered interpretations that he was "not medically qualified to provide." Tr. 1869.

Plaintiff asserts that Mr. Meuse was not reinterpreting Dr. Horton's medical data or test findings, but that he was simply responding to limitations proffered by counsel — just like VE

Vercillo.  [ECF No. 12 at 22].  Plaintiff thus argues that Mr. Meuse's testimony was "clearly within the scope of a [VE's] expertise."  [*Id.*].

The Commissioner counters that Mr. Meuse interpreted Dr. Horton's "raw medical data" — exactly what the Commissioner asserts Plaintiff has faulted ALJ Ross for doing.  [ECF No. 19 at 28].

As detailed above, Mr. Meuse merely reiterated verbatim Dr. Horton's own findings regarding Plaintiff's auditory memory, immediate memory, and delayed memory.  Tr. 2110–11.  Mr. Meuse did not reinterpret any raw data, but instead offered his vocational opinion based on Dr. Horton's findings as they existed — which he was permitted to do.  *Id.*; *see also Jenkins v. Colvin*, No. 1:14-cv-285-DBH, 2015 WL 5093290, at *2 (D. Me. Aug. 28, 2015) (finding that VE simply "gave an opinion about whether there were available jobs in the national economy for a person with specified characteristics," and that such "testimony was clearly within the scope of a vocational expert's expertise," and "was not psychiatric testimony").

Accordingly, this reason also fails.

*Relevance*

Finally, ALJ Ross refused to consider Mr. Meuse's declaration because Mr. Meuse "fail[ed] to provide an opinion as to [Plaintiff's] ability to perform work with[in] the specific limitations [that ALJ Ross] identified in [his RFC] finding."  Tr. 1869.  The Court has already found that the ALJ erred in assessing Plaintiff's RFC.  Accordingly, ALJ Ross' reliance on the erroneous RFC to support his refusal to consider other relevant evidence — including Mr. Meuse's declaration — likewise fails.

In sum, ALJ Ross erred when he failed to provide a reason that "a reasonable mind might accept as adequate to support" his rejection of the Meuse affidavit.  *Pate*, 2020 WL 3105075, at

*10 (quoting *Biestek*, 587 U.S. at 105). The Court nevertheless notes that the ALJ's error in evaluating the Meuse declaration is largely intertwined with the ALJ's related errors in rejecting multiple opined limitations from the challenged medical opinions, with his errors in assessing Plaintiff's RFC, and with his error in propounding hypotheticals to VE Vercillo based on an inaccurate or incomplete RFC. For the reasons already discussed, those errors were harmful.

Regarding the Meuse declaration, the Court notes that existing law is unclear as to whether it is permitted in assessing the appropriate remedy on appeal to give effect to the supplemental vocational declaration, which it has found the ALJ erroneously rejected. Given this lack of clarity regarding the Court's ability to consider the Meuse declaration on appeal — along with the parties' failure to address the issue — the Court declines to consider and has not considered the Meuse declaration in determining that remand for an award of benefits is appropriate. The Court instead has rested its determination that an award of benefits is warranted in part on its consideration of VE testimony from VEs whom the ALJs themselves, including ALJ Ross, accepted as "well-qualified" experts. *See* Tr. 1869 (ALJ Ross' findings regarding VE Vercillo); *see also id.* at 657–58 (ALJ Fulton's March 2015 decision relying on testimony of VE Scorzelli); *id.* at 988 (ALJ Rodgers' August 2017 decision relying on testimony of VE Stark).

**F.    Plaintiff is Entitled to Remand for An Award of Benefits.**

Plaintiff requests remand solely for an award of benefits. [ECF No. 12 at 1, 25]. The Commissioner counters that to the extent the Court finds harmful error, Plaintiff fails to demonstrate his entitlement to benefits. [ECF No. 19 at 31 n.21 (citing *Seavey*, 276 F.3d at 11)]. For the reasons below, the Court finds that an award of benefits is warranted.

"Under the Social Security Act, courts are empowered 'to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing.'"
*Sacilowski*, 959 F.3d at 437 (quoting 42 U.S.C. § 405(g); *Garrison*, 759 F.3d at 1019; and
*Seavey*, 276 F.3d at 8–9); *see also Garrison*, 759 F.3d at 1019 (citing *Seavey* and awarding
benefits). "[E]very Court of Appeals," including the First Circuit, "has recognized that in
appropriate circumstances courts are free to reverse and remand a determination by the
Commissioner with instructions to calculate and award benefits." *Sacilowski*, 959 F.3d at 437
(quoting *Garrison*, 759 F.3d at 1019). "Courts have generally exercised this power when it is
clear from the record that a claimant is entitled to benefits." *Id.*; *see also Seavey*, 276 F.3d at 11–
12. In other words, "if the evidence and law compel[] one conclusion or the other, then the court
[may] order an award of benefits or affirm a denial of benefits." *Seavey*, 276 F.3d at 11 (citing
*Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)) ("For example, a judicial award of
benefits would be proper where the proof of disability is overwhelming or where the proof is
very strong and there is no contrary evidence.").

Here, "the underlying facts and law are such that [the SSA] has no discretion to act in any
manner other than to award . . . benefits." *Seavey*, 276 F.3d at 11. First, if the opined limitations
from the challenged medical opinions erroneously rejected by ALJ Ross were treated as true,
Plaintiff would be unable to sustain full-time competitive employment. These include the
multiple opined limitations from Drs. Keuthen, Fierman, Boxer, Horton, and Wojcik, as set forth
in the Relevant Medical Evidence section above, as follows:

(1) Plaintiff's need for a supportive, non-critical supervisor;

(2) Plaintiff's inability to "be around large groups of people" due to his anxiety, such that
he was "limited to work" involving only "smaller groups of people with whom he [was]
familiar;"

135

(3) Plaintiff's need to "excuse himself" for "anywhere . . . [from] five minutes to . . . [twenty to thirty] minutes if he did have a panic attack," approximately once every two weeks;

(4) Plaintiff's "significant" limitation in "remembering complex instructions" and "carrying them out" based potentially on "some learning issues" in addition to Plaintiff's anxiety;

(5) Plaintiff's inability to adapt to changes related to "coworkers or . . . supervisors he is unfamiliar with, not comfortable with;"

(6) Plaintiff's "extremely low range" memory skills, which severely impact his ability to learn and recall work procedures;

(7) Plaintiff's difficulty with attendance, work rate/persistence, tolerance for change, and ability to sustain work relationships as a result of anxiety symptom interference;

(8) Plaintiff's marked limitations in his abilities to handle conflicts with others;

(9) Plaintiff's marked limitation in his ability to sustain ordinary routine and regular attendance at work, and to work a full day without more than the allotted number or length of breaks;

(10) Plaintiff's inability to distinguish between acceptable and unacceptable work performance, to set realistic goals, to make plans for himself independently of others, and to be aware of normal hazards and to take appropriate precautions; and

(11) Plaintiff's need to be off-task fifteen to twenty percent of every eight-hour work day, and his need to be absent approximately four days per month.

As provided by VEs Vercillo, Stark, and Scorzelli, whose testimony the respective ALJs accepted, the incorporation of the above limitations into Plaintiff's RFC, either individually

and/or in combination, would have rendered Plaintiff disabled.  *See, e.g.*, Tr. 708 (VE Scorzelli testifies in December 2014 that it would take "a very special place" to accommodate Dr. Keuthen's restriction limiting Plaintiff to a supportive, non-critical supervisor, and that a marked limitation in Plaintiff's ability to handle conflict and/or interactions with other colleagues or supervisors would preclude competitive employment because "[an employee]'s blowing off on the job . . . [or] any kind of act of aggression whatsoever . . . would cause that person to be terminated immediately"); *id.* at 1032 (VE Stark's testimony in July 2017 that "[i]n a normal situation, employers don't provide a lot of support in the work," such that Plaintiff would find a supportive and non-critical supervisor only in "special circumstances" because "[g]enerally, [supervisors] are not real supportive"); *id.* at 1926-29 (VE Vercillo's testimony that Plaintiff would not be permitted to be more than fifteen percent off-task or non-productive, that he would not be able sustain competitive work if he was absent more than one and one-half days per month, and that he would not be employable if his mental impairment symptoms rendered him off-task for thirty minutes once every two weeks); *id.* at 1932–34 (VE Vercillo's testimony that competitive work would be unavailable for a person:  (1) who was unable to maintain focus on simple tasks for two hour blocks; or (2) who required less than occasional interaction with coworkers and/or supervisors; or (3) who was unable to learn the tasks required for simple work following a thirty-day learning period absent additional special supervision and/or reminders or retraining).

　　　　Second, given the repeating nature of the same errors over the fifteen years that this case has been pending, the Court finds that there are no outstanding factual and/or legal issues that

must be resolved before a determination of disability can be made.[95]  *See Seavey*, 276 F.3d at 11

(noting that if an essential factual issue has not been resolved, there is no clear entitlement to

benefits, and the court must remand for further proceedings).  Here, as discussed throughout this

Order, many of ALJ Ross' errors in evaluating the medical opinion evidence and in assessing

Plaintiff's RFC were not isolated errors — including the ALJ's evaluation of Drs. Keuthen's,

Fierman's, Horton's, and Wojcik's opinions.[96]  Rather, ALJ Ross made the same errors made by

prior ALJs, especially as concerned Dr. Keuthen's 2010 opined limitation regarding Plaintiff's

need for a supportive and non-critical supervisor.  Additionally, several of these errors also

involved violations of the rule of mandate.[97]

Given the "'overwhelming' evidence in the record to support a finding of disability and

an award of benefits," the Court sees no purpose in remanding for a seventh ALJ decision.[98]

*Sacilowski*, 959 F.3d at 441 (citing *Seavey*, 276 F.3d at 11–12).  The Court thus remands the case

for an award of benefits in accordance with the instructions below.

---

[95] The Court finds that further proceedings would be fruitless because its review of what amounts to the sixth ALJ decision in this case suggests that, in fact, adequate support for the rejection of the challenged medical opinions cannot be found within this record.

[96] As noted, Dr. Boxer did not testify until 2023.  Thus, ALJ Ross' decision was the first time that Dr. Boxer's opinion was evaluated.  Nevertheless, the Court notes that in rejecting portions of Dr. Boxer's opinion, ALJ Ross repeated erroneous consistency reasons identical to those he provided in rejecting the opinions from Drs. Keuthen, Fierman, Horton, and Wojcik.

[97] The Court has concluded that ALJ Ross erred in evaluating all of the challenged medical opinions for reasons independent of — and in addition to — any violation of the rule of mandate.  Thus, the Court has not relied solely on ALJ Ross' or past ALJs' violations of the rule of mandate in finding error regarding ALJ Ross' evaluation of the medical opinions.

[98] Although the Court has not relied on equitable concerns like excessive delay in awarding benefits here, it notes that those concerns also clearly exist in this case.

*Instructions re Award of Benefits*

The Court has determined that remand for an award of benefits is warranted in this case. As discussed above, in calculating the amount of benefits to which Plaintiff is entitled, the SSA will need to determine the appropriate SSI and DIB relevant periods, and, in doing so, account for Plaintiff's incarceration.  *See* 20 C.F.R. § 404.468(a) ("No monthly benefits will be paid to any individual for any month any part of which the individual is confined in a jail, prison, or other penal institution or correctional facility for conviction of a felony."); *see also D'Amato v. Comm'r of Soc. Sec.*, No. 18-cv-6998, 2020 WL 759957, at *23 (S.D.N.Y. Jan. 30, 2020), *report and recommendation adopted*, No. 18-cv-6998-VEC, 2020 WL 757841 (S.D.N.Y. Feb. 14, 2020) ("If the ALJ determines that plaintiff was disabled under the Act for some or all of the alleged disability period, the ALJ should consider whether plaintiff's incarceration during a portion of that period prohibits an award of disability benefits as to that period.").  Assuming that the SSA agrees regarding the existence of a March 2010-August 2010 gap in the DIB and SSI relevant periods, the SSA will need to account for that "gap period" as well.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiff's motion to reverse the decision of the Commissioner, [ECF No. 12], is **<u>GRANTED</u>**.  The Commissioner's motion to affirm, [ECF No. 18], is **<u>DENIED</u>**.  Pursuant to sentence four of § 405(g), the case is remanded to the Commissioner for calculation and an award of benefits consistent with this Order.

SO ORDERED.

March 24, 2025                                             */s/ Allison D. Burroughs*
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE